**ASSET PURCHASE AGREEMENT**

**by and among**

**EVEROST, INC.,**

**HAROLD WOTTON, DARROLL WOTTON**

**AND**

**STERIS INSTRUMENT MANAGEMENT SERVICES, INC.**

**December 29, 2017**

EXHIBIT A

## TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................................................................... 1

**ARTICLE II PURCHASE AND SALE** ............................................................................................. 12

    2.01        Purchase and Sale of the Purchased Assets ...................................... 12

    2.02        Excluded Assets ................................................................................. 13

    2.03        Assumption of Liabilities.................................................................. 14

    2.04        Purchase Price ................................................................................... 15

    2.05        Purchase Price Adjustment ............................................................... 16

    2.06        Earn-Out. ........................................................................................... 17

    2.07        Withholding Tax ............................................................................... 18

    2.08        Allocation of Purchase Price............................................................. 18

**ARTICLE III CLOSING** ................................................................................................................ 18

    3.01        Closing .............................................................................................. 18

    3.02        Closing Deliverables......................................................................... 18

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLING SHAREHOLDERS** ........................................................................................................................ 20

    4.01        Authority........................................................................................... 20

    4.02        No Conflicts; Consents ..................................................................... 20

    4.03        Legal Proceedings ............................................................................. 21

**ARTICLE V REPRESENTATIONS AND WARRANTIES RELATING TO THE SELLER** ......... 21

    5.01        Existence and Good Standing ............................................................ 21

    5.02        Indebtedness and Selling Expenses; Subsidiaries............................. 21

    5.03        Power; Validity and Enforceability .................................................. 21

    5.04        No Conflicts; Consents ..................................................................... 21

    5.05        Financial Statements; Undisclosed Liabilities ................................. 22

    5.06        Absence of Certain Changes, Events and Conditions........................ 23

    5.07        Material Contracts............................................................................. 24

    5.08        Title................................................................................................... 26

    5.09        Condition and Sufficiency of Assets................................................. 26

    5.10        Real Property .................................................................................... 26

| 5.11 | Intellectual Property | 27 |
| 5.12 | Accounts Receivable | 28 |
| 5.13 | Customers and Suppliers | 29 |
| 5.14 | Insurance | 29 |
| 5.15 | Legal Proceedings; Orders | 29 |
| 5.16 | Compliance with Laws; Permits | 30 |
| 5.17 | Environmental Matters | 30 |
| 5.18 | Employee Benefit Plans | 31 |
| 5.19 | Employment Matters | 33 |
| 5.20 | Related Party Transactions | 34 |
| 5.21 | Taxes | 34 |
| 5.22 | Brokers | 36 |
| 5.23 | Data Security and Privacy | 36 |
| 5.24 | Full Disclosure | 37 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE BUYER ............... 37**

| 6.01 | Organization | 37 |
| 6.02 | Authority | 38 |
| 6.03 | No Conflicts; Consents | 38 |
| 6.04 | Brokers | 38 |
| 6.05 | Legal Proceedings | 38 |

**ARTICLE VII COVENANTS ............... 38**

| 7.01 | Employees | 38 |
| 7.02 | Non-competition; Non-solicitation | 39 |
| 7.03 | Bulk Sales Laws | 40 |
| 7.04 | Use of Business Name | 40 |
| 7.05 | Public Announcements | 40 |
| 7.06 | Tax Matters | 40 |
| 7.07 | Accounts Receivable | 42 |
| 7.08 | Further Assurances | 42 |
| 7.09 | [Reserved] | 42 |
| 7.12 | UK Assets | 42 |

**ARTICLE VIII INDEMNIFICATION ............... 43**

| 8.01 | Survival | 43 |

|        |                                                            |    |
|--------|------------------------------------------------------------|----|
| 8.02   | Indemnification by the Seller and the Selling Shareholders | 43 |
| 8.03   | Indemnification by the Buyer                               | 44 |
| 8.04   | Certain Limitations                                        | 44 |
| 8.05   | Indemnification Procedures                                 | 45 |
| 8.06   | Payments                                                   | 46 |
| 8.07   | Tax Treatment of Indemnification Payments                  | 47 |

**ARTICLE IX MISCELLANEOUS** ....................................................................................... **47**

|        |                                                            |    |
|--------|------------------------------------------------------------|----|
| 9.01   | Expenses                                                   | 47 |
| 9.02   | Notices                                                    | 47 |
| 9.03   | Interpretation                                             | 48 |
| 9.04   | Headings                                                   | 48 |
| 9.05   | Severability                                               | 48 |
| 9.06   | Entire Agreement                                           | 49 |
| 9.07   | Successors and Assigns                                     | 49 |
| 9.08   | No Third Party Beneficiaries                               | 49 |
| 9.09   | Amendment and Modification; Waiver                         | 49 |
| 9.10   | Governing Law; Submission to Jurisdiction                  | 49 |
| 9.11   | Specific Performance                                       | 49 |
| 9.12   | Counterparts                                               | 50 |

**LIST OF EXHIBITS**

| Exhibit A | Form of Escrow Agreement                   |
|-----------|--------------------------------------------|
| Exhibit B | Form of Employment Agreements              |
| Exhibit C | Form of Restricted Stock Grant Agreement   |
| Exhibit D | Form of Royalty Agreement                  |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of December 29, 2017 (the "***Closing Date***"), is entered into by and among (i) Everost, Inc., a Massachusetts corporation (the "***Seller***"), (ii) Harold Wotton ("***Harold***") and Darroll Wotton ("***Darroll***"; each of Harold and Darroll is, individually, a "***Selling Shareholder***" and are, collectively, the "***Selling Shareholders***") and (iii) STERIS Instrument Management Services, Inc., a Delaware corporation (the "***Buyer***").

## RECITALS

A.     The Seller is engaged in the business of designing, manufacturing, marketing and selling products relating to veterinary surgeries, including, without limitation, orthopedic trauma products, internal fixation products, bone anchors, specialty plates and advanced bio absorbable implants (collectively, the "***Business***").

B.     The Seller desires to sell, transfer and assign to the Buyer, and the Buyer desires to acquire and assume from the Seller, all of the Purchased Assets and all of the Assumed Liabilities, in each case, subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

"***Accounts Receivable***" means, with respect to any Person, all accounts or notes receivable that are held by such Person, including any security, claim, remedy or other right related to any of the foregoing.

"***Action***" means any claim, action, complaint, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, inquiry, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"***Affiliate***" means, with respect to any Person, any other person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Assumed Contracts***" has the meaning set forth in **Section 2.01(e)**.

"***Assumed Liabilities***" has the meaning set forth in **Section 2.03(a)**.

"***Assumption Agreement***" means that certain assignment and assumption agreement, dated as of the Closing Date, by and among the Buyer and the Seller.

"***Balance Sheet Date***" has the meaning set forth in **Section 5.05(a)**.

"***Basket***" has the meaning set forth in **Section 8.04(a)**.

"***Bill of Sale***" means that certain bill of sale, dated as of the Closing Date, executed and delivered by the Seller and delivered to the Buyer.

"***Business***" has the meaning set forth in the recitals.

"***Business Day***" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"***Buyer***" has the meaning set forth in the preamble.

"***Buyer Indemnitees***" has the meaning set forth in **Section 8.02(a)**.

"***Cash***" means the Seller's cash and cash equivalents, calculated in accordance with GAAP and the Specified Accounting Principles.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"***Claims Notice***" has the meaning set forth in **Section 8.06(b)**.

"***Closing***" has the meaning set forth in **Section 3.01**.

"***Closing Date***" has the meaning set forth in the preamble.

"***Closing Date Purchase Price***" has the meaning set forth in **Section 2.04(a)**.

"***COBRA***" means Part 6 of Subtitle B of Title I of ERISA or Section 4980B(f) of the Code or any similar provisions of state Law to the extent applicable.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Confidential Information***" means, with respect to any Person, all information, whatever its nature and form and whether obtained orally, by observation, from written materials or otherwise, that relates to any research, technical, manufacturing, business or commercial activities or plans of such Person with respect to the Business, including, without limitation, all systems, servicing methods and business techniques, programs, formulas, processes, compilations of technical and non-technical information, inventions, discoveries and improvements, designs, drawings, blueprints, software, software code, databases, product ideas, concepts, prototypes, features, procedures, training, promotional materials, training courses and other training and instructional materials, vendor and product information, sales intermediary lists and other sales intermediary information, and customer lists and other customer information, whether or not patented or patentable, and all other information that is not otherwise generally available to the public (including, without limitation, any terms or provisions of this Agreement) and could constitute a trade secret of such Person with respect to the Business under the Uniform Trade Secrets Act.  The term "***Confidential Information***" will exclude any information that is (or that becomes) generally available to the public through no action of the Person (including its Representatives) required to maintain the confidentiality of such information.

"***Consent***" has the meaning set forth in **Section 5.04**.

"***Contaminants***" has the meaning in **Section 5.23(e)**.

"**_Contracts_**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and joint ventures, all purchase orders, task orders, change orders or other ancillary document in which the terms of any other Contract are supplemented or in any way modified and all other agreements, commitments and legally binding arrangements, and all oral understandings.

"**_Copyrights_**" means all copyrights, whether in published or unpublished works, Documents, databases, data collections and rights therein, software, web site content; rights to compilations, collective works and derivative works of any of the foregoing and moral rights in any of the foregoing; registrations and applications for registration for any of the foregoing and any renewals or extensions thereof; and moral rights and economic rights of others in any of the foregoing.

"**_Cumulative Revenues_**" means the actual cumulative gross revenues with respect to the sale of Eligible Products during the Earn-Out Period, net of discounts, returns and bad debts, calculated in accordance with GAAP as applied by the Buyer.

"**_Cumulative Gross Margins_**" means the actual cumulative gross margins with respect to the sale of Eligible Products during the Earn-Out Period, calculated as gross revenues with respect to the sale of Eligible Products during the Earn-Out Period <u>less</u> cost of goods sold ("**_COGS_**"), in each case, as calculated in accordance with GAAP as applied by Buyer; <u>provided</u>, <u>however</u>, that Cumulative Gross Margins will exclude commissions and any selling expense accruals or income, charges or benefits resulting from the transactions contemplated by this Agreement.  For purposes of this definition, COGS (i) is comprised of all direct manufacturing and products costs, including material costs, product acquisition costs, direct labor and production related depreciation, and (ii) does not include any allocation of overheads.

"**_Direct Claim_**" has the meaning set forth in **<u>Section 8.05(c)</u>**.

"**_Disputed Amounts_**" has the meaning set forth in **<u>Section 8.06(c)(i)</u>**.

"**_Documents_**" means all files, documents, instruments, papers, books, reports, business and employment records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, operating data and plans, drawings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets, in each case whether or not in electronic form.

"**_Domain Names_**" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet, all applications for any of the foregoing and the goodwill of the Business associated with each of the foregoing.

"**_Earn-Out Dispute Notice_**" has the meaning set forth in **<u>Section 2.06(a)</u>**.

"**_Earn-Out Payment_**" has the meaning set forth in **<u>Section 2.06(a)</u>**.

"**_Earn-Out Period_**" means the period beginning on April 1, 2018 and ending on March 31, 2021.

"**_Earn-Out Statement_**" has the meaning set forth in **<u>Section 2.06(b)</u>**.

"***Eligible Products***" means, collectively, the product lines of STERIS Animal Health.

"***Employee Benefit Plan***" means, with respect to any Person, each "employee benefit plan" (as defined in Section 3(3) of ERISA) and each other material benefit plan, program, or arrangement maintained, sponsored, contributed to (or required to be contributed to) by such Person or any Subsidiary or any ERISA Affiliate of such Person, or with respect to which such Person or any Subsidiary or any ERISA Affiliate of such Person has any Liability.

"***Employee Pension Benefit Plan***" has the meaning set forth in Section 3(2) of ERISA.

"***Employee Welfare Benefit Plan***" has the meaning set forth in Section 3(1) of ERISA.

"***Employees***" means those Persons employed by the Seller in connection with the Business immediately prior to the Closing.

"***Employment Agreements***" has the meaning set forth in **Section 3.02(a)(iv)**.

"***Encumbrance***" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership or similar restrictions or limitations.

"***Environmental Claim***" means any Action, Order, Encumbrance, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from (a) the presence, Release of, or exposure to, any Hazardous Materials or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"***Environmental Law***" means any applicable Law, and any Order or binding agreement with any Governmental Authority (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, safety of employees or the public or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata) or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials, including the following (including their implementing regulations and any state analogs):  CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§7401 et seq. and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§651 et seq.

"***Environmental Notice***" means any written directive, request for information, demand letter, notice of violation or infraction or notice respecting any Environmental Claim.

"***Environmental Permit***" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"***ERISA Affiliate***" means any organization that is a member of the controlled group of organizations of the Seller and any Subsidiaries (within the meaning of Sections 414(b) or (c) of the Code) or that is a member of an affiliated service group with the Seller or any Subsidiaries (within the meaning of Section 414(m) of the Code).

"***Escrow Agent***" means U.S. Bank, National Association.

"***Escrow Agreement***" means that certain escrow agreement, dated as of the Closing Date, by and among the Seller, the Escrow Agent, and the Buyer, in substantially the form attached hereto as **Exhibit A**.

"***Escrow Amount***" means $450,000.

"***Excluded Assets***" has the meaning set forth in **Section 2.02**.

"***Excluded Liabilities***" has the meaning set forth in **Section 2.03(b)**.

"***Excluded Representations*** has the meaning set forth in **Section 8.01**.

"***Final Working Capital***" has the meaning set forth in **Section 2.05(b)**.

"***Final Working Capital Statement***" has the meaning set forth in **Section 2.05(b)**.

"***Financial Statements***" has the meaning set forth in **Section 5.05(a)**.

"***GAAP***" means United States generally accepted accounting principles.

"***Governmental Authority***" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"***Guarantee***" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing or otherwise supporting in whole or in part the payment of any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligations of the payment of such Indebtedness or to protect such obligee against loss in respect of such Indebtedness (in whole or in part).  The term "***Guarantee***" used as a verb has a correlative meaning.

"*Hazardous Materials*" means any (a) toxic, hazardous, extremely hazardous, infectious, explosive, corrosive, flammable, carcinogenic, mutagenic, sanitary, solid or radioactive waste, or otherwise hazardous substance, waste or material,  (b) petroleum and petroleum products, radioactive materials, asbestos-containing materials, mold, urea formaldehyde foam insulation, polychlorinated biphenyls or radon gas, (c) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "extraordinarily hazardous substances", "solid wastes", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any Environmental Law and (d) any other chemical, pollutant, waste, material or substance that is regulated by or to which liability or standards of conduct may be imposed under any Environmental Law.

"*Indebtedness*" means any Liability (a) for borrowed money, (b) under any reimbursement obligation, including those related to letters of credit, banker's acceptances or note purchase facilities, (c) evidenced by a bond, note, debenture or similar instrument (including a purchase money obligation), (d) for the payment of money relating to leases that are required to be classified as capitalized lease obligations in accordance with GAAP, (e) for the deferred purchase price of any property or services, (f) all obligations under any interest rate, currency or other hedging agreement, (g) commitments to repay deposits or advances by or owing to third parties, (h) prepayment premiums of any change of control premiums, if any, "breakage" costs or similar payments associated with the repayments thereof and accrued interest, if any, on and fees and expenses and all other amounts owed in respect of any of the foregoing and (i) any direct or indirect guaranty of indebtedness of any other Person or a type described in the foregoing clauses (a) through (h).

"*Indemnified Party*" means a party making a claim under **Article VIII**.

"*Indemnifying Party*" means a party against whom a claim is asserted under **Article VIII**.

"*Independent Accountant*" means Skoda, Minotti & Co., certified public accountants.

"*Information Systems*" has the meaning set forth in **Section 5.11(g)**.

"*Insurance Policy*" or "*Insurance Policies*" has the meaning set forth in **Section 5.14**.

"*Intellectual Property*" means Copyrights, Domain Names, Patents, Software, Trademarks and Trade Secrets.

"*Intellectual Property Assets*" means all of the Intellectual Property owned by the Seller or Harold that relates to, is used in, is necessary for the conduct of or is held for use in connection with the Business, including all of the rights of the Seller and Harold to Intellectual Property under the Intellectual Property Licenses and the goodwill represented by all such Intellectual Property.

"*Intellectual Property Licenses*" means all licenses, sublicenses and other agreements by or through which other Persons, including any Affiliate of the Seller, grant to the Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in or is necessary for the conduct of the Business as currently conducted.

"*Intellectual Property Registrations*" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"*Interim Financial Statements*" has the meaning set forth in **Section 5.05(a)**.

"*Inventory*" means, with respect to any Person, any inventory, including finished goods, supplies, raw materials, work in progress, spare, replacement and components, or goods or products used, held for use or related to such Person's conduct of the Business, whether located on such Person's respective Real Property or located at any third-party locations.

"*Investment*" means any equity interest (including any convertible debt, options, warrants and similar instruments), of record or beneficially, directly or indirectly, in any Person.

"*IRCA*" means the Immigration Reform and Control Act of 1986, as amended.

"*IRS*" means the United States Internal Revenue Service.

"*Joint Certificate*" has the meaning set forth in **Section 8.06(b)**.

"*Knowledge*" means (a) with respect to the Seller, the actual knowledge of either Selling Shareholder, and the knowledge that any such Person could have possessed after a reasonable investigation of the subject matter in question as would be expected of a reasonably prudent person similarly situated under the circumstances and (b) with respect to any other Person, the actual knowledge of such Person, and the knowledge that any such Person could have possessed after a reasonable investigation of the subject matter in question as would be expected of a reasonably prudent person similarly situated under the circumstances.

"*Law*" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, policy, guidance, judgment, decree, other requirement or rule of law of any Governmental Authority.

"*Leased Real Property*" has the meaning set forth in **Section 5.10(b)**.

"*Liability*" means a liability, obligation or commitment of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"*Loss*" means loss, damage, Liability, deficiency, judgment, interest, award, penalty, fine, settlement, disbursement, cost or expense of whatever kind, including reasonable attorneys' fees and the reasonable cost of enforcing any right to indemnification hereunder.

"*Lower Collar Amount*" means $425,000.

"*Material Adverse Effect*" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Seller or the Business (including the Purchased Assets) or (b) the ability of the Seller or either Selling Shareholder, as the case may be, to consummate the transactions contemplated by this Agreement; provided, that, "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Seller operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement; (vi) any changes in applicable Laws or accounting rules, including GAAP; or (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement, provided further, however, that any event, occurrence, fact, condition or change referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected

to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"*Material Contract*" has the meaning set forth in **Section 5.07(a)**.

"*Material Customer*" has the meaning set forth in **Section 5.13(a)**.

"*Material Supplier*" has the meaning set forth in **Section 5.13(b)**.

"*Net Working Capital*" means the amount by which (a) the current assets of the Seller (to the extent that they are Purchased Assets) exceed (b) the current liabilities of the Seller (to the extent that they are Assumed Liabilities), in each case, determined as of the applicable date and calculated in accordance with GAAP, except as provided in the Specified Accounting Principles.

"*Non-Assignable Contract*" has the meaning set forth in **Section 7.10**.

"*Object Code*" means computer software that is substantially or entirely in binary form and that is intended to be directly executable by a computer after suitable processing and linking but without any intervening steps of compilation or assembly.

"*Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Ordinary Course of Business*" means the ordinary and usual course of day-to-day operations of the Business consistent with past custom and practice (including with respect to quantity and frequency).

"*Patents*" means all patents, industrial and utility models, industrial designs, petty patents, patents of importation, patents of addition, certificates of invention, and any other indicia of invention ownership issued or granted by any Governmental Authority, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, re-examinations or equivalents or counterparts of any of the foregoing: and moral and economic rights of inventors in any of the foregoing.

"*Permit*" means a permit, license, franchise, approval, authorization, registration, certificate, variance or similar right obtained, or required to be obtained, from Governmental Authorities.

"*Permitted Encumbrances*" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in title insurance policies that have been delivered to the Buyer, (b) statutory Encumbrances for Taxes, assessments, fees and other charges by Governmental Authorities that are not yet due and payable as of the Closing Date and for which there are adequate accruals or reserves on the balance sheet included with the Interim Financial Statements, or (c) mechanics', carriers', workmen's, repairmen's, landlord's, warehousemen's Encumbrances arising or incurred in the Ordinary Course of Business that are not material to the business, operations and financial condition of the Seller's property so encumbered and that are not resulting from a breach, default or violation by the Seller of any Contract or Law, or (d) liens set forth on **Schedule 1.1**.

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"*Personal Property*" means, with respect to any Person, all machinery, equipment, furniture, computer hardware, fixtures, motor vehicles, other miscellaneous supplies, tools, fixed assets, raw materials, supplies, works in process, finished goods and other inventories and other tangible personal

property owned or leased by such Person related to or used or usable in connection with the Business, including all artwork, desks, chairs, tables, hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"***Personally Identifiable Information***" means any information that, alone or in combination with other information held by the Seller in connection with its operation of the Business, can be used to specifically identify a Person.

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and, with respect to any Straddle Tax Period, the portion of such taxable period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Tax Period, the portion of such taxable period ending on and including the Closing Date.

"***Purchase Price***" has the meaning set forth in **Section 2.04(a)**.

"***Purchased Assets***" has the meaning set forth in **Section 2.01**.

"***Purchased Intellectual Property***" means all Intellectual Property owned (in whole or in part), held or used by the Seller, together with all income, royalties, damages and payments due or payable to the Seller as of the Closing or thereafter and the rights to sue and collect damages for such infringements, misappropriations or other violations, and any corresponding equivalent or counterpart rights, title or interest that exist or may be secured hereafter anywhere in the world and all copies and tangible embodiments of the foregoing, including the Intellectual Property listed on **Schedule 5.11(a)**.

"***Qualified Benefit Plan***" has the meaning set forth in **Section 5.18(e)**.

"***Real Property***" means any and all real property and interests in real property of the Seller (together with all buildings, structures, fixtures and improvements thereon), including the Leased Real Property, any real property leaseholds and subleaseholds, purchase options, easements, licenses, rights to access and rights of way and any other real property otherwise owned, occupied or used by the Seller.

"***Real Property Leases***" has the meaning set forth in **Section 5.10(b)**.

"***Related Party***" means any current or former shareholder, director, officer, employee or Affiliate of the Seller or any descendant (whether natural or adopted), sibling, spouse, parent or Affiliate of either Selling Shareholder.

"***Release***" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"***Releasee***" has the meaning set forth in **Section 7.09**.

"***Releasor***" has the meaning set forth in **Section 7.09**.

"***Representative***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"***Restricted Party***" means, collectively, the Seller and the Selling Shareholders.

"***Restricted Period***" has the meaning set forth in **Section 7.02(a)**.

"***Restricted Stock Grant Agreement***" has the meaning set forth in **Section 2.04(a)(xx)**.

"***Restricted Territory***" means (a) the United States, (b) the geographic area(s) within a one-hundred (100) mile radius of any and all Buyer and Seller location(s) in which employees of the Buyer or the Seller work or of any other geographic location to which employees of the Buyer  or the Seller are assigned or have any responsibility (either direct or supervisory) and (c) all of the specific customer accounts of the Buyer and the Seller as of the Closing Date, whether within or outside of the geographic areas defined in clauses (a) and (b) above.

"***Royalty Agreement***" has the meaning set forth in **Section 2.04(a)(xxi)**.

"***Sale Bonus***" means any stay bonus, change of control payment or other amount paid as a result of the transactions contemplated by this Agreement.

"***Seller***" has the meaning set forth in the preamble.

"***Seller Indemnitees***" has the meaning set forth in **Section 8.03**.

"***Seller Sites***" has the meaning set forth in **Section 5.23(b)**.

"***Seller Site Policies***" has the meaning set forth in **Section 5.23(b)**.

"***Selling Expenses***" means any fees or expenses due by the Seller or either Selling Shareholder to any Person arising as a result of the transactions contemplated hereby, including accounting fees, legal fees, brokers fees and any other fees or expenses.

"***Selling Shareholder***" or "***Selling Shareholders***" has the meaning set forth in the preamble.

"***Software***" means all computer software, programs and code, including assemblers, applets, compilers, Source Code, Object Code, development tools, design tools, user interfaces and data, in any form or format, however fixed.

"***Source Code***" means computer software that may be displayed or printed in human-readable form, including all related programmer comments, annotations, flowcharts, diagrams, help text, data and data structures, instructions, procedural, object-oriented or other human-readable code, and that is not intended to be executed directly by a computer without an intervening step of compilation or assembly.

"***Specified Accounting Principles***" has the meaning set forth in **Section 2.05(a)**.

"***Statement of Objections***" has the meaning set forth in **Section 2.05(c)**.

"***STERIS Animal Health***" means the business division of the Buyer and certain of its Affiliates for animal-health products, including the Business and further including, without limitation, the Patented Products and the Other Products (as defined in the Royalty Agreement) and any other entities (or divisions of such entities or any portion thereof) purchased by the Buyer that operate exclusively in the animal health space, that is designated by the Buyer and such Affiliates as "STERIS Animal Health", the financial performance of which is reported by the Buyer and such Affiliates on a separate profit and loss statement for STERIS Animal Health.

"***Straddle Tax Period***" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

4852-3090-4917.8
#57301476
57352294 v1

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, trust or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, any equity interests in such entity.

"**Target Working Capital**" means $450,000.

"**Tax**" or "**Taxes**" means any federal, state, county, local or foreign income, gross receipts, commercial activity, *ad valorem*, franchise, net worth, profits, sales or use, value added, transfer, production, documentary, profits, windfall profits, registration, excise, utility, environmental, premium, communications, real or personal property, real property transfer, intangibles, capital stock, escheatment or unclaimed property, license, lease, service, service use, payroll, wage or other withholding, employment, unemployment, social security, severance, stamp, occupation, alternative or add-on minimum, estimated, customs, duties and other taxes of any kind whatsoever (including tax for which a taxpayer is responsible by reason of Treasury Regulations Section 1.1502-6 and any comparable provision of state, local or foreign Tax Legal Requirements) or as a successor or by reason of contract, indemnity or otherwise, together with any interest, deficiencies, penalties, additions to tax and any interest attributable in respect of such deficiencies, penalties or additions whether disputed or not.

"**Tax Contest**" has the meaning set forth in **Section** Error! Reference source not found..

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means any Governmental Authority responsible for the imposition or the administration of any Tax.

"**Third Party Claim**" has the meaning set forth in **Section 8.05(a)**.

"**Threat of Release**" means a substantial likelihood of a Release that requires action to prevent or mitigate damage or injury to health, safety or the Environment that might result from such Release.

"**Trade Secrets**" means anything that would constitute a "trade secret" under applicable Law, and all other inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, confidential information, proprietary information, customer lists, software and technical information; and moral and economic rights of authors and inventors in any of the foregoing.

"**Trademarks**" means trademarks, service marks, fictional business names, trade names, commercial names, certification marks, collective marks, Internet domain names and uniform resource locators and alphanumeric designations associated therewith and other proprietary rights to any words, names, slogans, symbols, logos, devices or combinations thereof used to identify, distinguish and indicate the source or origin of goods or services; registrations, renewals, applications for registration, equivalents and counterparts of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transferred Employees**" has the meaning set forth in **Section 7.01(a)**.

"**Treasury Regulations**" means final and temporary regulations promulgated under the Code.

"*UK Affiliate*" means Everost UK Limited, a United Kingdom private limited company, which was formerly an affiliate of the Seller but which has been dissolved and no longer holds and/or owns assets of the Seller or the Business.

"*Uncertain Value Claim*" has the meaning set forth in **Section 8.06(c)(ii)**.

"*Upper Collar Amount*" means $475,000.

"*WARN Act*" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign Laws related to plant closings, relocations, mass layoffs and employment losses.

"*Working Capital Overage*" has the meaning set forth in **Section 2.05(d)**.

"*Working Capital Underage*" has the meaning set forth in **Section 2.05(d)**.

**ARTICLE II**
**PURCHASE AND SALE**

2.01     **Purchase and Sale of the Purchased Assets**.  Subject to the terms and conditions of this Agreement, at the Closing, the Seller will sell, assign, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, all right, title and interest of the Seller in and to all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located, to the extent used, held for use or related to the conduct of the Business by the Seller (such assets, properties and rights, being referred to as the "*Purchased Assets*"), in each case free and clear of all Encumbrances, other than the Permitted Encumbrances, including the following:

(a)     all Inventory of the Seller;

(b)     all Personal Property of the Seller;

(c)     all Accounts Receivable, unbilled revenues, reimbursable costs and expenses and other claims for money due to the Seller, including the proceeds thereof and any security therefor;

(d)     all deferred expenses, prepaid expenses, credits, advance payments, inventory payments, refundable deposits (including customer deposits and security for rent, electricity, telephone or otherwise) and other prepaid items, in each case, of the Seller and all rights of Seller to receive discounts, refunds, rebates, awards and the like;

(e)     all rights and incidents of interest of, and benefits accruing to, the Seller under all Contracts of the Seller related to or used in connection with the Business and that are specifically set forth on **Schedule 2.01(e)** (the "*Assumed Contracts*"), including all claims or causes of action with respect to such Contracts;

(f)     the Leased Real Property of the Seller set forth on **Schedule 5.10(b)**;

(g)     the Purchased Intellectual Property;

(h)     all Documents of the Seller, whether or not physically located on any of the premises referred to in clause (f) above;

(i)      all Permits, including Environmental Permits, used by the Seller in the Business (which includes all Permits necessary to conduct the Business as currently conducted) and all rights, and incidents of interest therein);

(j)      all books of account, financial and accounting records, files (excluding any medical files relating to the Employees), invoices and suppliers' lists related to the Business owned, held or used by the Seller;

(k)      all claims and causes of action of the Seller against third parties relating to the Business and all rights to proceeds therefrom;

(l)      all insurance proceeds, and all rights to insurance proceeds, in each case of the Seller and to the extent received or receivable in respect of the Business;

(m)      all rights of the Seller under non-disclosure or confidentiality, non-compete or non-solicitation agreements with former employees, Employees, consultants and agents of the Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof); and

(n)      the Business of the Seller as a going concern and all goodwill and other intangible assets associated with the Business of the Seller, including the goodwill associated with the Purchased Intellectual Property and the Business of the Seller.

2.02    **Excluded Assets**.  Nothing contained in this Agreement is deemed to sell, transfer, assign or convey the Excluded Assets to the Buyer, and the Seller will retain all right, title and interest to, in and under the Excluded Assets.  "***Excluded Assets***" means each of the following assets:

(a)      Cash, marketable securities, intercompany receivables, Investments and all rights to any bank or deposit accounts;

(b)      all Employee Benefit Plans of the Seller (including any Contracts related thereto) and all assets held with respect to the Employee Benefit Plans;

(c)      subject to **Section 7.06(a)** relating to cooperation on Tax matters, the articles of incorporation, operating agreements, and bylaws of the Seller, minute books, stock ledgers and stock records, qualifications to conduct business, taxpayer and other identification numbers, Tax Returns, Tax information, Tax records related to the Seller or any of the Seller's Affiliates, corporate seals and any other document relating to the organization, maintenance and existence of the Seller, including duplicate copies of such records as are necessary to enable the Seller to file Tax Returns and reports;

(d)      causes of action, lawsuits, judgments, claims and demands relating to any of the Excluded Liabilities or the Excluded Assets, whether arising by way of counterclaim or otherwise;

(e)      all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights relating to the Excluded Liabilities or the Excluded Assets, including third party warranties and guarantees and all related claims, credits, rights of recovery and set-off as to third parties which are held by or in favor of the Seller and relate to the Excluded Liabilities or the Excluded Assets;

(f)      the rights that accrue to the Seller under this Agreement and under the Transaction Documents to which the Seller is a party;

(g)     claims, causes of action and rights relating to Tax credits and refunds or recovery of Taxes, to the extent such Taxes are Excluded Liabilities or were paid by the Seller (whether paid directly by the Seller or indirectly by a third party on the Seller's behalf) regardless of whether such claims, causes of action or rights have arisen or hereafter arise;

(h)     all records prepared in connection with the sale of the Purchased Assets, including bids received from third Persons and analyses relating to the Purchased Assets;

(i)     all Insurance Policies (and any cash or surrender value thereon);

(j)     any Permits that are not by their nature or terms, assignable;

(k)     any equity interest in any Person held by the Seller;

(l)     the assets set forth on **Schedule 2.02(l)**.

2.03     **Assumption of Liabilities**.

(a)     Subject to the terms and conditions of this Agreement, concurrent with the execution of this Agreement the Buyer will assume only the following Liabilities of the Seller (collectively, the "*Assumed Liabilities*"), in each case in accordance with their respective terms:

(i)     all accounts payable and accrued expenses of the Seller, in each case, arising in the Ordinary Course of Business; and

(ii)     the Liabilities of the Seller with respect to the Assumed Contracts to the extent relating to performance thereunder following the Closing; provided, however, that the Buyer is not assuming any Liabilities of the Seller in respect of a breach of or default under, or any non-compliance with respect to, any Assumed Contract that occurred on or before, or that relates to or commenced during any period prior to, the Closing Date.

(b)     The Assumed Liabilities will not include, and the Buyer will not assume or be liable for, any Excluded Liabilities.  The Seller will timely perform, satisfy and discharge in accordance with their respective terms all Excluded Liabilities.  "*Excluded Liabilities*" means all Liabilities of the Seller, other than the Assumed Liabilities, including:

(i)     any Liabilities for (A) the Transferred Employees and other Employees, former employees and other service providers, in each case, of the Seller for periods on or prior to the Closing Date and (B) the Excluded Employees, whether before, on or after the Closing Date;

(ii)     any product Liability claims with respect to the conduct of the Business by Seller that occurred on or prior to the Closing Date;

(iii)     any Liability under or with respect to any Employee Benefit Plan of the Seller, including any Liability of the Seller under Code Section 4980B and any similar state Law or any Liability of the Seller under Title IV of ERISA;

(iv)     any Liability related to any actual or alleged violation or Liability arising under any Environmental Law or resulting from the use, exposure to, generation, storage, treatment, disposal, handling, transport, release, or threatened release of Hazardous Materials at the Real Property or in relation to the Business on or prior to the Closing Date, regardless of whether such Liability related to any act or omission of the Seller;

        (v)      any Indebtedness of the Seller or any Encumbrances on the Purchased Assets**,** other than the Permitted Encumbrances;

        (vi)      any Liability of the Seller to the extent related to or arising in connection with the Excluded Assets;

        (vii)      any Liability of the Seller to any Affiliate or Representative of the Seller;

        (viii)      any Liability of the Seller under this Agreement or the Transaction Documents to which the Seller is a party and any costs and expenses incurred by the Seller incident to the negotiation and preparation of this Agreement and the Seller's performance and compliance with the agreement and conditions contained herein, including any sale or transaction bonuses payable to any former employee, Employee, independent contractor, advisor or other Representative of the Seller;

        (ix)      any Liability of the Seller for any Selling Expenses or to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement;

        (x)      any Liability for income Taxes of the Seller or any of the Seller's Affiliates (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability), and, except as expressly provided in this Agreement, any Liability for any other Taxes of the Seller or any of the Seller's Affiliates (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability); and

        (xi)      any Liability relating to the UK Affiliate.

    2.04    **Purchase Price**.

        (a)      The aggregate purchase price to be paid by the Buyer for the Purchased Assets is (i) an amount in cash equal to $4,500,000 (as adjusted, the "***Closing Date Purchase Price***"), plus (ii) the amount of the Working Capital Overage, if any, payable by the Buyer pursuant to **Section 2.05**, minus (iii) the amount of the Working Capital Underage, if any, payable by the Seller pursuant to **Section 2.05**, plus (iv) any amounts payable pursuant to **Section 2.06** (the result of the foregoing calculation, the "***Purchase Price***").

        (b)      At the Closing, the Buyer will deliver, or cause to be delivered, by wire transfer of immediately available funds pursuant to the wire instructions set forth on **Schedule 2.04(b)**, an amount equal to the Closing Date Purchase Price.  The Closing Date Purchase Price will be delivered as follows:

        (i)      to the Escrow Agent, an amount equal to the Escrow Amount, to be held in accordance with the terms of the Escrow Agreement;

        (ii)      to each applicable Person set forth on **Schedule 2.04(b)**, an amount equal to the portion of Selling Expenses set forth opposite such Person's name;

        (iii)      to each applicable Person set forth on **Schedule 2.04(b)**, an amount equal to the portion of Indebtedness set forth opposite such Person's name; and

        (iv)      to the Seller, the balance, as set forth on **Schedule 2.04(b)**.

2.05    **Purchase Price Adjustment**.

(a)    Final Working Capital Statement.  Within ninety (90) days after the Closing Date, the Buyer will prepare and deliver, or cause to be prepared and delivered, to the Seller a statement (the "***Final Working Capital Statement***") setting forth the calculation of the Net Working Capital as of the close of business on the day prior to the Closing Date (the "***Final Working Capital***").  The Final Working Capital Statement will be prepared in accordance with GAAP applied using the accounting methods, practices, principles, policies and procedures set forth on **Schedule 2.05(a)(i)** (the "***Specified Accounting Principles***").  For purposes of illustration only, an example calculation of Net Working Capital is set forth on **Schedule 2.05(a)(ii)**.

(b)    Disputes.  Within thirty (30) days following receipt by the Seller of the Final Working Capital Statement, the Seller will deliver written notice (an "***Statement of Objections***") to the Buyer of any dispute the Seller has with respect to the content or preparation of such Final Working Capital Statement.  A Statement of Objections must describe in reasonable detail the items contained in the Final Working Capital Statement that the Seller disputes and the basis for such disputes.  Any items not disputed in the Statement of Objections will be deemed to have been accepted by the Seller.  If the Seller does not deliver an Objection Notice with respect to the Final Working Capital Statement within such thirty (30) day period, such Final Working Capital Statement will be final, conclusive and binding on the parties hereto.  If the Seller delivers a timely Statement of Objections, the Buyer and the Seller will negotiate in good faith to resolve such objections within the period of thirty (30) days immediately following the delivery of the Statement of Objections.  If the Seller and the Buyer, notwithstanding such good faith effort, fail to resolve such dispute within such thirty (30) day period, then the Seller and the Buyer will jointly engage the Independent Accountant to resolve such dispute in accordance with the standards set forth in this **Section 2.05(b)**, who, acting as an expert and not an arbitrator, will review only the disputed items jointly submitted by the Seller and the Buyer, and make a final determination of such disputed items and of the Final Working Capital as a result of such review, which determination will be conclusive, final and binding upon the parties hereto.  As promptly as practicable thereafter (and, in any event, within thirty (30) days after the Independent Accountant's engagement), the Seller will submit any unresolved elements of the Statement of Objections to the Independent Accountant in writing (with a copy to the Buyer), supported by any documents and arguments upon which it relies.  In resolving any disputed item, the Independent Accountant may not assign a value to any item greater than the greatest value claimed for such item by either party or less than the smallest value claimed for such item by either party.  The fees, costs and expenses of the Independent Accountant will be apportioned between the Seller, on the one hand, and the Buyer, on the other, based upon the relative difference between the Independent Accountant's resolution of the disputed items jointly submitted by the Seller and the Buyer and the respective positions of the Seller and the Buyer in respect thereof.  The Independent Accountant will make a determination as soon as practicable, but in any event within thirty (30) days after its engagement pursuant to this **Section 2.05(b)**.

(c)    Compliance.  For purposes of complying with the terms set forth in this **Section 2.05**, each party will cooperate with and make available to the other party and its Representatives all information, records, data and working papers and will permit access to its facilities and personnel, as may be reasonably required in connection with the preparation and analysis of the Final Working Capital Statement and the resolution of any disputes under the Final Working Capital Statement.

(d)    Post-Closing Adjustment.  If the Final Working Capital (as finally determined pursuant to **Section 2.05(b)**) is less than the Lower Collar Amount, the Purchase Price will be reduced by the amount of such shortfall (the "***Working Capital Underage***"), and the Seller will pay to the Buyer, within three (3) Business Days from the date on which the Final Working Capital is finally determined pursuant to **Section 2.05(b)**, by wire transfer of immediately available funds to an account designated in

writing by the Buyer, an amount in cash equal to the Working Capital Underage. If the Final Working Capital (as finally determined pursuant to **Section 2.05(b)**) is greater than the Upper Collar Amount, the Purchase Price will be increased by the amount of such excess (the "***Working Capital Overage***"), and the Buyer will pay to the Seller, within three (3) Business Days from the date on which the Final Working Capital is finally determined pursuant to **Section 2.05(b)**, by wire transfer of immediately available funds to an account designated in writing by the Seller, an amount in cash equal to the Working Capital Overage. If the Final Working Capital (as finally determined pursuant to **Section 2.05(b)**l is greater than or equal to the Lower Collar Amount but less than or equal to the Upper Collar Amount, then the Purchase Price will not be adjusted pursuant to this **Section 2.05(d)**.

      2.06   **Earn-Out**.

          (a)    Earn-Out Statement. Within sixty (60) days following the expiration of the Earn-Out Period, the Buyer shall prepare and deliver to the Seller a statement (the "***Earn-Out Statement***") setting forth the Buyer's calculation of Cumulative Revenues and Cumulative Gross Margins. The Seller shall, no later than thirty (30) days after receipt of the Earn-Out Statement, have the opportunity to render a written notice of objection to the Buyer's determination of the Cumulative Revenues and/or Cumulative Gross Margins as set forth in the Earn-Out Statement (the "***Earn-Out Dispute Notice***"). During such thirty (30)-day period, the Buyer will cooperate with and make available to the Sellers and its Representatives all information, records, data and working papers as may be reasonably required in connection with the review and analysis of the Earn-Out Statement. The Earn-Out Dispute Notice shall list those items, if any, to which the Seller disputes and the Seller's proposed calculation of the amount in dispute. If the Seller does not deliver an Earn-Out Dispute Notice within such thirty (30)-day period, the Seller shall be deemed to have accepted the Earn-Out Statement for the purposes of determining the amount of any Earn-Out Payments pursuant to **Section 2.06(b)**. If the Seller gives the Earn-Out Dispute Notice within such thirty (30)-day period, the Buyer and the Seller shall, during the thirty (30)-day period following such delivery, use commercially reasonable efforts to reach agreement in writing with respect to the objections set forth in the Earn-Out Dispute Notice. If the Buyer and the Seller reach agreement in writing with respect to the objections set forth in the Earn-Out Dispute Notice, the Cumulative Revenues and Cumulative Gross Margins as so agreed upon by the parties hereto shall be final and binding on the parties hereto for all purposes under this Agreement. If the Buyer and the Seller are unable, within such thirty (30)-day period, to resolve the objections set forth in the Earn-Out Dispute Notice, then Buyer and the Seller shall submit such objections to the Independent Accountant for resolution in accordance with the procedures set forth in **Section 2.05(c)**, *mutatis mutandis*.

          (b)    Earn-Out Payments. Within five (5) Business Days after the final determination pursuant to **Section 2.06(a)** of the Cumulative Revenues and Cumulative Gross Margins, the Buyer shall pay to the Seller, by wire transfer of immediately available funds pursuant to the wiring instructions set forth on **Schedule 2.04(b)**, the following amounts, if any (each an "***Earn-Out Payment***" and collectively, the "***Earn-Out Payments***"):

               (i)    an amount equal to one of the following: (i) $1,000,000, if Cumulative Revenues equal or exceed $50,000,000, (ii) $500,000, if Cumulative Revenues equal or exceed $37,500,000, but are less than $50,000,000, or (iii) $0, if Cumulative Revenues are less than $37,500,000; and

               (ii)    an amount equal to one of the following: (i) $1,000,000.00, if Cumulative Gross Margins equal or exceed $22,600,000, (ii) $500,000, if Cumulative Gross Margins equal or exceed $17,000,000, but are less than $22,600,000, or (iii) $0, if Cumulative Gross Margins are less than $17,000,000.

For the avoidance of doubt, in no event will the amount of the Earn-Out Payment with respect to either the Cumulative Revenues or Cumulative Gross Margins exceed $1,000,000 individually, nor will the Earn-Out Payments exceed $2,000,000 in the aggregate.

(c)     Treatment of Earn-Out Payments.  Any amount to be paid pursuant to this **Section 2.06**, if any, will be treated as an adjustment to the Purchase Price for all purposes.

2.07     **Withholding Tax**.  The Buyer will be entitled to deduct and withhold from the Purchase Price all Taxes that the Buyer is required to deduct and withhold under any applicable provision of Tax Law.  All such withheld amounts will be treated as delivered to the Seller hereunder.

2.08     **Allocation of Purchase Price**.  Attached hereto as **Schedule 2.08** is an allocation for Tax purposes (prepared in accordance with the principles set forth in Section 1060 of the Code) of the Purchase Price (including the Assumed Liabilities, to the extent required by Tax Law) among the Purchased Assets and the covenants set forth in **Section 7.02**.  To the extent the Purchase Price is adjusted pursuant to **Section 2.05**, the Buyer and the Seller will amend such allocation to reflect such adjustments. The Buyer and the Seller will file, or cause to be filed, their Tax Returns (and IRS Forms 8594) on the basis of such allocation, as it may be amended pursuant to the preceding sentence, and no Party will thereafter take a position on a Tax Return or in an audit or other proceeding inconsistent with such allocation except upon a final determination by a Taxing Authority.

### ARTICLE III
### CLOSING

3.01     **Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "***Closing***") will take place remotely via the exchange of documents and signatures on the Closing Date.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.02     **Closing Deliverables**.

(a)     Deliveries of the Seller.  At or prior to the Closing, the Seller will deliver, or cause to be delivered, to the Buyer each of the following:

(i)     the Escrow Agreement, duly executed by the Seller and the Escrow Agent;

(ii)     the Bill of Sale, duly executed by the Seller;

(iii)     the Assumption Agreement, duly executed by the Seller;

(iv)     employment offer letters, dated as of the Closing Date, in substantially the form attached hereto as **Exhibit B** (the "***Employment Agreements***"), duly executed by each of Harold and Darroll;

(v)     the articles of incorporation of the Seller, certified by the Secretary of the Commonwealth of Massachusetts as of a date not more than ten (10) days prior to the Closing Date;

(vi)     a reasonably current certificate of good standing of the Seller, certified by the Secretary of the Commonwealth of Massachusetts;

(vii)     resolutions of the directors and the shareholders of the Seller approving this Agreement and the transactions contemplated hereby, in each case, certified by an officer of the Seller;

(viii)    all documents and instruments, executed and delivered in form and substance acceptable to the Buyer, amending the Seller's articles of incorporation, any foreign qualification registrations and any assumed name or d/b/a filings to eliminate the Seller's right to use the names "Everost, Inc." or any other name that, in the reasonable judgment of the Buyer, is similar to such name;

(ix)      titles to any motor vehicles owned by the Seller constituting Purchased Assets, duly endorsed or otherwise transferred to the Buyer;

(x)       copyright assignments, in a form reasonably acceptable to the Buyer, transferring to the Buyer all right, title and interest in, to and under all of the Copyrights held or used by the Seller, duly executed by the Seller;

(xi)      domain name assignments, in a form reasonably acceptable to the Buyer, transferring to the Buyer all right, title and interest in, to and under all of the Domain Names held or used by the Seller, duly executed by the Seller;

(xii)     patent assignments, in a form reasonably acceptable to the Buyer, transferring to the Buyer all right, title and interest in, to and under all of the Patents held or used by the Seller, duly executed by the Seller;

(xiii)    trademark assignments, in a form reasonably acceptable to the Buyer, transferring to the Buyer all right, title and interest in, to and under all of the Trademarks held or used by the Seller, duly executed by the Seller;

(xiv)     payoff letters and appropriate termination statements under the Uniform Commercial Code and other instruments as may be requested by the Buyer to extinguish all Indebtedness pertaining to the Purchased Assets and all security interests related thereto, in each case, to the extent directed by the Buyer, together with evidence of the full release of all Encumbrances, other than the Permitted Encumbrances, relating to any of the Purchased Assets and in a form satisfactory to the Buyer;

(xv)      the Consents set forth on **Schedule 3.02(a)(xv)**;

(xvi)     evidence satisfactory to the Buyer that the Contracts set forth on **Schedule 3.02(a)(xvi)** have been terminated.

(xvii)    a certificate from the Seller in a form reasonably acceptable to Buyer certifying that, pursuant to Treasury Regulation Section 1.1445-2(b), the Seller is not a foreign person within the meaning of Section 1445 of the Code and in the form provided in Treasury Regulation Section 1.445-2(b)(2)(iv)(B);

(xviii)   estoppel certificates, waivers, collateral access agreements and non-disturbance agreements relating to the Leased Real Property, as requested by the Buyer, each in a form reasonably acceptable to the Buyer; and

(xix)     the restricted stock grant agreements, dated as of the Closing Date, in substantially the form attached hereto as **Exhibit C** (the "***Restricted Stock Grant Agreements***"), duly executed by each of Harold and Darroll; and

(xx)     the royalty agreement, dated as of the Closing Date, in substantially the form attached hereto as **Exhibit D** (the "*Royalty Agreement*"), duly executed by the Seller.

(b)     Deliveries of the Buyer.  At or prior to the Closing, the Buyer will deliver, or cause to be delivered, to the Seller, the following:

(i)     the Closing Date Purchase Price, payable in accordance with **Section 2.04(b)**;

(ii)     the Escrow Agreement, duly executed by the Buyer and the Escrow Agent;

(iii)     the Assumption Agreement, duly executed by the Buyer;

(iv)     each of the Employment Agreements, duly executed by the Buyer;

(v)     the Restricted Stock Grant Agreements, duly executed by STERIS plc;

(vi)     the Royalty Agreement, duly executed by the Buyer;

(vii)     the certificate of incorporation of the Buyer, certified by the Secretary of the State of Delaware as of a date not more than ten (10) days prior to the Closing Date; and

(viii)     a reasonably current certificate of good standing of the Buyer, certified by the Secretary of the State of Delaware.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLING SHAREHOLDERS

Each Selling Shareholder represents and warrants to the Buyer as follows:

4.01     **Authority**.  Such Selling Shareholder has the capacity to execute, deliver and perform such Selling Shareholder's obligations under this Agreement and each Transaction Document to which such Selling Shareholder is a party.  This Agreement and each of the Transaction Documents, as applicable, has been executed by such Selling Shareholder, and (assuming due authorization, execution and delivery by the Buyer) constitutes a legal, valid and binding obligation of such Selling Shareholder in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.02     **No Conflicts; Consents**.  Except as set forth on **Schedule 4.02**, neither the execution and delivery of this Agreement and the Transaction Documents, nor the performance by such Selling Shareholder of such Selling Shareholder's obligations hereunder or thereunder will:  (a) conflict with or result in a violation or other breach of any Law or Order applicable to such Selling Shareholder, (b) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of or constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which such Selling Shareholder is a party or by which such Selling Shareholder is bound or (c) result in the creation or imposition of any Encumbrance.

4.03    **Legal Proceedings**.  There is no Order or Action pending or, to the Knowledge of such Selling Shareholder, threatened against either Selling Shareholder that would give any Person the right to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent such Selling Shareholder from performing its obligations under this Agreement or under any Transaction Document to which such Selling Shareholder is a party or from otherwise complying with the terms of this Agreement.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES RELATING TO THE SELLER**

5.01    **Existence and Good Standing**.  The Seller is duly incorporated, validly existing and in good standing under the laws of the Commonwealth of Massachusetts, and the Seller is duly licensed or qualified to do business as a foreign corporation in each of the jurisdictions set forth on **Schedule 5.01**, which are the only jurisdictions in which the Seller is required to be so qualified.  The Seller is the only Person through which the Business is conducted or which owns, operates or leases any of the Purchased Assets.

5.02    **Indebtedness and Selling Expenses; Subsidiaries**.  **Schedule 5.02(a)** sets forth a true and complete list of the individual components (indicating the amount and the Person to whom such amount is owed) of all (a) Indebtedness outstanding with respect to the Seller and (b) Selling Expenses. The Seller has no Subsidiaries and holds no Investments, in each case, other than as set forth on **Schedule 5.02(b)**.

5.03    **Power; Validity and Enforceability**.  The Seller has the requisite, full corporate power and authority necessary to (a) own, operate and lease the Seller's properties and assets (including the Purchased Assets) as and where currently owned, operated and leased, (b) carry on the Business as currently conducted by the Seller and (c) execute and deliver this Agreement and the Transaction Documents to which the Seller is a party and to perform the Seller's obligations hereunder and thereunder.  The execution and delivery by the Seller of this Agreement and the Transaction Documents to which the Seller is a party, the performance by the Seller of the Seller's obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Seller.  This Agreement has been duly executed and delivered by the Seller and (assuming due authorization, execution and delivery by the Buyer) this Agreement constitutes a legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  When each Transaction Document to which the Seller is, or will be, a party has been duly executed and delivered by the Seller (assuming due authorization, execution and delivery by the Buyer where applicable), each such Transaction Document will constitute a legal and binding obligation of the Seller enforceable against the Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.04    **No Conflicts; Consents**.  Except as set forth on **Schedule 5.04**, neither the execution and delivery of this Agreement and the Transaction Documents, nor the performance by the Seller of the Seller's obligations hereunder or thereunder will:  (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of the Seller, (b) conflict with or result in a violation or other breach of any Law or Order applicable to the Seller or the Business, (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of or

constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Assumed Contract or Permit to which the Seller is a party or by which the Seller is bound or (d) result in the creation or imposition of any Encumbrances.   Except as set forth on **Schedule 5.04**, no consent, waiver, approval, authorization, exemption, registration, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority (collectively, "***Consents***") is required by or with respect to the Seller in connection with the execution and delivery of this Agreement or any of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.  **Schedule 5.04** identifies a list of each Person from which the Seller obtained a written consent prior to the Closing to execute and deliver this Agreement and the Transaction Documents, perform in accordance with this Agreement and the Transaction Documents or consummate the transactions contemplated by this Agreement and the Transaction Documents.  Except as set forth on **Schedule 5.04**, no Consent is required with (a) the execution and delivery by the Seller of this Agreement or the Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

       5.05     **Financial Statements; Undisclosed Liabilities**.

       (a)     **Schedule 5.05** sets forth true, complete and correct copies of (i) the compiled balance sheets of the Seller as of December 31, 2016 (the "***Balance Sheet Date***"), December 31, 2015 and December 31, 2014, and the compiled statements of income, shareholders' equity and cash flows for the fiscal years then ended, together with the notes thereto, and the other financial information included therewith (collectively, the "***Financial Statements***"), and (ii) the unaudited balance sheet of the Seller as of October 31, 2017, and the related unaudited statement of income, shareholders' equity and cash flows for the ten (10) month period then ended (the "***Interim Financial Statements***").

       (b)     The Financial Statements present fairly, in all material respects, the financial position, results of operations, shareholders' equity and cash flows of the Seller at the dates and for the time periods indicated.  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, except for the absence of footnote disclosure.  The Interim Financial Statements present fairly, in all material respects, the financial position, results of operations, shareholders' equity and cash flows of the Seller at the dates and for the time periods indicated, have been prepared and reviewed by the management of the Seller in accordance with GAAP and are consistent with the Financial Statements, except for the absence of footnote disclosure and the customary year-end adjustments, none of which could reasonably be expected to have a Material Adverse Effect.  The Financial Statements and the Interim Financial Statements were derived from the books and records of the Seller.  The books of account of the Seller are true, accurate and complete, have been maintained in accordance with good business practices and fairly reflect, in all material respects, all of the properties, assets, Liabilities and transactions of the Seller.  The internal controls and procedures of the Seller are sufficient to ensure that the Financial Statements are true, correct and complete in all material respects.

       (c)     The Inventory of the Seller is of a quality and quantity useable and saleable in the Ordinary Course of Business and fit for the purpose for which they were procured or manufactured, subject to appropriate and adequate allowances reflected on the Financial Statements for obsolete, excess, slow-moving and other irregular items.  Such allowances have been calculated in accordance with GAAP and in a manner consistent with past practice.  The quantities of each item of Inventory (whether raw materials, work-in-process or finished goods) are not excessive, but are reasonable in the present circumstances of the Seller.  None of the Seller's Inventory is held on consignment, or otherwise, by third parties.

(d)    The Seller has no Liabilities, except (i) those that are adequately reflected or reserved against the balance sheet included in the Financial Statements and (ii) those that have been incurred in the Ordinary Course of Business since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

5.06    **Absence of Certain Changes, Events and Conditions**.  Since the Balance Sheet Date, the business and operations of the Seller have been conducted in the Ordinary Course of Business and there have not occurred any facts, events, developments or circumstances that constitute, or are reasonably likely to result in, a Material Adverse Effect.  Without limiting the generality of the foregoing, since the Balance Sheet Date, the Seller has not:

(a)    amended any of the Seller's organizational documents;

(b)    changed any method of accounting or accounting practice, including any changes to Tax reporting or accounting principles;

(c)    changed any cash management practices and policies, practices and procedures with respect to revenue recognition, collection of Accounts Receivable, establishment of reserves for uncollectible Accounts Receivable, accrual of Accounts Receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(d)    entered into, amended or terminated any Material Contract;

(e)    incurred, assumed or Guaranteed any Indebtedness, borrowed any amount or become subject to any Liability other than (i) current Liabilities incurred in the Ordinary Course of Business, (ii) Liabilities under Contracts entered into in the Ordinary Course of Business and (iii) borrowings under lines of credit existing on such date;

(f)    paid, discharged or satisfied any Liability in excess of $50,000, other than the repayment of debt or trade obligations;

(g)    transferred, assigned, sold or otherwise disposed of any of the assets or properties shown or reflected in the balance sheet included in the Financial Statements, other than in the Ordinary Course of Business;

(h)    cancelled any debts or claims or amended, terminated or waived any rights of the Seller relating thereto;

(i)    transferred, assigned or granted any license or sublicense of any rights under or with respect to any Intellectual Property Assets;

(j)    sustained any damage, destruction or loss, or any interruption in use, of any assets or properties of the Seller, whether or not covered by insurance;

(k)    accelerated, terminated, modified or cancelled any Permit;

(l)    incurred capital expenditures or commitments therefor in excess of $25,000 individually or $50,000 in the aggregate;

(m)    sold, assigned, transferred (including, without limitation, transfers to any Employees, shareholders or Affiliates), licensed or subjected to any Encumbrance any tangible or

intangible assets or properties, other than Permitted Encumbrances or sales of Inventory in the Ordinary Course of Business;

(n)     (i) granted any bonuses, whether monetary or otherwise, in respect of any Employee, (ii) changed the terms of any employment for, or the terms of any Contract related to the employment of, any Employee or (iii) entered into or terminated any Contract (or other employment relationship not by Contract) related to the employment of any Employee, other than in the Ordinary Course of Business, or any collective bargaining agreement covering any Employee;

(o)     made a loan to, or entered into any other transaction with, any Employee;

(p)     adopted any plan of merger, consolidation, reorganization, liquidation or dissolution or filed (or consented to the filing of) a petition in bankruptcy under any provisions of federal or state bankruptcy Law;

(q)     purchased, leased or otherwise acquired the right to own, use or lease any property or assets in connection with the Business for an amount in excess of $25,000 individually (in the case of a lease, per annum) or $50,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term);

(r)     (i) made a new Tax election or change in any Tax election, (ii) amended any Tax Return, (iii) settled any Tax audit, or (iv) changed any Tax accounting method or practice;

(s)     (i) increased the salary, wages or other compensation rates of any officer, Employee, director or consultant, other than in the Ordinary Course of Business, (ii) adopted, amended, modified or terminated any Employee Benefit Plan or (iii) incurred any Liability to any organization (including any such action taken with respect to any Employee Benefit Plan); or

(t)     entered into any Contract, or committed any act or omission, that would, or would reasonably be expected to, result in any of the foregoing in this **Section 5.06**.

5.07     **Material Contracts**.

(a)     **Schedule 5.07(a)** sets forth, by reference to the applicable subsection of this **Section 5.07(a)**, each Contract (and in the case of an oral Contract, the material terms of such Contract) to which the Seller is a party or to which any Purchased Assets are bound:

(i)     involving aggregate consideration in excess of $25,000 or that cannot be cancelled without penalty or without more than sixty (60) days' notice;

(ii)     providing for the indemnification of any Person or the assumption of any Tax or other Liability of any Person;

(iii)     relating to the acquisition or disposition of any business, stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)     pertaining to any broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contract;

(v)     involving any (A) employment relationship (including employment Contracts) or (B) independent contractor services, management services, consulting services, support services or any other similar services;

(vi)     governing the borrowing of money or the Guarantee or repayment of Indebtedness or the granting of any Encumbrance on any property or asset of the Seller;

(vii)     concerning the use of or restricting the use of any Intellectual Property, including development, assignment and licenses therefor;

(viii)     involving the lease, occupancy, management or operation of the Leased Real Property;

(ix)     involving a customer of the Business that entails the delivery after the Closing Date of products or services in exchange for annual aggregate payments that could exceed $25,000;

(x)     involving a vendor that (A) could involve payments in excess of $25,000 during the twelve (12) month period following the Closing or (B) obligate the Buyer (or any Affiliate thereof) to purchase products or services from such vendor during periods following the twelve (12) month anniversary of the Closing;

(xi)     pertaining to the settlement or compromise of any Actions that were (A) entered into during the three (3) years prior to the Closing Date or (B) under which the Seller has any outstanding Liability or obligation;

(xii)     providing for the lease of (by or from the Seller) personal property and that provide for potential annual aggregate payments in excess of $50,000;

(xiii)     concerning any Governmental Authority;

(xiv)     limiting or purporting to limit the ability of the Seller to compete in any line of business or with any Person or in any geographic area or during any period of time, including exclusivity arrangements, non-competition or similar restrictions;

(xv)     relating to a joint venture, partnership or similar arrangements;

(xvi)     providing for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the assets or properties of the Seller, including "most favored nation" pricing arrangements, special warranties, agreements to take back or exchange goods, consignment arrangements; and

(xvii)     involving any labor organization, union or association, including any collective bargaining Contract relating thereto.

The Contracts described in the foregoing clauses (i)-(xiv) are each, individually, a "***Material Contract***" and are, collectively, the "***Material Contracts***."

(b)     The Seller has provided to the Buyer true and complete copies of each Material Contract, as amended through the Closing Date. Each Material Contract is valid, binding and enforceable obligation of the Seller and, to the Knowledge of Seller, the other parties thereto, enforceable in accordance with its terms, and is in full force and effect. With respect to the Material Contracts listed on **Schedule 5.07(a)** (or required to be listed on **Schedule 5.07(a)**), (i) neither the Seller nor, to Seller's Knowledge, any other party to any Material Contract is in default under or in violation of, in any material respect, or has provided or received any notice of any intention to terminate, any Material Contract, (ii) to the Knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both,

would constitute such a default or violation or would cause or permit the acceleration, termination or other changes to any right or obligation or the loss of any benefit thereunder, (iii) to the Knowledge of the Seller, no party to a Material Contract has repudiated any of the terms thereof or threatened to terminate, cancel or not renew any Material Contract and (iv) there are no disputes pending or, to the Knowledge of the Seller, threatened, under any Material Contract.

5.08    **Title**.  The Seller has good and marketable title to, or a valid leasehold interest in, all of its properties and assets, tangible or intangible, that are either used or held for use by it (wherever located), that are reflected on the Financial Statements or that were acquired after the Balance Sheet Date, in each case free and clear of all Encumbrances, except for Permitted Encumbrances, excluding properties and assets sold or disposed of since the Balance Sheet Date in the Ordinary Course of Business.

5.09    **Condition and Sufficiency of Assets**.  The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of Personal Property constituting the Purchased Assets are structurally sound, free from any defects, in good operating condition and repair (subject to normal wear and tear), and adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of Personal Property constituting the Purchased Assets is in need of maintenance or repairs except for ordinary, routine maintenance and repairs.  Except for the Excluded Assets, the Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.

5.10    **Real Property**.

(a)    The Seller does not own any Real Property.

(b)    **Schedule 5.10(b)** sets forth a true and complete description of all Real Property leased, licensed to or otherwise used or occupied (but not owned) by the Seller (collectively, the "***Leased Real Property***") and a true, correct and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions, renewals, guaranties and other agreements related to, used by, necessary for the conduct of or held for use in connection with the Business (the "***Real Property Leases***").  The Seller has delivered to the Buyer a true, correct and complete copy of each Real Property Lease.  Except as set forth on **Schedule 5.10(b)**, with respect to each Real Property Lease:

(i)    such Real Property Lease is valid, binding, enforceable and in full force and effect, and the Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)    the Seller is not in breach or default under such Lease and, to the Knowledge of Seller, no event has occurred or circumstance exists that, with the delivery of notice, passage of time or both, would constitute such a breach or default;

(iii)    the Seller has paid all rents, deposits and additional rents due and payable under such Real Property Lease and no security deposit or portion thereof has been applied in respect of a breach or deposit under such Real Property Lease that has not been redeposited in full;

(iv)    the Seller has not received, and has not given, any notice of any default under any of the Leases;

(v)    to the Knowledge of Seller, no other party thereto is in default thereof or has exercised any termination rights with respect thereto;

(vi)    the Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(vii)   the Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property, and has received no written, or to the Knowledge of Seller, oral notice that the owner of such Leased Real Property has made any assignment, mortgage, pledge or hypothecation of such Real Property Lease or the rents or use fees due thereunder.

(c)    Neither the Seller nor either Selling Shareholder has received any written or, to the Knowledge of Seller, oral notice of:  (i) violations of building codes, zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or, to the Knowledge of the Seller, threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or, to the Knowledge of the Seller, threatened, zoning, building code or other moratorium proceedings.  Neither the whole nor any portion of the Leased Real Property has been damaged or destroyed by fire or other casualty during the tenancy by the Seller.

(d)    The Leased Real Property is (i) in good condition and repair (subject to normal wear and tear) and (ii) sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted and as presently proposed to be conducted.

5.11    **Intellectual Property**.

(a)    **Schedule 5.11(a)** sets forth: (i) all of the Intellectual Property Registrations (with owner, countries, registration and application numbers and dates initiated), and (ii) all of the Intellectual Property Assets that are not registered.   All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars and all Intellectual Property Registrations are otherwise in good standing.   No renewal, maintenance fees, or annuities are due prior to the Closing Date or within the three (3) month period after the Closing Date.  The Seller has provided to the Buyer true, correct and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

(b)    The Seller or Harold owns exclusively all right, title and interest in and to the Intellectual Property Assets, free and clear of Encumbrances, except for Permitted Encumbrances.  Except as set forth on **Schedule 5.11(b)**, the Seller has entered into binding, written agreements with every Employee and former employee of the Seller, and with every current and former independent contractor, whereby such Employees, former employees and independent contractors (i) assigned to the Seller any ownership interest and right they may have in the Intellectual Property Assets and (ii) acknowledge the Seller's or Harold's exclusive ownership of all Intellectual Property Assets.  **Schedule 5.11(b)** lists all such agreements entered into by the Seller, and the Seller has provided to the Buyer a true, correct and complete copy of each such agreement.  Each of the Seller and Harold is in material compliance with all legal requirements applicable to such Intellectual Property Assets and the Seller's, or Harold's (on behalf of Seller), ownership and use thereof.  No Person, except for the Seller or Harold, respectively, owns or claims any rights in (or has made application for) any Intellectual Property Assets owned by the Seller or Harold or, to the Knowledge of the Seller, any Intellectual Property Asset licensed by the Seller for use in connection with the conduct of the Business.

(c)    **Schedule 5.11(c)** lists all Intellectual Property Licenses.  The Seller has provided the Buyer with true, correct and complete copies of all Intellectual Property Licenses.  All Intellectual Property Licenses are valid, binding and enforceable between the Seller or Harold (on behalf of the Seller) and, to the Knowledge of Seller, the other parties thereto and the Seller or Harold and, to the

Knowledge of Seller, each other party thereto is in full compliance with the terms and conditions of such Intellectual Property Licenses.  Upon and after the Closing, Buyer will own, be licensed, or otherwise have the valid right to exploit all Intellectual Property in the possession of, under the control of, or used by the Seller in the Business, all upon the same terms and subject to the same conditions as exploited by the Seller prior to the Closing.

(d)     The Intellectual Property Assets as currently or formerly owned, licensed or used in the Business, and the conduct of the Business as currently and formerly conducted have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person, nor does the operation of the Business constitute unfair competition or a deceptive or unfair trade practice.  Neither the Seller nor either Selling Shareholder has received any written or, to the Knowledge of Seller, oral communication, and no Action has been instituted, settled or, to the Knowledge of the Seller, threatened, that alleges any such infringement, violation or misappropriation.  None of the Intellectual Property is subject to any outstanding Order.

(e)     **Schedule 5.11(e)** sets forth all licenses, sublicenses and other agreements pursuant to which the Seller or Harold grants rights or authority to any Person with respect to any Intellectual Property Assets.  Except as set forth on **Schedule 5.11(e)**, the Intellectual Property Assets are not used or available for use by any Person, except the Seller, and no Person is licensed or has been granted any right under any of the Intellectual Property Assets.  The Seller has provided the Buyer with true, correct and complete copies of all such agreements.  All such agreements are valid, binding and enforceable on the Seller and the Seller is in material compliance with the terms and conditions of such agreements.  To the Knowledge of the Seller, no Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Intellectual Property Assets.  The Intellectual Property Assets are not the subject of any Action and, to the Seller's Knowledge, no Action is threatened against the Seller relating to any Intellectual Property Asset.  Seller has not agreed not to assert any Intellectual Property Assets against any person.

(f)     The Seller uses reasonable measures to maintain the secrecy of all Trade Secrets of the Seller that the Seller or either Selling Shareholder advocates as material to the operations of the Seller and are valuable thereto by virtue of their secrecy.  Seller has entered into confidentiality and nondisclosure agreements with all Persons with access to any Trade Secrets to protect the confidentiality and value of such Trade Secrets, and, to the Seller's Knowledge, there has not been any breach of any such agreement.

(g)     **Schedule 5.11(g)** identifies the principal information systems (including operating systems, software, applications and databases) related to, used by, necessary for the conduct of or held for use in connection with the Business (the "***Information Systems***").  The Information Systems are operational and perform the functions for which they were intended.  Except as disclosed on **Schedule 5.11(g)**, (i) the Seller owns or has a valid license for all of the Information Systems used by it in the Business, (ii) the Information Systems do not contain any computer code or any other procedures, routines or mechanisms which permit a third party to access such Information Systems without authorization and (iii) the Information Systems that are owned by the Seller (and not licensed from a third party) are not subject to the terms or any "open source," "copyleft" or other similar license or distribution model that would require its source code to be publicly distributed in either whole or part.

5.12     **Accounts Receivable**.  The Accounts Receivable reflected on the balance sheet included with the Financial Statements and the Accounts Receivable arising after the Balance Sheet Date (a) have arisen from bona fide transactions entered into by the Seller involving the sale of goods or the rendering of services in the Ordinary Course of Business, (b) constitute only valid, undisputed claims of the Seller not subject to claims of setoff or other defenses or counterclaims and (c) are collectible in full in the

Ordinary Course of Business, net of the reserve therefor, within sixty (60) days after billing.  There are no disputes with respect to any of the Accounts Receivable reflected on the balance sheet included in the Interim Financial Statements that have not been reserved for in the Interim Financial Statements.  The reserve on the Financial Statements against the Accounts Receivable for returns and bad debts is adequate and has been calculated in accordance with GAAP and in a manner consistent with past practice.

5.13 **Customers and Suppliers**.

(a) **Schedule 5.13(a)(i)** sets forth the top ten (10) customers of the Business (determined on the basis of the total dollar amount of sales to such customers) for each of the years ended December 31, 2016, December 31, 2015 and December 31, 2014 and for the period between January 1, 2017 and October 31, 2017 ("***Material Customers***"), and, opposite the name of each Material Customer, the dollar amount of revenues from such Material Customer during such periods.  Except as set forth on **Schedule 5.13(a)(ii)**, (i) all Material Customers continue to be customers of the Business and none of such Material Customers has materially reduced, nor, to the actual knowledge of either Selling Shareholder, does any Material Customer plan to reduce, its business with the Seller from the levels achieved during the year ended December 31, 2016, (ii) no Material Customer has terminated its relationship with the Seller, nor has the Seller received any written or, to the Knowledge of Seller, oral notice that any Material Customer intends to do so, (iii) the Seller is not involved in any material claim, dispute or controversy with any Material Customer and (iv) the Seller is not involved in any material claim, dispute or controversy with any of its other customers.

(b) **Schedule 5.13(b)(i)** sets forth the top ten (10) suppliers of the Business (determined on the basis of the total dollar amount of purchases from such suppliers) for each of the years ended December 31, 2016, December 31, 2015 and December 31, 2014 and for the period between January 1, 2017 and October 31, 2017 ("***Material Suppliers***"), and, opposite the name of each Material Supplier, the dollar amount of purchases from such Material Supplier during such periods.  Except as set forth on **Schedule 5.13(b)(ii)**, (i) all Material Suppliers continue to be suppliers of the Business and none of such Material Suppliers has materially reduced, nor, to the actual knowledge of either Selling Shareholder, does any Material Supplier plan to reduce, its business with the Seller from the levels achieved during the year ended December 31, 2016, (ii) no Material Supplier has terminated its relationship with the Seller, nor has the Seller received any written or, to the Knowledge of Seller, oral notice that any Material Supplier intends to do so, (iii) the Seller is not involved in any material claim, dispute or controversy with any Material Supplier and (iv) the Seller is not involved in any material claim, dispute or controversy with any of its other suppliers..

5.14 **Insurance**.  **Schedule 5.14(a)** sets forth (i) a true, correct and complete list and brief description (including all applicable premiums and deductibles) of all current insurance policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance (each, an "***Insurance Policy***") maintained by the Seller, or under which the Seller, or any director, manager or officer of the Seller, as the case may be, is or has been a party, an insured or otherwise the beneficiary of coverage and (ii) a list of all pending claims, a list of any potential claims reserved for on the Financial Statements and a list of the claims history for the Seller since the Balance Sheet Date.  There are no claims pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.

5.15 **Legal Proceedings; Orders**.

(a) Except as set forth on **Schedule 5.15(a)(i)**, there are no Actions pending or, to the Knowledge of the Seller, threatened, and no Actions have been brought against or brought by the Seller, (a) that relate to or affect the Seller or the Business or (b) that challenge or seek to prevent, enjoin

or otherwise delay the transactions contemplated by this Agreement.  To the Knowledge of Seller, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. There are no outstanding Orders and no unsatisfied judgments, penalties or awards against the Seller or the Business.  **Schedule 5.15(a)(ii)** lists all Actions to which the Seller was a party in the past three (3) years (whether or not settled).  None of the items set forth on **Schedule 5.15(a)**, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on **Schedule 5.15(b)**, (i) there is no Order to which the Seller, or any of the Purchased Assets, is subject and (ii) to the Seller's Knowledge, no officer, director, manager, agent, consultant, former employee or Employee, in each case, of the Seller is subject to any Order that prohibits such officer, manager, agent, consultant, former employee or Employee from engaging in or continuing any conduct, activity or practice relating to the Business.  The Seller is, and has been for the past three (3) years, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject.  The Seller has not received any written or, to the Knowledge of Seller, oral notice from any Governmental Authority or any other Person regarding any actual or alleged violation of, or failure to comply with, any term or requirement of any Order to which the Seller, or any of the assets owned or used by the Business, is or has been subject within the past three (3) years.

5.16     **Compliance with Laws; Permits**.

(a)     The Seller is now, and for the past three (3) years has been, in material compliance with all Laws and Orders.  To the Knowledge of the Seller, no event has occurred or circumstance exists as of the Closing Date that could reasonably be expected to constitute a violation of any Law in connection with the conduct of the Business. All Permits required for the Seller to conduct the Business immediately following the Closing have been obtained by the Seller and are valid and in full force and effect.  All fees and charges with respect to such Permits as of the Closing Date have been paid in full.  **Schedule 5.16** sets forth a list of all current Permits issued to the Seller that are related to the conduct of the Business and the operation of the Purchased Assets as currently conducted, including the names of the Permits and their respective dates of issuance and expiration.

(b)     Neither the Seller nor any Related Party or any other Person acting on behalf of the Seller, has directly or indirectly (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, regardless of form, whether in money, property or services, (A) to obtain favorable treatment in securing business for the Business, (B) to pay for favorable treatment for business secured by the Business or (C) to obtain special concessions or for special concessions already obtained, for or in respect of the Business or (ii) established or maintained any fund or asset with respect to the Business that has not been recorded in the books and records of the Business.

5.17     **Environmental Matters**.  Except as set forth on **Schedule 5.17**:

(a)     The Seller, and the operations of the Seller with respect to the Business or the Purchased Assets, are currently and have been in compliance with all Environmental Laws.  There currently are effective all Environmental Permits required under any Environmental Law that are necessary for the Seller's activities and operations at the Real Property and for the operation of the Business, and any applications for renewal of such Environmental Permits have been submitted on a timely basis and a list of such Environmental Permits are provided on **Schedule 5.17(a)**.

(b)     The Seller has not received from any Person any Environmental Notice or Environmental Claim.

(c)     The Seller has not stored, treated, recycled or disposed of, or arranged for the storage, treatment, recycling or disposal of, any Hazardous Materials at any Real Property in violation of any applicable Environmental Laws or disposed of, or arranged for the storage, treatment, recycling or disposal at any real property that is listed on, or has been proposed for listing on, the National Priorities List (or the Comprehensive Environmental Response, Compensation, and Liability Information System) under CERCLA, or any similar state list.

(d)     The Seller has not used, generated, manufactured, refined, transported, treated, stored, handled, disposed, transferred, produced or processed any Hazardous Materials at, under or upon the Real Property or formerly owned, leased or operated property, except in compliance with all applicable Environmental Laws; there has been no Release or Threat of Release of any Hazardous Material by Seller, at, under or in the vicinity of the Real Property that requires or may require reporting, investigation, assessment, cleanup, remediation or any other type of response action pursuant to any Environmental Law; and, to the Knowledge of the Seller, there has been no Release or Threat of Release of any Hazardous Material at, under or in the vicinity of property formerly owned or leased by the Seller that requires or may require reporting, investigation, assessment, cleanup, remediation or any other type of response action by the Seller pursuant to any Environmental Law.

(e)     To the Knowledge of the Seller, there are no underground tanks at the Real Property.  To the Knowledge of the Seller, except in compliance with applicable Environmental Law, there is no asbestos nor any asbestos-containing materials or polychlorinated biphenyls used in, applied to or in any way incorporated in any building, structure or other form of improvement on the Real Property. The Seller does not sell or lease, and has not sold or leased, any product containing asbestos or that utilizes or incorporates asbestos-containing materials in any way.

(f)     The Seller has delivered, or caused to be delivered, to the Buyer true, correct and complete copies of all documents, records and information in its possession or control concerning environmental conditions and potential liability under Environmental Laws, including environmental site assessments, compliance audits, asbestos surveys and documents regarding any Release of Hazardous Materials at, upon or from the Real Property, spill control plans and environmental agency reports and correspondence.

5.18    **Employee Benefit Plans**.

(a)     **Schedule 5.18(a)** lists each Employee Benefit Plan maintained by the Seller, to which the Seller contributes or has any obligation to contribute, or with respect to which the Seller has any Liability.

(i)     Except as set forth on **Schedule 5.18(a)(i)**, each such Employee Benefit Plan (and each related trust, insurance contract, or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan and complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code, and other applicable Laws.

(ii)    All required reports and descriptions (including Form 5500 annual reports, summary annual reports, and summary plan descriptions) have been timely filed and/or distributed in accordance with the applicable requirements of ERISA and the Code with respect to each such Employee Benefit Plan.  The requirements of COBRA have been met in all material respects with respect to each such Employee Benefit Plan.

(iii)   All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by

ERISA and the Code to each such Employee Benefit Plan that is an Employee Pension Benefit Plan and all contributions for any period ending on or before the Closing Date that are not yet due have been made to each such Employee Pension Benefit Plan or accrued in accordance with the past custom and practice of the Seller.  All premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each such Employee Benefit Plan that is an Employee Welfare Benefit Plan.

(iv)     There have been no prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code with respect to any Employee Benefit Plan maintained by the Seller or any Employee Benefit Plan maintained by an ERISA Affiliate.  No fiduciary has any liability for material breach of fiduciary duty or any other material failure to act or comply in connection with the administration or investment of the assets of any such Employee Benefit Plan.  No action, suit, proceeding, hearing, or investigation with respect to the administration or the investment of the assets of any such Employee Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of the Seller, threatened.

(v)     The Seller has delivered to the Buyer with respect to each Employee Benefit Plan correct and complete copies of the plan documents and summary plan descriptions, the most recent determination letter received from the Internal Revenue Service or, with respect to a prototype plan, the opinion letter from the IRS to the prototype plan sponsor, the three most recent annual reports (Form 5500, with all applicable attachments), all personnel, payroll, and employment manuals and policies and any employee handbook, all reports regarding satisfaction of the nondiscrimination requirements of Sections 410(b), 401(k), and 401(m) of the Code and compliance with the limitations of Sections 402(g) and 415 of the Code, the most recent trustee's report for each such Employee Benefit Plan funded through a trust, all related trust agreements, insurance contracts, and other funding arrangements which implement each such Employee Benefit Plan, and all other administration and service agreements with respect to each such Employee Benefit Plan.

(b)     Neither the Seller nor any ERISA Affiliate contributes to, has or ever has had any obligation to contribute to, or has any Liability under or with respect to any Employee Pension Benefit Plan that is a "defined benefit plan" (as defined in Section 3(35) of ERISA) or that is subject to Section 412 of the Code.

(c)     Neither the Seller nor any ERISA Affiliate contributes to, has or ever has had any obligation to contribute to, has any Liability (including withdrawal liability as defined in Section 4201 of ERISA) under or with respect to any Multiemployer Plan (as defined in Section 3(37) of ERISA), or has engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(a) of ERISA.

(d)     Neither the Seller nor any ERISA Affiliate contributes to, has or ever has had any obligation to contribute to, or has any Liability with respect to, any Employee Welfare Benefit Plan or other arrangement providing health or life insurance or other welfare type benefits for Employees or retired or terminated employees (or any spouse or other dependent thereof) of the Seller other than in accordance with COBRA and state equivalent laws.

(e)     Each Employee Benefit Plan that is an Employee Pension Benefit Plan intended to be qualified under Section 401(a) of the Code (a "*Qualified Benefit Plan*") has received a favorable determination letter from the IRS, or with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a) of the Code, and to the Knowledge of the Seller, nothing has occurred that could reasonably be

expected to cause the revocation of such determination letter from the IRS or the unavailability of reliance on such opinion letter from the IRS, as applicable.

(f)     The Seller does not have any nonqualified deferred compensation plan or arrangement subject to Section 409A of the Code.

(g)     No Employee Benefit Plan is subject to Section 457A of the Code.

(h)     No Employee Benefit Plan is funded by, associated with, or related to a "voluntary employees' beneficiary association" within the meaning of Section 501(c)(9) of the Code.

(i)     Neither the Seller nor any ERISA Affiliate is or has ever been an "applicable large employer" as defined in Section 4980H(c)(2) of the Code.

(j)     Each such Employee Benefit Plan has been timely amended to reflect the provisions of any and all laws, regulations, and rulings in effect for any period prior to or as of the Closing other than amendments for which the remedial amendment period under Section 401(b) of the Code (including, if applicable, any extension of the remedial amendment period) has not expired, and there are no plan document failures, operational failures, demographic failures, or employee eligibility failures within the meaning of Revenue Procedure 2016-51 with respect to any such Employee Benefit Plan.

(k)     Except as provided in **Schedule 5.18(k)(i)**, neither the execution or delivery of this Agreement, the performance by the Seller nor the consummation of the transactions contemplated by this Agreement could entitle any Employee or former employee, officer, director or consultant of the Seller to: (i) severance pay or any increase in severance pay upon termination of employment after the date of this Agreement or (ii) accelerate the time of payment or vesting or result in any payment or funding of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Employee Benefit Plans. The Seller does not have Liability in connection with any employment or other relationship between the Seller, on the one hand, and the former employees of the Seller, on the other hand, except as identified in **Schedule 5.18(k)(ii)**.

5.19    **Employment Matters**.

(a)     **Schedule 5.19(a)** contains a list of all Employees, independent contractors and sales representatives and sets forth for each such individual the following: (i) title or position (including whether full or part time), (ii) hire date, (iii) current annual base compensation rate, (iv) commission, bonus or other incentive-based compensation, (v) accrued or deferred bonus payments, including any Sale Bonuses and (vi) a description of the fringe benefits provided to each such individual. All commissions and bonuses payable to Employees, former employees, consultants, or contractors of the Business for services performed on or prior to the Closing Date have been paid in full or are reflected as a current liability of the Seller and there are no outstanding agreements, understandings or commitments of the Seller with respect to any commissions, bonuses or increases in compensation.

(b)     The Seller is not a party to, or bound by, any collective bargaining or other Contract with a labor organization representing any of the Employees, and there are no labor organizations representing, purporting to represent or to the Knowledge of Seller, attempting to represent any Employee. There has never been, nor has there been, to the Knowledge of the Seller, any threat of, any strike, slowdown, work stoppage, lockout, organizational attempt on behalf of any labor union, concerted refusal to work overtime or other similar labor activity or dispute affecting the Seller or any of the Employees or former employees.

(c)     The Seller is and has been in material compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to the Employees or former employees, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, health and safety, workers' compensation, leaves of absence and unemployment insurance.  All individuals characterized and treated by the Seller as consultants or contractors of the Business are set forth on **Schedule 5.19(c)**.  There are no Actions against the Seller pending or, to the Knowledge of the Seller, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any Employee or former employee, consultant or independent contractor of the Business, including any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under applicable Laws.

(d)     The Seller has complied in all respects with the WARN Act, and during the last twelve (12) months, there has been no mass layoff, plant closing or shutdown that implicates the WARN Act or any similar Law.

(e)     The Seller has complied with all applicable Laws relating to the Employees and former employees, including provisions relating to hiring, terms and conditions, discrimination and termination, wages, hours, equal opportunity, collective bargaining and the withholding and payment of social security and other Taxes.  The Seller has not incurred, and no circumstances exist under which the Seller would reasonably be expected to incur, any liability arising from the misclassification of any Employees or former employees as consultants or independent contractors or from the misclassification of consultants or independent contractors as employees of the Seller.

(f)     Other than as set forth on **Schedule 5.19(f)**, none of the Employees or former employees is subject to any secrecy or non-competition agreement (including Contracts with Persons that are not Affiliates of the Seller) or any other similar agreement or restriction.  Except as set forth on **Schedule 5.07(a)(v)(A)**, no Employee has an employment agreement that is not "at will."

(g)     All Employees who work in the United States are, and all former employees who worked in the United States whose employment terminated, voluntarily or involuntarily were, within the five (5) years prior to the Closing Date, legally authorized to work in the United States.  The Seller has completed and retained the necessary employment verification paperwork under IRCA for the Employees.  Further, the Seller is, and has been, in compliance with both the employment verification provisions (including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA.

5.20     **Related Party Transactions**.  Except as set forth on **Schedule 5.20**, no Related Party (a) has been during the past five (5) years a party to any Contract, commitment or transaction with the Seller, (b) is currently a party to any Contract, commitment or transaction with the Seller that is in effect as of the Closing Date or (c) has (or has had during the past five (5) years) any direct or indirect interest (i) in, or during the last five (5) years was a director, manager, officer or employee of, any Person that is a client, customer, supplier, lessor, lessee, debtor, creditor or competitor of the Seller or (ii) in any material property, asset or right that is owned or used by the Seller in the conduct of the Business.

5.21     **Taxes**.  Except as set forth on **Schedule 5.21**:

(a)     all Tax Returns required to be filed by the Seller for any Pre-Closing Tax Period have been timely filed and such Tax Returns are true, complete and correct in all material respects;

(b)      all Taxes due and owing by the Seller for any Pre-Closing Tax Period (whether or not shown on any Tax Return) have been timely paid;

(c)      the Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any Employee, former employee, or shareholder, and has complied with all information reporting and backup withholding provisions of applicable Law;

(d)      no extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Seller and there are no extensions of time within which to file any Tax Return;

(e)      all Tax deficiencies asserted, or assessments made, against the Seller as a result of any examinations by any Taxing Authority have been fully paid and, to the Knowledge of the Seller, there are no Tax deficiencies or assessments threatened with respect to the Seller;

(f)      no claim that the Seller is or may be subject to taxation has been made by a Taxing Authority in a jurisdiction where the Seller does not file Tax Returns;

(g)      there are no pending or, to the Knowledge of the Seller, threatened, audits, examinations or investigations by any Taxing Authority concerning the Seller;

(h)      there are no Tax administrative proceedings or Tax litigation against the Seller;

(i)      the Seller is not a party to any Tax allocation, Tax indemnity or Tax sharing agreements or similar arrangements;

(j)      the Seller has collected all sales, use or value added taxes required to be collected by applicable Law, and has timely remitted such amounts to the appropriate Taxing Authorities;

(k)      the Seller is not, and has not been, a member of a consolidated, affiliated, combined or unitary Tax group;

(l)      the Seller has not been a party to a "reportable transaction" (as such term is defined in Treasury Regulations Section 1.6011-4(b));

(m)      the Seller (i)(A) in the case where a foreign country does not have a Tax treaty with the U.S., is not engaged in business in any such foreign country, or (B) in the case where a foreign country has a Tax treaty with the U.S., does not have a permanent establishment in any such foreign country, (ii) does not have an office or fixed place of business in any foreign jurisdiction, or (iii) is not otherwise subject to Tax in any foreign jurisdiction;

(n)      to the extent required by applicable Law, the Seller has duly and timely filed each Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts, and each FinCEN Report 114, Report of Foreign Bank and Financial Accounts, required to be filed by the Seller, and all such forms are true, complete and correct in all respects;

(o)      all withholding taxes resulting from cross-border payments or transfers (or deemed payments or transfers) of any kind by the Seller have been withheld by the Seller and paid over to the appropriate Tax Authority;

(p)      there are no Liens, other than Permitted Liens, on the Purchased Assets;

(q)     none of the Purchased Assets constitute tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code, and none of the Purchased Assets are subject to a lease, safe harbor lease or other arrangement as a result of which the Seller is not treated as the owner of such Purchased Assets for federal income tax purposes;

(r)     none of the Purchased Assets are subject to an arrangement that may cause a "tax-exempt use loss" under Section 470 of the Code for any year;

(s)     none of the Purchased Assets are subject to any "Section 467 rental agreement" within the meaning of Section 467(d) of the Code or Treasury Regulation Section 1.467-1(c); and

(t)     the transactions contemplated by this Agreement will not cause any reduction in, or elimination of, any Tax advantaged financing, Tax holiday or other Tax benefit (including credits) with respect to the Purchased Assets or the Business.

5.22    **Brokers**.  No Person (a) has acted directly or indirectly as a broker, finder, financial advisor or investment banker for the Seller or either Selling Shareholder or (b) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Transaction Document based upon arrangements made by or on behalf of the Seller, either Selling Shareholder or any of their respective Affiliates.

5.23    **Data Security and Privacy**.

(a)     <u>General</u>.  The Seller maintains policies and procedures regarding security, privacy, and use of personal data that are commercially reasonable, consistent with applicable Law and with industry practices relevant to the Business.  The Seller is not subject to any pending, or to the Knowledge of Seller, threatened action against the Seller nor has it received any written notice alleging that the Seller or the operation of the Business has experienced a security breach adversely affecting the Seller's protection of personal data or violated any person's privacy rights, privacy-related Law or privacy policy.

(b)     <u>Personally Identifiable Information</u>.  The Seller has complied in all material respects with applicable Laws, contractual and fiduciary obligations, the Seller's terms of use and service Contracts, and any privacy policies published by the Seller relating to (i) the privacy of users of the Internet websites and mobile applications owned, maintained or operated by the Seller in connection with the Business (collectively, the "***Seller Sites***") or (ii) the collection, storage, use, transfer, sharing, disposal or processing of any Personally Identifiable Information collected or used by the Seller or maintained by third parties having authorized access to such information (collectively, all of the foregoing, the "***Seller Site Policies***").  The execution, delivery and performance of this Agreement complies in all material respects with applicable Laws relating to privacy and with the Seller Site Policies published by the Seller.  Copies of all Seller Site Policies published by the Seller have been provided to the Buyer.  Each such Seller Site Policy and all materials distributed or marketed by the Seller have at all times made all disclosures to users or customers required by applicable Laws, and none of such disclosures made or contained in any such policy or in any such materials has been in violation in any material respect of any applicable Laws or misleading or deceptive.

(c)     <u>Protection of Personally Identifiable Information</u>.  The Seller has at all times taken commercially reasonable steps (including implementing and monitoring compliance with adequate measures with respect to technical and physical security) to (i) protect the confidentiality of confidential information and trade secrets of the Seller or of any third party that has provided any confidential information or trade secrets to the Seller, and (ii) ensure that all Personally Identifiable Information is protected against loss and against unauthorized access, use, modification, disclosure or other misuse.  To

the Knowledge of Seller, there has been no loss, unauthorized access or misuse of Personally Identifiable Information, nor has the Seller experienced an event that requires it under applicable Law to provide notice to any third party or Governmental Authority of any loss or misuse of or unauthorized access to Personally Identifiable Information pursuant to applicable Laws.  Except as set forth on **Schedule 5.23(c)**, the Seller does not currently have, and never has had, any Personally Identifiable Information of any customers of the Business.

(d)     _Bugs and Defects_.  To the Knowledge of Seller, there are no material errors, bugs or defects with respect to any of the Software or the Seller Sites that the Seller reasonably believes it cannot fix in the Ordinary Course of Business or which otherwise will materially adversely affect the use or functionality of such Software or the Seller Sites.

(e)     _Contaminants_.  To the Knowledge of Seller, all Seller Sites, the Software and information technology systems used by the Seller in connection with the operation of the Business are free of any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software routines or hardware components that permit unauthorized access or the unauthorized disablement or erasure of such Seller Sites, Software, systems, data or other software ("**_Contaminants_**").  The Seller has taken commercially reasonable steps to prevent the introduction of Contaminants into such Seller Sites, Software and information technology systems used by the Seller in connection with the operation of the Business.

(f)     _Security Measures_.  The Seller has taken commercially reasonable steps to protect the information technology systems used in connection with its operations of the Business.  To the Knowledge of Seller, there have been no unauthorized intrusions or breaches of the security of such information technology systems.  Without limiting the generality of the foregoing, the Seller represents and warrants that it has implemented and currently maintains appropriate security measures in accordance with 201 CMR 17.00: Standards for The Protection of Personal Information of Residents of the Commonwealth of Massachusetts.

5.24    **Full Disclosure.**  Except for the representations and warranties contained in this Article V or Article IV (including the related portions of the Schedules attached hereto), neither Seller, Selling Shareholders nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Selling Shareholders, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents, materials or management presentations (in any form), in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in Law.  Without limiting the generality of the foregoing, except as expressly set forth in this Agreement, neither the Seller not the Selling Shareholders makes any representation or warranty with respect to any projections, estimates or budgets delivered to or made available to the Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Seller of the future business or operations of the Seller.

### ARTICLE VI
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller and Selling Shareholders as follows:

6.01    **Organization**.  The Buyer was duly organized, is validly existing, is in good standing under the Laws of the State of Delaware and has the full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it.

6.02  **Authority**.  The Buyer has the full power and authority to execute, deliver and perform the Buyer's obligations under this Agreement and the Transaction Documents to which it is a party.  The execution and delivery by the Buyer of this Agreement and the Transaction Documents to which it is a party, the performance by the Buyer of its obligations hereunder and thereunder and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Buyer.  This Agreement has been duly executed and delivered by the Buyer, and (assuming due authorization, execution and delivery by the Seller and the Selling Shareholders) this Agreement constitutes a legal, valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.  When each Transaction Document to which the Buyer is, or will be, a party has been duly executed and delivered by the Buyer (assuming due authorization, execution and delivery by each other party thereto), each such Transaction Document will constitute a legal and binding obligation of the Buyer enforceable against it in accordance with its terms.

6.03  **No Conflicts; Consents**.  Except as set forth on **Schedule 6.03**, neither the execution and delivery of this Agreement and the Transaction Documents, nor the performance by the Buyer of the Buyer's obligations hereunder or thereunder will:  (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of the Buyer, (b) conflict with or result in a violation or other breach of any Law or Order applicable to the Buyer or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of or constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which the Buyer is a party or by which the Buyer is bound.  No consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement or any of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

6.04  **Brokers**.  No Person (a) has acted directly or indirectly as a broker, finder, financial advisor or investment banker for the Buyer or (b) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Transaction Document based upon arrangements made by or on behalf of the Buyer or any of its Affiliates.

6.05  **Legal Proceedings**.  There are no Actions pending or, to the Knowledge of the Buyer, threatened, and no Actions have been brought against or brought by the Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**ARTICLE VII**
**COVENANTS**

7.01  **Employees**.

(a)  In connection with the Closing, the Buyer will make offers of employment on an at-will basis as of the Closing Date to each Employee, other than those Employees set forth on **Schedule 7.01** (the "*Excluded Employees*") (which offers will include, as a condition to employment, customary non-compete and non-solicit agreements in forms acceptable to the Buyer to be executed by each such Employee); provided, however, that nothing in this Agreement obligates, or will be construed to obligate, the Buyer to employ any Employee for any period of time or continue any term or condition of employment or any employment benefits or policies for any period of time.  The Employees who accept employment with the Buyer will be referred to herein as "*Transferred Employees*."

(b)  The Buyer will take such reasonable actions as are necessary to immediately transition the Transferred Employees to the relevant existing or new Employee Benefit Plans of the Buyer (or an Affiliate of the Buyer).  For purposes of this **Section 7.01**, the Selling Shareholders

and the Seller will, and will cause their respective Affiliates to, cooperate in providing, and will promptly provide, all relevant data and information reasonably requested by the Buyer to facilitate the transition of the Transferred Employees in all respects to employment with, and extending coverage under Employee Benefit Plans of, the Buyer (or any Affiliate of the Buyer) and to satisfy any obligations of the Buyer with respect thereto.

(c)     The Buyer (i) shall give each Transferred Employee under any benefit plan or personnel policies that covers the Transferred Employee after the Closing Date, including any vacation, sick leave and severance policies, credit for purposes of eligibility and vesting for the Transferred Employee's service with the Seller prior to the Closing Date, (ii) shall use reasonable efforts to allow such Transferred Employees to participate in each employee benefit plan of the Buyer (or any Affiliate of the Buyer) providing welfare benefits (including medical, life insurance, long-term disability insurance and long-term care insurance, if applicable) without regard to preexisting-condition limitations, waiting periods, evidence of insurability or other exclusions or limitations not imposed on the Transferred Employees by the corresponding Benefit Plans immediately prior to the Closing Date, and (iii) if any of the Benefit Plans are terminated prior to the end of the plan year that includes the Closing Date, the Buyer shall use reasonable efforts to credit the Transferred Employees with any expenses that were covered by the Benefit Plans for purposes of determining deductibles, co-pays and other applicable limits under any similar replacement plans.

7.02    **Non-competition; Non-solicitation**.

(a)     Non-Competition.  For the period commencing on the Closing Date and ending on the five (5)-year anniversary of the Closing Date (the "***Restricted Period***"), each Restricted Party will not, directly or indirectly, (i) enter into, be employed by, engage in, consult, manage or otherwise participate in the operation of any business which competes with the Business (as conducted by the Buyer) within the Restricted Territory, (ii) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Business (as conducted by the Buyer) within the Restricted Territory, (iii) divert, entice or otherwise take away any customers, business, patronage or orders of the Buyer, or attempt to do so or (iv) promote or assist, financially or otherwise, any person engaged in any business which competes with the Business (as conducted by the Buyer) within the Restricted Territory.  Nothing contained in this **Section 7.02** will prohibit the Restricted Parties from acquiring or holding at any one time a passive Investment of less than two percent (2%) of the outstanding shares of capital stock of any publicly traded corporation that may compete with the Buyer within the Restricted Territory.  For purposes of this **Section 7.02**, the Buyer will also include any Affiliate of the Buyer.

(b)     Non-Solicitation.  During the Restricted Period, each Restricted Party will not, directly or indirectly, at any time solicit, induce or hire, or attempt to solicit, induce or hire, any employee, sales representative, agent or consultant of the Buyer, or any of its Affiliates, to terminate their employment, representation or other association with the Buyer or its Affiliates, without obtaining written consent of the Buyer prior to such solicitation or inducement.

(c)     Non-Disclosure.  Each Restricted Party will keep in strict confidence, and will not, directly or indirectly, at any time, (i) disclose, divulge or make accessible to any Person any Confidential Information, without the prior written consent of the Buyer, unless and except to the extent that such disclosure is necessary in the performance of employment duties for the Buyer or as required by any subpoena or other legal process or (ii) use any Confidential Information for such Person's own account, for the account of any other Person or to the detriment of the Buyer or its Affiliates, without the prior written consent of the Buyer.  Upon the Buyer's request, the Restricted Party will deliver, or cause

to be delivered, to the Buyer all tangible embodiments relating to the Confidential Information that such Person possesses or has under his, her or its control.

(d)     Acknowledgment and Relief.  Each Restricted Party acknowledges that (i) its obligations under this **Section 7.02** are reasonable in the context of the nature of the Business and the competitive injuries likely to be sustained by the Buyer if it were to violate such obligations, (ii) the covenants in this **Section 7.02** are adequately supported by consideration from the Buyer for the benefit of the Business after the Closing Date and (iii) the foregoing makes it necessary and reasonable for the protection of the Business that it not compete with the Buyer for the Restricted Period contained herein. Accordingly, each Restricted Party acknowledges and agrees that the remedy at law available to the Buyer for breach of such Restricted Party's obligations under this **Section 7.02** would be inadequate; therefore, in addition to any other rights or remedies that the Buyer may have at law or in equity, temporary and permanent injunctive relief may be granted in any Action which may be brought to enforce any provision contained in this **Section 7.02** without the necessity of proof of actual damage.  If it is judicially determined that the Restricted Party has violated this **Section 7.02**, then the period applicable to each obligation that such Person has been determined to have violated will automatically be extended by a period of time equal in length to the period during which such violation or violations occurred.

(e)     Other Agreements.  The obligations and restrictions set forth in this **Section 7.02** are in addition to the provisions of any employment or other agreement of each Restricted Party that may be entered into from time to time and addresses the same or similar subject matter covered by this **Section 7.02**.

7.03     **Bulk Sales Laws**.  The Buyer hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" Laws (including any Tax "bulk transfer" or Tax successor Liability Laws) of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Buyer; provided, however, that the Seller and Selling Shareholder, jointly and severally, agree (a) to pay and discharge when due or to contest or litigate all claims of creditors or Taxing Authorities that are asserted against the Buyer or the Purchased Assets by reason of such noncompliance, (b) to indemnify, defend and hold harmless the Buyer from and against any and all such claims in the manner provided in **Article VIII** and (c) to take promptly all necessary action to remove any Encumbrance that is placed on the Purchased Assets by reason of such noncompliance.

7.04     **Use of Business Name**.  Following the Closing, the Seller will immediately cease to use or do business, and cease to allow any Affiliate of the Seller to use or do business, under the name "Everost, Inc." or any name that is derivative or similar to such name or any trade names.

7.05     **Public Announcements**.  Unless otherwise required by applicable Law or the rules or regulations of any stock exchange or national market system on which the securities of the Buyer (or any Affiliate of the Buyer) are listed (based upon the advice of counsel), no party hereto will make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other (which consent may not be unreasonably withheld or delayed) and the parties hereto will cooperate as to the timing and contents of any such announcement.

7.06     **Tax Matters**.

(a)     Cooperation on Tax Matters.  The Seller and the Buyer will cooperate in the preparation and filing of, and if necessary, join in the execution of, Tax Returns related to the Business, including furnishing to each other, upon request, as promptly as practicable, available information relating to the Business (including access to books and records) as is reasonably necessary for the filing of all Tax

Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any action relating to any Tax. The Seller and the Buyer will cooperate with each other and take any action reasonably requested by the other party to minimize Taxes and fees, including assisting the other party (i) in filing a claim for refund, (ii) in responding to an inquiry by a Taxing Authority or (iii) in defending or litigating a Tax matter relating to the Business. The Seller and the Buyer will retain all Tax Returns, schedules and work papers, records and other documents of the Seller or that otherwise relate to the Business, that are in their possession for Pre-Closing Tax Periods and Straddle Tax Periods until one (1) year after the expiration of the applicable statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective taxable periods. The Seller will deliver, or cause to be delivered, within five (5) days of the Buyer's request therefor any information required to be reported by the Buyer, either Selling Shareholder or the Seller pursuant to Section 6043A of the Code.

(b)      Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid 50% by the Seller and the Selling Shareholders, and 50% by the Buyer when due. The Seller and the Buyer will, at their shared expense, timely file any Tax Return or other document with respect to such Taxes or fees.

(c)      Prorations of Certain Taxes. Subject to **Section 7.06(b)**, with respect to any non-income Tax Liability for a Straddle Tax Period, such Taxes will be allocated between the Pre-Closing Tax Period and Post-Closing Tax Period in the following manner: (i) real property taxes and personal property taxes will be prorated based on the number days in each of the Pre-Closing Tax Period and Post-Closing Tax Period and (ii) all other non-income Taxes will be allocated between the Pre-Closing Tax Period and Post-Closing Tax Period based on an interim closing of the books of the Business as of the close of business on the Closing Date. To the extent that actual Tax bills for the Straddle Tax Period are not available prior to Closing, Taxes will be prorated at Closing utilizing the most recent ascertainable tax bills. The Seller and the Buyer will re-prorate the Taxes at issue upon the Buyer's receipt of the actual Tax bill for the Tax year in question, if any. If one party remits to the appropriate Taxing Authority payment for Taxes, which are subject to proration under this **Section 7.06(c)** and such payment includes the other party's share of such Taxes, such other party will promptly reimburse the remitting party for its share of such Taxes.

(d)      Employment Taxes. With respect to the preparation and filing of employment Tax Returns, the Seller and the Buyer will follow the Standard Procedure specified in Rev. Proc. 2004-53, 2004-2 C.B. 320, Sec. 4, whereby, among other things, (i) the Seller will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by the Seller to the Transferred Employees in connection with the operation of the Business on or prior to the Closing Date and (ii) the Buyer will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by the Buyer to the Transferred Employees in connection with the operation of the Business after the Closing Date.

(e)      Certain Tax Matters. For U.S. federal tax purposes, any payment to Seller following the year in which the Closing Date occurs will be treated as deferred contingent purchase price eligible for installment sale treatment under Section 453 of the Code and any corresponding provision of foreign, state or local law, as appropriate, and will be subject to imputation of interest under Section 483 or Section 1274 of the Code, if required. Neither Buyer nor Seller shall take a position in any tax return

or examination or other administrative or judicial proceeding relating to any tax that is inconsistent with such treatment.

7.07 **Accounts Receivable**.  If the Seller or either Selling Shareholder receives any payment relating to any Purchased Asset, including any Accounts Receivable of the Seller with respect to the Business, outstanding on or after the Closing Date, such payment will be the property of, and the Seller will cause the Seller or such Selling Shareholder, as the case may be, to immediately forward and remit such payment to, the Buyer.  The Seller will cause the Seller or such Selling Shareholder, as the case may be, to promptly endorse and deliver to the Buyer any cash, checks or other documents received by the Seller on account of any such Purchased Asset, including any such Accounts Receivable.  The Seller will cause the Seller or such Selling Shareholder, as the case may be, to advise the Buyer (promptly following the Seller or such Selling Shareholder, as the case may be, becoming aware thereof) of any counterclaims or set-offs that may arise subsequent to the Closing Date with respect to any such Purchased Asset, including any Accounts Receivable.

7.08 **Further Assurances**.  Following the Closing, each of the parties hereto will, and will cause its respective Affiliates to, execute and deliver any additional document, instrument, conveyance or assurance, and take any further action, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Transaction Documents.

7.09 **[Reserved]**.

7.10 **Non-Assignable Contracts**.  Subject to the terms of this Agreement, nothing in this Agreement or any of the Transaction Documents, as the case may be, requires the Seller to assign to the Buyer any Assumed Contract or Permit for which a necessary consent or payment is required and not obtained by the Seller prior to the Closing (each such Assumed Contract or Permit, a "*Non-Assignable Contract*").  The parties will, during the remaining term of each Non-Assignable Contract, use commercially reasonable efforts to (a) obtain the consent of the third parties required thereunder, (b) make the benefit of such Non-Assignable Contract available to the Buyer and (c) enforce, at the request of the Buyer and at the sole expense and for the account of the Buyer, any right of the Seller arising from such Non-Assignable Contract against the other party or parties thereto (including the right to elect or terminate any such Non-Assignable Contract in accordance with the terms thereof).  With respect to any such Non-Assignable Contract as to which the necessary approval or consent for the assignment or transfer to the Buyer is obtained following the Closing, the Seller will transfer such Non-Assignable Contract to the Buyer by execution and delivery of an instrument of conveyance, in a form satisfactory to the Buyer, within five (5) Business Days following receipt of such approval or consent.  Nothing in this **Section 7.10** requires the Buyer to pay any amount to the Seller or any other Person in order to obtain any consent required under any Non-Assignable Contract not obtained by the Seller prior to the Closing.

7.11 **Qualified Benefit Plans**.  Following the Closing, as applicable, the Seller and the Selling Shareholders will provide, or cause to be provided, notice to the Buyer within one (1) Business Day following the Seller or either Selling Shareholder's receipt, as applicable, of any notice from any Person (including, without limitation, any Governmental Authority) that any Qualified Benefit Plan has failed, is failing or may fail to, satisfy all applicable requirements of Section 401(a) of the Code or has been, is or may become subject to any Action relating thereto.

7.12 **UK Assets**.  The Seller acknowledges that the transfer of certain of the Purchased Assets, including, without limitation, the Intellectual Property Assets set forth on **Schedule 7.12** (the "*Specified Assets*"), from the UK Affiliate to the Seller was not properly documented and recorded with the appropriate Governmental Authorities. Notwithstanding the previous sentence, the Seller represents and warrants that the Specified Assets constitute Purchased Assets and are subject to all of the representations

and warranties of the Seller with respect to the Purchased Assets set forth herein.  Following the Closing, the Seller shall, at the Seller's expense, will, and will cause its respective Affiliates to, as soon as practicable, execute and deliver any additional document, instrument, conveyance or assurance, and take any further action, as may be reasonably requested by the Buyer to properly evidence and effect the transfer of the Specified Assets from the Seller to the Buyer.

## ARTICLE VIII
## INDEMNIFICATION

8.01    **Survival**.  The representations and warranties of the Selling Shareholders, the Seller and the Buyer contained in this Agreement will survive the Closing for a period ending on the 18-month anniversary of the Closing Date; provided, however, that (a) the representations and warranties set forth in **Sections 5.17** (Environmental Matters), **5.18** (Employee Benefit Plans) and **5.21** (Tax Matters) will survive the Closing until the expiration of the applicable statute of limitations, as extended, plus a period of thirty (30) days; (b) the representations and warranties set forth in **Sections 4.01** (Authority); **5.01** (Existence and Good Standing); **5.03** (Power; Validity and Enforceability); **5.08** (Title); **5.11(b)** (Intellectual Property – Ownership); **5.16** (Compliance with Laws; Permits) and **5.22** (Brokers) will survive the Closing indefinitely (the representations and warranties included in the foregoing subsections (a) and (b) are, collectively, the "***Excluded Representations***"); and (c) any pending claims for which a notice has been given in accordance with **Section 8.05** prior to the expiration of the relevant survival period may continue to be asserted and indemnified against until finally resolved.  All of the covenants and agreements of the Selling Shareholders, the Seller and the Buyer will survive after the Closing Date in accordance with their terms.

8.02    **Indemnification by the Seller and the Selling Shareholders**.

(a)     The Seller and the Selling Shareholders will be solely responsible for and will, jointly and severally, indemnify, defend and hold harmless each of the Buyer, the Buyer's Representatives, and the Buyer's and the Buyer's Representative's respective Affiliates (collectively, the "***Buyer Indemnitees***") from and against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of: (i) any inaccuracy in or breach of any of the representations or warranties of the Seller and the Selling Shareholders contained in this Agreement (other than **Article IV**) (including any schedule or exhibit attached hereto or certificate delivered in connection herewith) or any Transaction Document; (ii) any breach of any covenant, agreement or obligation of the Seller contained in this Agreement (including any schedule or exhibit attached hereto or certificate delivered in connection therewith) or any Transaction Document; (iii) the Excluded Liabilities; and (iv) any termination, consent or similar fee or payment arising from or otherwise relating to the assignment by the Seller to the Buyer of, or any Liability arising from or relating to the termination in connection with the transactions contemplated by this Agreement of, the Consulting Agreement, dated March 20, 2014, between the Seller and Orthobiologic Innovations, LLC and the Evervisc Profit Allocation Agreement, dated October 13, 2014, between the Seller and Orthobiologic Innovations, LLC.

(b)     Each Selling Shareholder will be solely responsible for and indemnify, defend and hold harmless the Buyer Indemnitees from and against, and will hold them harmless from and against, and will pay and reimburse them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of: (i) any inaccuracy in or breach of any of the representations or warranties of such Selling Shareholder (and not of any other Selling Shareholder) contained in **Article IV** (including any schedule or exhibit attached hereto or certificate delivered in connection herewith); and (ii) any breach of any covenant, agreement or

obligation of such Selling Shareholder contained in this Agreement (including any schedule or exhibit attached hereto or certificate delivered in connection herewith) or any Transaction Document.

8.03    **Indemnification by the Buyer**.  The Buyer will be solely responsible for and indemnify, defend and hold harmless the Seller, the Selling Shareholders, the Seller's Representatives, the Selling Shareholders' Representatives and their respective Affiliates (collectively, the "***Seller Indemnitees***") from and against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of (a) any inaccuracy in or breach of any of the representations or warranties of the Buyer contained in this Agreement (including any schedule or exhibit attached hereto or certificate delivered in connection herewith) or any Transaction Document; (b) any breach of any covenant, agreement or obligation of the Buyer contained in this Agreement (including any schedule or exhibit attached hereto or certificate delivered in connection herewith); and (c) the Assumed Liabilities.

8.04    **Certain Limitations**.

(a)    The Seller and the Selling Shareholders will not have any liability pursuant to **Sections 8.02(a)(i)** or **8.02(b)(i)** (other than with respect to the Excluded Representations, for which the following limitation will not apply) until the aggregate amount of all Losses sustained by the Buyer Indemnitees exceeds $60,000 (the "***Basket***"), in which event the Seller and the Selling Shareholders will be liable for all such Losses from the first dollar.

(b)    The Seller and the Selling Shareholders will not have any liability pursuant to **Sections 8.02(a)(i)** or **8.02(b)(i)** (other than with respect to the Excluded Representations, for which the following limitation will not apply) in excess of $600,000; provided that with respect to the Excluded Representations, the Seller and the Selling Shareholders will not have any liability pursuant to **Sections 8.02(a)(i)** or **8.02(b)(i)** in excess of $4,500,000.

(c)    The Seller and the Selling Shareholders will not have any liability pursuant to **Sections 8.02(a)(ii)** or **8.02(b)(ii)** in excess of $4,500,000, inclusive  of any liability pursuant to **Sections 8.04(a) and (b)** above, such that the total liability pursuant to **Section 8.02** may not exceed $4,500,000.

(d)    For purposes of determining the amount of any Buyer Losses or Seller Losses under this Article VIII, but not for purposes of determining any inaccuracy or breach of any representation or warranty, each representation and warranty in this Agreement, and in any other agreement or certificate delivered pursuant hereto, shall be interpreted without reference to any qualification or limitation regarding "material," "materiality," "in all material respects," "material adverse effect" (which instead will be read as any adverse effect), "immaterial," "materially" or similar materiality qualifiers set forth in such representation or warranty.

(e)    The amount of the Buyer Losses subject to indemnification hereunder shall be reduced by the amount, if any, of any actual insurance recovery or benefit (net of reasonable expenses and other costs incurred in obtaining such recovery or benefit, and adjusted for any deductible, retroactive premium adjustment, reimbursement obligation or the insurer's reasonably projected premium increase) that the Indemnified Party under this Agreement receives with respect to the event that resulted in such Buyer Losses.

(f)    Except to the extent recovered from the Indemnified Party by a third party, the Indemnifying Party shall not be liable to the Indemnified Party for any punitive damages, loss of future revenue or loss of opportunity.

(g)     None of the limitations set forth above in this **Section 8.04** will apply to any Losses based upon, arising out of, with respect to or by reason of fraud, intentional misrepresentation, criminal activity or willful misconduct by the Seller or either Selling Shareholder, provided, however, in no event shall the Seller's and the Selling Shareholders' aggregate liability with respect to this Section 8.04(g) exceed an amount equal to the Purchase Price.

8.05    **Indemnification Procedures**.

(a)     Third Party Claims.  If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "***Third Party Claim***") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party will give the Indemnifying Party written notice thereof as soon as is reasonably practicable after the Indemnified Party becomes aware of such Third Party Claim.  No delay in, or failure to give such notice will adversely affect any of the other rights or remedies of the Indemnified Party or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party to the extent that such delay or failure has not materially prejudiced the Indemnifying Party.  Such notice by the Indemnified Party will describe the Third Party Claim in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party.  The Indemnifying Party will have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party will cooperate in good faith in such defense, provided, however, that if the Indemnifying Party is the Seller, such Indemnifying Party will not have the right to defend or direct the defense of any such Third Party Claim: (i) that is asserted directly by or on behalf of a Person that is a supplier or customer of the Business, (ii) that seeks an injunction or other equitable relief against the Indemnified Party, (iii) if the Indemnifying Party, in the reasonable judgment of the Indemnified Party, does not have the financial resources, or may not be able, to satisfy the amount of such Third Party Claim, (iv) if the Third Party Claim, or the Indemnifying Party's defense or direction of the defense thereof, may, in the reasonable judgment of the Indemnified Party, result in a Material Adverse Effect or (v) unless the Indemnifying Party expressly agrees in writing to be fully responsible for all Losses relating to such Third Party Claim. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.05(b)**, the Indemnifying Party will have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party.  The Indemnified Party will have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to control the defense thereof and the fees and disbursements of such counsel will be at the expense of the Indemnified Party, provided, however, that, if in the reasonable opinion of counsel to the Indemnified Party, either there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party or there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, then the Indemnifying Party will be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.  If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.05(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. The Seller and the Buyer will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of **Section 7.02(c)**) records relating to such Third Party Claim and furnishing, without expense (other than

reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     Settlement of Third Party Claims.  Notwithstanding any other provision of this Agreement, the Indemnifying Party will not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.05(b)**.  If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to that effect to the Indemnified Party.  If the Indemnified Party fails to consent to such firm offer within ten (10) Business Days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer.  If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim.  If the Indemnified Party has assumed the defense pursuant to the provisions of **Section 8.05(a)**, it will not agree to any settlement without the written consent of the Indemnifying Party (which consent will not be unreasonably withheld or delayed).

(c)     Direct Claims.  Any Action by an Indemnified Party on account of a Loss that does not result from a Third Party Claim (a "***Direct Claim***") will be asserted by the Indemnified Party as soon as is reasonably practicable after such Indemnified Party becomes aware of such Direct Claim.  No delay in, or failure to give such notice will adversely affect any of the other rights or remedies of the Indemnified Party or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party to the extent that such delay or failure has not materially prejudiced the Indemnifying Party.  Such notice by the Indemnified Party will describe the Direct Claim in reasonable detail and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party.  Within fifteen (15) Business Days after being notified of any such Direct Claim, the Indemnifying Party will notify the Indemnified Party of whether or not such Indemnifying Party disputes its liability for such Direct Claim.  If the Indemnifying Party does not so notify the Indemnified Party that it disputes its liability for such Direct Claim within such fifteen (15) Business Day period, the Direct Claim specified by such Indemnified Party in its notice to the Indemnifying Party thereof will be conclusively deemed to be a liability of the Indemnifying Party and the Indemnifying Party will be obligated to make payment therefor according to the provisions of **Section 8.06**, provided, however, that if the amount of such liability is not then determinable, the Indemnifying Party will be obligated to make payment therefor according to the provisions of **Section 8.06** when the amount of such liability is agreed to by the Indemnifying Party and the Indemnified Party or is finally adjudicated.

(d)     Overlap.  To the extent that **Section 7.06** (Tax Matters) is inconsistent with **Section 8.05**, **Section 7.06** will control.

8.06    **Payments**.

(a)     Subject to **Section 8.06(b)**, once a Loss is deemed final or is finally adjudicated pursuant to this **Article VIII**, the Indemnifying Party must satisfy its obligations within three (3) Business Days thereafter by wire transfer of immediately available funds.  Should an Indemnifying Party fail to make full payment of any such obligations within such three-Business Day period, any amount payable will accrue interest from and including the date of agreement or adjudication (but excluding the date such payment has been made) at a rate per annum equal to five percent (5%).

Such interest will compound monthly and will be calculated daily on the basis of a 365-day year and the actual number of days elapsed.

(b)     With respect to any claim for Losses by any Buyer Indemnitee pursuant to **Section 8.02**, once a Loss is deemed final or is finally adjudicated to be payable pursuant to this **Article VIII**, within three (3) Business Days thereafter, the Buyer and the Seller will promptly execute and deliver written instructions to the Escrow Agent authorizing release (a "***Joint Certificate***") to the Buyer Indemnitee identified in the applicable notice delivered pursuant to **Section 8.05(a)** or **8.05(c)** (each a "***Claims Notice***") an amount from the Escrow Amount equal to the agreed upon or finally determined amount of any Losses identified in such Claims Notice.

(c)     Promptly, but in no event later than ten (10) days following the eighteen (18)-month anniversary of the Closing Date, the Buyer and the Seller will execute and deliver a Joint Certificate to the Escrow Agent authorizing release to the Seller from the from the Escrow Amount all of the remaining portion of the Escrow Amount (including all earnings thereon); provided, however, that:

(i)     if the Buyer has delivered to Escrow Agent a Claims Notice that sets forth the amount of a claim (the amount set forth in any such Claims Notice, the "***Disputed Amount***") that has not been withdrawn or resolved pursuant to this **Article VIII** on or prior to the eighteen (18)-month anniversary of the Closing Date, then the payment to the Seller shall be the balance of the Escrow Amount less the aggregate amount of all of the Disputed Amounts; and

(ii)     if the Buyer has delivered to the Escrow Agent a Claims Notice that does not set forth the amount of a claim (an "***Uncertain Value Claim***") that has not been withdrawn or resolved pursuant to this **Article VIII** on or prior to the eighteen (18)-month anniversary of the Closing Date, then no further distributions shall be made from the Escrow Amount until the Buyer has delivered written instructions to the Escrow Agent indicating that the Uncertain Value Claim has been resolved. Any portion of the Escrow Amount that is not released pursuant to this **Section 8.06(c)** following the eighteen (18)-month anniversary of the Closing Date will remain on deposit with the Escrow Agent until release is authorized in accordance with the terms of this Agreement and the Escrow Agreement.

8.07     **Tax Treatment of Indemnification Payments**.  All indemnification payments made under this Agreement will be treated by the parties hereto as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

8.08     **Right of Setoff**.  Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy the Buyer has or may have, the Buyer may set off any amount to which it may be entitled under this **Article VIII** against amounts otherwise payable to the Seller or either Selling Shareholder under this Agreement or any Transaction Document (including, without limitation, the amount of any Earn-Out Payment).

## ARTICLE IX
## MISCELLANEOUS

9.01     **Expenses**.  Except as otherwise provided in this Agreement, each of the parties will bear their respective expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

9.02     **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered in person, (b) when dispatched by electronic facsimile transfer (with a confirmation report that the transmission was

successful), (c) one business day after having been dispatched by a nationally recognized overnight courier service or (d) five business days after being sent by registered or certified mail, return receipt requested, postage prepaid, to the appropriate party at the address or facsimile number specified below:

| | |
|---|---|
| If to the Seller, to either Selling Shareholder or to both Selling Shareholders: | Darroll E. Wotton<br> 11 Meadow View LaneFiskdale, MA 01518<br>Fax:  508-462-0321 |
| with a copy to: | Hinckley, Allen & Snyder, LLP<br>28 State Street<br>Boston, Massachusetts 02109-1775<br>Attention:  Todd M. Gleason, Esq.<br>Fax:  (617) 345-9020 |
| If to the Buyer: | STERIS Instrument Management Services, Inc.<br>c/o STERIS Corporation<br>5960 Heisley Road<br>Mentor, Ohio  44060<br>Attention: Vice President, Business Development<br>Fax: (440) 357-2344 |
| with a copy to: | STERIS Corporation<br>5960 Heisley Road<br>Mentor, Ohio  44060<br>Attention: General Counsel<br>Fax:  (440) 357-2344 |

9.03  **Interpretation**.  For purposes of this Agreement, (a) the words "include", "includes" and "including" means "including without limitation", (b) the word "or" is not exclusive, (c) the words "herein", "hereof", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole and (d) the singular will be deemed to include the plural and vice versa.  Unless the context otherwise requires, references herein:  (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement, (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The schedules and exhibits referred to in this Agreement will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim in this Agreement.

9.04  **Headings**.  The headings in this Agreement are for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

9.05  **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any party or circumstance is, to any extent, adjudged invalid or unenforceable, the application of the remainder of such provision to such party or circumstance, the application of such provision to other parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.

9.06    **Entire Agreement**.  This Agreement and the Transaction Documents, together with that certain Confidentiality Agreement, dated as of **[•]** by and between the Seller and STERIS, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the Transaction Documents, the Exhibits or the Schedules (other than an exception expressly set forth as such in the Schedule corresponding to such exception), the statements in the body of this Agreement will control.

9.07    **Successors and Assigns**.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No party hereto may assign its rights or obligations hereunder without the prior written consent of the other party, provided, however, that the Buyer may, without the prior written consent of the Seller, (a) assign all or any portion of its rights under this Agreement to one or more of its Affiliates (but such assignment will not release the Buyer from any liability or obligation under this Agreement) or (b) collaterally assign all or any portion of its rights under this Agreement to any of the Seller's or the Buyer's lenders.

9.08    **No Third Party Beneficiaries**.  Except as provided in **Article VIII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.09    **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Buyer, on the one hand, and the Seller and the Selling Shareholders, on the other hand.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.10    **Governing Law; Submission to Jurisdiction**.

(a)    This Agreement will be governed by and construed in accordance with the internal laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Ohio.

(b)    Any Action arising out of or based upon this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby will be instituted in the federal courts of the United States of America or the courts of the State of Ohio, in each case located in the city of Ohio and county of Cuyahoga, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such Action.  Service of process, summons, notice or other document by mail to such party's address set forth in this Agreement will be effective service of process for any Action brought in any such court.  The parties hereto irrevocably and unconditionally waive any objection to the laying of venue of any Action in such courts and irrevocably waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

9.11    **Specific Performance**.  The parties hereto acknowledge that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that

the parties will be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

9.12 **Counterparts**.  This Agreement may be executed in counterparts (including electronically-transmitted counterparts), each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.

**[Signatures on the Following Pages.]**

IN WITNESS WHEREOF, the parties hereto have executed, or caused to be executed, this Agreement, as of the Closing Date.

**SELLER:**

EVEROST, INC.

By: _____

Name: HAROLD M WOTTON III

Title: PRESIDENT

**SELLING SHAREHOLDERS:**

_____
HAROLD WOTTON, individually

_____
DARROLL WOTTON, individually

[Signature Page to STERIS – Everost Asset Purchase Agreement]

**BUYER:**

STERIS INSTRUMENT MANAGEMENT SERVICES,
INC.

By: _____

     Name: Michael J. Tokich

     Title:

Reviewed and approved as to form by the
STERIS Legal Department

_____     _____

Attorney Initials         Date

[Signature Page to STERIS – Everost Asset Purchase Agreement]

**<u>Exhibit A</u>**

**Form of Escrow Agreement**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "*Escrow Agreement*"), dated as of December 29, 2017 is by and among STERIS Instrument Management Services, Inc., a Delaware corporation (the "*Buyer*"), Everost, Inc., a Massachusetts corporation (the "*Seller*"), and U.S. Bank National Association, a national banking association, as escrow agent hereunder ("*Escrow Agent*").

## BACKGROUND

A.      The Buyer, the Seller, Harold Wotton and Darroll Wotton are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "*Purchase Agreement*"), pursuant to which, among other things, the Buyer will purchase from the Seller, and the Seller will sell to the Buyer, the Purchased Assets.

B.      Pursuant to Sections 3.02(a) and 3.02(b) of the Purchase Agreement, the Buyer and the Seller are required to enter into this Escrow Agreement at the Closing to provide for the deposit and the terms of disbursement of certain amounts as described herein.

C.      Escrow Agent has agreed to accept, hold and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

D.      Solely as between Buyer and Seller, capitalized terms used in this Escrow Agreement that are not otherwise defined herein, will have the meanings given thereto in the Purchase Agreement.

**NOW THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Escrow Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Appointment of and Acceptance by Escrow Agent.  The Buyer and the Seller hereby appoint Escrow Agent to serve as escrow agent hereunder.  The Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with **Section 2** below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

2.      Deposit of Escrow Funds.  Simultaneously with the execution and delivery of this Escrow Agreement, the Buyer, on behalf of the Seller, will transfer, by wire transfer of immediately available funds, an amount equal to $450,000 (the "*Escrow Funds*") to the Escrow Account (as defined below). The Escrow Agent agrees to hold the Escrow Funds and to administer and maintain a segregated account for such amounts on the terms set forth herein; and the Escrow Agent agrees to disburse the Escrow Funds in accordance with the terms of this Escrow Agreement.

3.      Disbursements of Escrow Funds.  The Escrow Agent will disburse the Escrow Funds pursuant to this **Section 3**.  If, at any time after the Closing, the Escrow Agent receives (a) a written direction executed by the Buyer and the Seller, directing the Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Escrow Agreement (the "*Joint Certificate*") or (b) a final non-appealable judgment or award rendered by a court of competent jurisdiction that is accompanied by Buyer's or Seller's written confirmation that such judgment or award is final, non-appealable and rendered by a court of competent jurisdiction (a "*Final Award*"), in either case, instructing the Escrow Agent to disburse all or part of the Escrow Funds in accordance with the terms of such Joint Certificate or Final Award, the Escrow Agent will distribute such amounts specified in such Joint Certificate or Final Award, as the case may be, in accordance with the terms thereof.  Prior to any disbursement, Escrow Agent shall have received reasonable identifying information regarding the

Seller such that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("**IRS**") Form W-9 or Form W-8, as applicable.  All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Escrow Indemnified Parties (defined below) pursuant to **Section 9** and **Section 10** hereof.

4.      **Suspension of Performance; Disbursement into Court**.  If, at any time, (i) there shall exist any dispute between the Buyer or the Seller with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Buyer and the Seller have not, within 30 calendar days of the furnishing by Escrow Agent of a notice of resignation pursuant to **Section 6** hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

        (a)      suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed.

        (b)      petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all remaining Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Subject to **Section 8**, the Escrow Agent shall have no liability to the Buyer or the Seller, their respective owners, shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of the Escrow Agent.

5.      **Investment of Funds**.  Based upon the Buyer's and the Seller's prior review of investment alternatives, in the absence of further specific written direction to the contrary, the Escrow Agent is directed to initially invest and reinvest the Escrow Funds in the investment indicated on **Schedule B** hereto.  The Buyer and the Seller may provide a Joint Certificate to the Escrow Agent changing the investment of the Escrow Funds; provided, however, that no investment or reinvestment direction shall be given except in the following:  (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United States of America; (b) U.S. dollar denominated deposit accounts and certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its Affiliates), which such deposits are either (i) insured by the Federal Deposit Insurance Corporation or a similar governmental agency, or (ii) with domestic commercial banks which have a rating on their short- term certificates of deposit on the date of purchase of "A-1" or "A-l+" by S&P or "P-1" by Moody's and maturing no more than 360 days after the date of purchase (ratings on holding companies are not considered as the rating of the bank); (c) repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its Affiliates); or (d) institutional money market funds, including funds managed by Escrow Agent or any of its Affiliates; underlined provided that the Escrow Agent will not be directed to invest in investments that the Escrow Agent determines are not consistent with the Escrow Agent's policy

2

57359232 v2

or practices.  The Buyer and the Seller acknowledge that the Escrow Agent does not have a duty nor will it undertake any duty to provide investment supervision or advice.

If Escrow Agent has not received a written instruction from the Buyer and the Seller at any time that an investment decision must be made, Escrow Agent is directed to invest the Escrow Funds, or such portion thereof as to which no written investment instruction has been received, in the investment indicated on **Schedule B** hereto.  All investments shall be made in the name of Escrow Agent.  Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to the Buyer and the Seller, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder.  All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds.  Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Escrow Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Escrow Funds.  With respect to any Escrow Funds received by Escrow Agent after 11:00 a.m., Central Time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which Escrow Agent is open to conduct its regular banking business.

Net profits resulting from, or interest or income produced by investments of, the Escrow Funds ("***Income***") will be deemed a part of the Escrow Funds.  Subject to the payment of fees and expenses as provided in **Section 10(a)**, any and all Income remaining after the payment of any investment or transaction fees relating to the Escrow Funds will be retained by the Escrow Agent and reinvested pursuant to this **Section 5** as part of the Escrow Funds.  All Income will be taxable to the Seller.

6.      Resignation or Removal of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving thirty (30) days prior written notice to the Buyer and the Seller specifying a date when such resignation shall take effect and, after the date of such resignation notice, notwithstanding any other provision of this Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent. Similarly, the Buyer and the Seller may remove and discharge Escrow Agent from the performance of its duties hereunder at any time by jointly giving thirty (30) days prior written notice to the Escrow Agent specifying a date when such removal shall take effect.  Upon any such notice of resignation or removal, the Buyer and the Seller jointly shall appoint a successor escrow agent hereunder prior to the effective date of such resignation or removal.  If the Buyer and the Seller fail to appoint a successor escrow agent within such time, the Escrow Agent shall have the right to petition a court of competent jurisdiction to appoint a successor escrow agent, and all costs and expenses (including without limitation attorneys' fees) related to such petition shall be paid jointly and severally the Buyer and the Seller.  The Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor escrow agent, after making copies of such records as the Escrow Agent deems advisable and after deduction and payment to the Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  After the Escrow Agent's resignation or removal, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.

7.      Binding Effect; Successors.  This Escrow Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors or assigns.  If the Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Escrow Agreement) to another corporation, the successor or transferee corporation without any further act shall be the successor Escrow Agent.

57359232 v2

8.      <u>Liability of Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no additional duties shall be implied.  The Escrow Agent has no fiduciary or discretionary duties of any kind.  The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement, including without limitation any other agreement between any or all of the parties hereto even though reference thereto may be made herein.  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to the Buyer or the Seller.  The Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent believes to be genuine and to have been signed or presented by the parties hereto.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages or penalties (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action.  Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control, including without limitation acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, attached or intrusions, power failures, earthquakes or other disasters.  Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding.  Escrow Agent, upon the prior written consent of the Buyer and the Seller (which consent may not be unreasonably withheld), may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the advice of such counsel.  The Buyer and the Seller, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.  The Buyer and the Seller agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder.

The Escrow Agent is authorized, in its sole discretion, to comply with final orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter.  If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

9.      <u>Indemnification of Escrow Agent</u>.  From and at all times after the Effective Date, the Buyer and the Seller, jointly and severally, shall, to the fullest extent permitted by law, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and Affiliate of Escrow Agent (collectively, the "***Escrow Indemnified Parties***") against any and all actions, claims (whether or not valid), losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without

4

limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Escrow Indemnified Parties, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) threatened, asserted or initiated by any person or entity, including without limitation the Buyer and the Seller, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance in connection with this Escrow Agreement or any transactions contemplated herein, whether or not any such Escrow Indemnified Party is a party to any such suit, action or proceeding or the target of any such inquiry or investigation; provided, however, that no Escrow Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Escrow Indemnified Party.  The Buyer and the Seller further agree, jointly and severally, to indemnify each Escrow Indemnified Party for all costs, including without limitation reasonable attorney's fees, incurred by such Escrow Indemnified Party in connection with the enforcement of the Buyer's and the Sellers' indemnification obligations hereunder.  Each Escrow Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Buyer and the Seller jointly and severally.  The obligations of the Buyer and the Seller under this **Section 9** shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

The parties agree that neither the payment by the Buyer or the Seller of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between the Buyer or the Seller, the respective rights and obligations of the Buyer or the Seller under the Purchase Agreement.

10.     Compensation of Escrow Agent.

(a)     Fees and Expenses.  The Buyer and the Seller agree, jointly and severally, to compensate the Escrow Agent on demand for its services hereunder in accordance with **Schedule A** attached hereto. Without limiting the joint and several nature of their obligations to Escrow Agent, the Buyer and the Seller agree that, as between themselves only, each will be responsible for one-half of Escrow Agent's compensation.  The obligations of the Buyer and the Seller under this **Section 10** shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)     Disbursements from Escrow Funds to Pay Escrow Agent.  Escrow Agent is authorized to, and may disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable under **Section 10(a)**.  Escrow Agent shall notify the Buyer and the Seller of any disbursement from the Escrow Funds to itself in respect of any compensation or reimbursement hereunder and shall furnish the Buyer and the Seller copies of related invoices and other statements.

(c)     Security and Offset.  The Buyer and the Seller hereby grant to Escrow Agent and the Indemnified Parties a first priority security interest in, lien upon and right of offset against the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds is insufficient to cover such compensation and reimbursement, the Buyer and the Seller shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.

11.     Representations and Warranties.     Each party hereby respectively makes the following representations and warranties to the other parties:

57359232 v2

(a)     it has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder; and this Escrow Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms; and

(b)     each of the applicable persons designated on **Schedule C** attached hereto have been duly appointed to act as authorized representatives hereunder and individually have full power and authority to execute and deliver any Joint Certificate, to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as authorized representatives under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party, provided that no change in designation of such authorized representatives shall be effective until written notice of such change is delivered to each other party to this Escrow Agreement pursuant to **Section 13**.

12.     Identifying Information.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent requires documentation to verify its formation and existence as a legal entity.  The Escrow Agent may ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  The parties acknowledge that a portion of the identifying information set forth herein is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "*Act*"), and each agrees to provide any additional information requested by the Escrow Agent in connection with the Act or any other legislation or regulation to which Escrow Agent is subject, in a timely manner.

13.     Notices.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered in person, (b) when dispatched by electronic facsimile transfer (with a confirmation report that the transmission was successful), (c) one business day after having been dispatched by a nationally recognized overnight courier service or (d) five business days after being sent by registered or certified mail, return receipt requested, postage prepaid, to the appropriate party at the address or facsimile number specified below:

If to the Buyer at:            [STERIS INSTRUMENT MANAGEMENT SERVICES, INC.]
                              c/o STERIS Corporation
                              5960 Heisley Road
                              Mentor, OH 44060
                              Attention: Vice President, Business Development
                              Fax: (440) 357-2344

with a copy to:               STERIS Corporation
                              5960 Heisley Road
                              Mentor, OH 44060
                              Attention: General Counsel
                              Fax: (440) 357-2344

If to the Seller at:          Darroll E. Wotton
                              11 Meadow View Lane
                              Fiskdale, MA 01518
                              Fax:  508-462-0321

with a copy to:               Hinckley, Allen & Snyder, LLP
                              28 State Street

57359232 v2

Boston, Massachusetts 02109-1775
Attention:  Todd M. Gleason, Esq.
Fax:  (617) 345-9020
Email:  tgleason@hinckleyallen.com

If to the Escrow Agent at:    U.S. Bank National Association, as Escrow Agent
ATTN:  David A. Schlabach
Global Corporate Trust Services
1350 Euclid Avenue
CN-OH-RN11
Cleveland, OH 44115
Telephone: 216-623-5987
Facsimile:  216-623-9202
E-mail:  david.schlabach@usbank.com

and to:

U.S. Bank National Association
60 Livingston Ave, EP-MN-WS3T
St. Paul, MN 55107
Attn: Nicole Launderville,Trust Finance Management
Tel: 651-466-6224
E-mail:  nicole.launderville@usbank.com

14.    <u>Optional Security Procedures</u>.  In the event funds transfer instructions, address changes or change in contact information are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, Escrow Agent is authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to the person or persons designated on **Schedule C** hereto.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes.  If Escrow Agent is unable to contact any of the designated representatives identified in **Schedule C**, Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more of the Buyer's or the Seller's respective executive officers, as the case may be, which shall include the titles of Chief Executive Officer, President and Vice President, as Escrow Agent may select.  Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Buyer or the Seller to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  Escrow Agent may apply any of the Escrowed Funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated.  The Buyer and the Seller acknowledge that these optional security procedures are commercially reasonable.

15.    <u>Severability</u>.  If any provision of this Escrow Agreement or the application of any provision of this Escrow Agreement to any party or circumstance is, to any extent, adjudged invalid or unenforceable, the application of the remainder of such provision to such party or circumstance, the application of such provision to other parties or circumstances, and the application of the remainder of this Escrow Agreement will not be affected thereby.

16.    <u>Entire Agreement.</u>  This Escrow Agreement (and, solely with respect to the Buyer and the Seller, the Purchase Agreement) constitutes the sole and entire agreement of the parties hereto with respect to the

7

subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  Buyer and Seller agree, solely as between themselves, that in the event of any inconsistency between the statements in the body of this Escrow Agreement and those in the Purchase Agreement, the statements in the body of the Purchase Agreement will control.

17.     Successors and Assigns.  This Escrow Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No party hereto may assign its rights or obligations hereunder without the prior written consent of the other party.

18.     No Third-Party Beneficiaries.  This Escrow Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

19.     Amendment and Modification; Waiver.  This Escrow Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Buyer, Escrow Agent and the Seller.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Escrow Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

20.     Governing Law; Submission to Jurisdiction.

        (a)     This Agreement will be governed by and construed in accordance with the internal laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Ohio.

        (b)     Any Action arising out of or based upon this Agreement or the transactions contemplated hereby or thereby will be instituted in the federal courts of the United States of America or the courts of the State of Ohio, in each case located in the city of Ohio and county of Cuyahoga, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such Action.  Service of process, summons, notice or other document by mail to such party's address set forth in this Agreement will be effective service of process for any Action brought in any such court.  The parties hereto irrevocably and unconditionally waive any objection to the laying of venue of any Action in such courts and irrevocably waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

21.     Specific Performance.  The parties hereto acknowledge that irreparable damage would occur if any provision of this Escrow Agreement were not performed in accordance with the terms hereof and that the parties will be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

22.     Dealings.  Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of the Buyer and the Seller and become pecuniarily interested in any transaction in which the Buyer and the Seller may be interested, and contract and lend money to the Buyer and the Seller and otherwise act as fully and freely as though it were not Escrow

57359232 v2

Agent under this Escrow Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for the Buyer and the Seller or for any other entity.

23.     Counterparts.  This Escrow Agreement may be executed in counterparts (including electronically-transmitted counterparts), each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.

24.     Brokerage Confirmation Waiver.  The Buyer and the Seller acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant either the right to receive brokerage confirmations for certain security transactions as they occur, the Buyer and the Seller specifically waive receipt of such confirmations to the extent permitted by law.  The Escrow Agent will furnish the Buyer and the Seller periodic cash transaction statements that include detail for all investment transactions made by the Escrow Agent.

25.     Tax Reporting.  Escrow Agent shall have no responsibility for the tax consequences of this Escrow Agreement and the Buyer and the Seller shall consult with independent counsel concerning any and all tax matters.  The Buyer and the Seller shall provide Escrow Agent an IRS Form W-9 and an IRS Form W-8, as applicable, for each payee.  If such tax documentation is not so provided, Escrow Agent shall withhold taxes as required by the IRS.  The Buyer and the Seller have determined that any interest of income on the Escrow Funds shall be reported on an accrual basis and deemed to be for the account of the Seller.

        (a)     Escrow Agent IRS Reporting.  The Buyer and the Seller shall accurately provide the Escrow Agent with all information requested by the Escrow Agent in connection with the preparation of all applicable Form 1099 and Form 1042-S documents with respect to all distributions as well as in the performance of Escrow Agent's other reporting obligations under applicable U.S. federal law or regulation. Except as otherwise agreed by Escrow Agent in writing, Escrow Agent has no tax reporting or withholding obligation except with respect to Form 1099-B reporting on payments of gross proceeds under Internal Revenue Code Section 6045 and Form 1099 and Form 1042-S reporting with respect to investment income earned on the Escrow Funds, if any.

        (b)     Withholding Requests and Indemnification.  The Buyer and the Seller jointly and severally agree to (i) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Escrow Agreement, (ii) request the Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations, and (iii) indemnify and hold the Escrow Agent harmless pursuant to **Section 9** hereof from any liability or obligation on account of taxes, assessments, additions for late payment, interest, penalties, expenses and other governmental charges that may be assessed or asserted against Escrow Agent.

        (c)     Imputed Interest.  To the extent that IRS imputed interest regulations apply, the Buyer and the Seller shall so inform Escrow Agent, provide Escrow Agent with all imputed interest calculations and direct Escrow Agent to disburse imputed interest amounts as the Buyer and the Seller deem appropriate**.**  Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information.

**[Signatures on the Following Page.]**

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

**EVEROST, INC.**

By: _____
     Name:
     Title:

**STERIS INSTRUMENT MANAGEMENT SERVICES, INC.**

By: _____
     Name:
     Title:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
     Name:
     Title:

## SCHEDULE A

### Schedule of Fees for Services as Escrow Agent

**I.      Administration Fee, One-Time:**                          **$3,000**

One-time fee for the routine duties of the Escrow Agent associated with the administration of the account. Administration fees are payable in advance.  In the event that the Agreement is not terminated within two years, then an additional administrative fee of $1,000 shall be due for each year or part thereof.  This assumes that the Escrow Agent will be directed to invest in an automated sweep vehicle available through the Escrow Agent's trust accounting system.

**II.      Disbursement Processing Fees (if any):**                 **$100 per disbursement *in excess* of ten disbursements per year**

Processing fees cover the routine duties of Escrow Agent associated with the administration of the account, billed in arrears.  This includes payment by check or wire.  This assumes that the Escrow Agent will receive complete and accurate payment information, upon which it can conclusively rely.

**III.      Out-of-Pocket Expenses (if any):**                       **At Cost**

Reimbursement of expenses associated with the performance of Escrow Agent's duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees.

**IV.      Extraordinary Fees (if any):**

Extraordinary fees are payable to the agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business. Payment of reasonable extraordinary fees is appropriate where particular inquiries, events or developments are unexpected, even if the possibility of such things could have been identified at the inception of the transaction.  Extraordinary services might include, without limitation, amendments or supplements, specialized reporting, non-routine calculations, foreign currency conversions, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

57359232 v2

**SCHEDULE B**

U.S. BANK NATIONAL ASSOCIATION

MONEY MARKET ACCOUNT AUTHORIZATION FORM

 DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account.  Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers.  U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

U.S. BANK, WHEN ACTING AS AN INDENTURE TRUSTEE OR IN A SIMILAR CAPACITY, IS NOT REQUIRED TO REGISTER AS A MUNICIPAL ADVISOR WITH THE SECURITIES AND EXCHANGE COMMISSION FOR PURPOSES OF COMPLYING WITH THE DODD-FRANK WALL STREET REFORM & CONSUMER PROTECTION ACT. INVESTMENT ADVICE, IF NEEDED, SHOULD BE OBTAINED FROM YOUR FINANCIAL ADVISOR.

26.     AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account.  The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

57359232 v2

**SCHEDULE C**

Each of the following person(s) is a **Buyer Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Purchaser's behalf (only one signature required):

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, provide the following information)*
The following person not listed above is authorized for call-back confirmations:

_____                          _____
Name                                          Telephone Number


Each of the following person(s) is a **Seller Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Seller's behalf (only one signature required):

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |

*(Note: if only one person is identified above, provide the following information)*
The following person not listed above is authorized for call-back confirmations

_____                          _____
Name                                          Telephone Number

**<u>Exhibit B</u>**

**Form of Employment Agreements**

B-1

## EMPLOYMENT AGREEMENT

This Employment Agreement (including any exhibits hereto, this "Agreement") is entered into by and between **[HAROLD/DARROLL WOTTON]** ("Executive") and STERIS Instrument Management Services, Inc. ("IMS") on this 29th day of December, 2017 (the "Effective Date").

**WHEREAS**, concurrent with the execution of this Agreement, IMS, Executive, Everost, Inc. ("Seller") and the other parties named therein are entering into an Asset Purchase Agreement, dated as of the date hereof (the "Asset Purchase Agreement"), pursuant to which IMS is purchasing substantially all of the assets of Seller (the "Transaction");

**WHEREAS**, as a material inducement to IMS to enter into the Asset Purchase Agreement and engage in the Transaction, Executive and IMS are entering into this Agreement, pursuant to which (i) Executive will become subject to the Employment Terms (as defined in Section 1) as of the closing of the transactions contemplated by the Asset Purchase Agreement (the "Closing") and (ii) Executive will confirm that the Employment Terms and the restricted shares awarded (the "Award") pursuant to the Restricted Stock Agreement attached hereto as Schedule 3 (the "Restricted Stock Agreement") are sufficient and valid consideration for Executive agreeing to the terms and conditions of Section 2.

**NOW**, **THEREFORE**, in consideration of the mutual promises contained in this Agreement and other good and valuable consideration the adequacy, sufficiency and receipt of which is hereby acknowledged, it is agreed as follows:

1.        Employment. Effective as of the Closing, Executive will become subject to the terms and conditions of employment set forth on Exhibit A hereto (the "Employment Terms").

2.        Non-Competition. Effective as of the Closing, in consideration of the Transaction Payments and the Employment Terms, Executive agrees to be bound by the Non-Compete and Non-Solicit Provision attached hereto as Exhibit B (the "Non-Compete and Non-Solicit Provision").  The foregoing shall be in addition to and not in lieu of any other terms and conditions that may be imposed upon Executive from time to time pursuant to or in conjunction with the Employment Terms, including but not limited to any terms and conditions imposed in conjunction with the receipt of equity grants.

Executive acknowledges and agrees that (a) the Closing of the Transaction, and the payments in connection with the Closing of the Transaction, is expressly conditioned upon the execution and delivery of this Agreement (including the Non-Compete and Non-Solicit Provision) and (b) the Award and the Employment Terms are sufficient and valid consideration for Executive agreeing to the terms and conditions of this Section 2.

       3.     <u>Voluntary Agreement</u>. Executive acknowledges that: (a) Executive is knowingly and voluntarily entering into this Agreement; (b) this Agreement has been written in understandable language and all of its provisions are understood by Executive; (c) neither Executive nor IMS are admitting any liability or violation of any law, contract or other agreement; (d) no promise or inducement has been offered to Executive except as stated in this Agreement, and the benefits being provided to Executive pursuant to this Agreement are more than Executive would otherwise be entitled to receive if he did not sign this Agreement; (e) Executive has been advised to consult with an attorney of his choice before signing this Agreement and, by signing below, Executive acknowledges that before signing this Agreement he has had sufficient opportunity to consult with an attorney if he so desires; (f) he has been offered a reasonable and adequate period of time to consider, review and evaluate the terms of this Agreement prior to signing it; (g) the terms of this Agreement are contractual and not a mere recital; and (h) Executive will maintain the terms of this Agreement as confidential and will not disclose these terms to anyone other than his spouse, financial advisor, or attorney, unless he has first received express written consent of IMS. If Executive discloses any of the terms of this Agreement to his spouse, financial advisor, or attorney, Executive shall notify such individual that this Agreement is confidential and may not be further disclosed, and any disclosure of this Agreement or its terms by Executive's spouse, financial advisor, or attorney shall be treated as a breach of this Agreement by Executive. If Executive believes that a subpoena or other legal obligation requires him to disclose terms of this Agreement or any confidential information of IMS, Executive shall promptly notify IMS in a writing addressed to General Counsel, STERIS Corporation, 5960 Heisley Road, Mentor, OH 44060, and shall provide IMS with a reasonable period of time to evaluate or contest the proposed disclosure before any disclosure is made by Executive.

4.    <u>Notice</u>. Immediately after signing this Agreement, Executive shall send a copy of the signed Agreement to IMS by electronic mail or facsimile and shall, within one (1) business day thereafter, send the original signed Agreement by registered or certified U.S. mail to the attention of:

> c/o STERIS Corporation
> Attention: General Counsel
> 5960 Heisley Road
> Mentor, OH 44060
> Facsimile:  (440) 357-2344

5.    <u>Governing Law</u>. This Agreement, including, without limitation, the interpretation, construction, validity and enforcement thereof, shall be governed by, construed, applied and enforced in accordance with the laws of the State of Ohio, without regard to the conflict of laws provisions thereof.

6.    <u>Severability</u>. All provisions of this Agreement are distinct and separable. If any provision or clause shall be held to be unenforceable or overly broad, a court of competent jurisdiction is hereby authorized to modify such provision or clause so as to render this Agreement and all provisions hereof enforceable to the maximum extent permitted by law.

7.    <u>Entire Agreement</u>. This Agreement, together with the employment offer letter to Executive dated as of an even date herewith, contains the entire understanding between the parties and, except as otherwise set forth herein, supersedes any prior understandings and agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings respecting the within subject matter, whether oral or written, between the parties, other than expressly provided herein.

8.    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which together constitute one and the same Agreement.

9.    <u>Recitals</u>. The Recitals to this Agreement are incorporated into this Agreement by reference.

10.     <u>Assignment</u>.  This Agreement will be binding in all respects upon, and shall be enforceable by and inure solely to the benefit of, the parties hereto, the Released Parties and the respective successors and permitted assigns of the parties and the Released Parties.

11.     <u>Withholding for Taxes</u>.  IMS may withhold from any amounts payable under this Agreement all federal, state, city or other taxes as shall be required to be withheld pursuant to any applicable law or government regulation or ruling.

12.     <u>Section 409A</u>.  The parties intend for this Agreement to either comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and all provisions of this Agreement will be interpreted and applied accordingly. In no event, however, shall this Section 12 or any other provisions of this Agreement be construed to require IMS to provide any gross-up for the tax consequences of any provisions of, or payments under, this Agreement and IMS shall have no responsibility for tax consequences to Executive resulting from the terms or operation of this Agreement.

[Signature Page Follows]

4

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

                                           **STERIS INSTRUMENT MANAGEMENT SERVICES, INC.**

_____        By:_____

**[HAROLD/DARROLL WOTTON]**

EXHIBIT A

**Employment Terms**

Any capitalized term that is used, but not defined, in this Exhibit A shall have the meaning set forth in the Agreement to which it is an Exhibit.

1.      <u>Employment</u>.  Effective as of the Closing, IMS will employ Executive, and Executive accepts such employment with IMS, upon the terms and conditions set forth in this Exhibit A and in the employment offer letter to Executive dated as of an even date herewith, and such other terms and conditions as may be applicable from time to time to IMS and/or STERIS Corporation ("<u>STERIS</u>") employees.  Notwithstanding anything in this Agreement to the contrary, at all times following the Closing, Executive will be an at-will employee of IMS and either IMS or Executive may terminate Executive's employment with IMS at any time, subject to the provisions of the STERIS Executive Severance Plan as in effect from time to time applicable to Tier III employees such as Executive, the current version of which is attached as Schedule 1. The period during which Executive is employed by IMS following the Closing pursuant to the terms and conditions hereof is referred to as the "<u>Employment Period</u>".

2.      <u>Position and Duties</u>.

(a)      During the Employment Period, Executive will serve as the **[●]** (or such other title as Executive and IMS may mutually agree) of IMS and will have the normal duties, responsibilities and authority of an executive serving in such position, subject to the power of the Board of Directors of IMS or the Chief Executive Officer of STERIS (or his designee) to expand or limit such duties, responsibilities and authority, either generally or in specific instances.

(b)      During the Employment Period, Executive will devote his best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of IMS, its subsidiaries and affiliates, including STERIS.

Executive will perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

(c)  Executive will perform his duties and responsibilities principally in the greater Boston, Massachusetts area; provided, however, that Executive acknowledges that he may be required to engage in travel in connection with the performance of his duties hereunder.

3.  <u>Base Salary</u>.  During the Employment Period, Executive initially will receive a base salary at an annual rate of $220,000, payable in accordance with the applicable payroll policies of IMS as in effect from time to time.

4.  <u>Annual Bonus</u>.  Executive will be eligible to participate in IMS's annual bonus plan. Executive's target bonus under such plan for Executive's first year of service will be thirty-five percent (35%) of Executive's annualized salary, which such bonus will be determined and paid in accordance with IMS's bonus plan.  Executive's target bonus and bonus criteria for subsequent years will be determined by IMS and/or STERIS from time to time.

5.  <u>Equity Grants</u>.  Executive will be awarded a grant of Restricted Shares effective the day after Closing, subject to the terms and conditions of the STERIS Corporation 2006 Long-Term Equity Incentive Plan and applicable evidence of award and the other grant related agreements, copies of which are attached as Schedules 2, 3, 4 and 5.  The number of shares granted will be determined as set forth in the Restricted Stock Agreement.

6.  <u>Employee Benefits</u>.  During the Employment Period, Executive will be eligible to participate in such employee benefit plans as are provided to IMS or STERIS employees from time to time.

[End of Exhibit A]

**EXHIBIT B**

**Non-Compete and Non-Solicit Provision**

Any capitalized term that is used, but not defined, in this Exhibit B shall have the meaning set forth in the Agreement to which it is an Exhibit.

1.        During the Term (as defined below), Executive will not (a) engage, directly or indirectly (whether as equityholder, partner, joint venturer, financing source or consultant in any capacity whatsoever), anywhere in the world, in the business of (i) providing and selling any of the following to hospitals, surgery centers, veterinary centers or affiliated businesses: (A) surgical instrument care products (including cardiac products, circumcision clamps, surgical forceps, laparoscopic instruments, laryngoscopes, needle holders, neurological, ophthalmic, orthopedic, podiatry, retractors, scissors, sterilization trays, stainless products, suction tubes, urological surgical instruments, face shields, finger traps, intestinal instruments, decontamination gloves, inspection mats, instrument cleaning brushes, flash cards, magnifiers, marking tape and instrument stringers), medical cleaning brushes and surgical instrument accessories; (B) surgical instrument repair and maintenance services (including instrument sharpening, instrument restoration and maintenance and repair services for flexible and rigid scopes); and (C) consulting, education, training, certification and workflow management services related to such products and services; (ii) providing and selling proprietary educational products and services for the sterile processing market or (iii) designing, manufacturing, marketing and selling products relating to veterinary surgeries, including, without limitation, orthopedic trauma products, internal fixation products, bone anchors, specialty plates and advanced bio absorbable implants (the "Business"), (b) have any direct or indirect financial or other interest in any corporation, firm, business or entity engaged in the Business or (c) solicit, directly or indirectly, any customer of IMS or its subsidiaries or affiliates with respect to or on behalf of any business or entity engaged in the Business; provided, however, this Exhibit B shall not prohibit Executive from owning a passive interest of less than five percent (5%) of a publicly traded company that competes with IMS or its subsidiaries or affiliates.

2.     During the Term, Executive shall not, on his own behalf or on behalf of any other individual or entity, directly or indirectly, solicit for employment or hire any employee employed by IMS and its affiliates (including, upon the Closing, STERIS, its affiliated companies, its subsidiary companies, its predecessor companies and its successor companies) without the prior written consent of IMS; provided that a general advertisement for employment not targeted at such employees shall be deemed to not be a violation of the foregoing restriction on solicitations.

3.     If Executive breaches, or threatens to commit a breach of, any of the provisions of this Exhibit B, IMS and its affiliates (including, upon the Closing, STERIS) shall have the right and remedy to have this Exhibit B specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to IMS and its affiliates (including, upon the Closing, STERIS) and that money damages will not provide an adequate remedy to IMS and its affiliates (including, upon the Closing, STERIS).   Nothing in this Exhibit B shall be construed to limit the right of IMS and its affiliates (including, upon the Closing, STERIS) to collect money damages in the event of a breach of this Exhibit B.   In addition to the remedies IMS and its affiliates (including, upon the Closing, STERIS) may seek and obtain pursuant to this Exhibit B, the Term shall be extended by and all periods during which Executive shall be found by a court of competent jurisdiction to have been in violation of this Exhibit B.

4.     Subject to the provisions of Paragraph 3 of this Exhibit B, the term of this Exhibit B (the "Term") shall be the Employment Period and the one (1) year period following termination of the Employment Period by Executive or IMS for any reason, unless a court of competent jurisdiction shall find that such period is not permissible with respect to a jurisdiction, in which case, this Exhibit B shall terminate, with respect to such jurisdiction only, at the end of the maximum period of time permissible under applicable law.  For the avoidance of doubt, the Term of this Exhibit B will run concurrently with any other non-competition covenants or restrictions between Executive and STERIS, or any of its affiliates.

5.      If any court of competent jurisdiction or other governmental authority determines that this Exhibit B, or any part thereof, is invalid or unenforceable, the remainder of this Exhibit B shall, to the extent enforceable under applicable law, not thereby be affected and shall be given full effect, without regard to the portions which have been declared invalid or unenforceable.

6.      If any court of competent jurisdiction or other governmental authority determines that this Exhibit B, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, it is the intention of the parties that such court of competent jurisdiction or other governmental authority shall have the power to modify any such provision, to the extent necessary to render the provision enforceable, and such provision as so modified shall be enforced.

[End of Exhibit B]

**<u>Exhibit C</u>**

**Form of Restricted Stock Grant Agreement**

**AGREEMENT FOR EMPLOYEES**

**STERIS plc**
**RESTRICTED STOCK AGREEMENT – January 2, 2018**

This Agreement ("Agreement") is between STERIS plc ("STERIS") and< first_name> <middle_name> < last_name> ("Grantee"), with respect to the grant of shares of STERIS restricted stock to Grantee pursuant to the STERIS plc 2006 Long-Term Equity Incentive Plan, as Amended and Restated Effective August 2, 2016, and as further amended from time to time (the "Plan"). All terms used herein with initial capital letters and not otherwise defined herein that are defined in the Plan shall have the meanings assigned to them in the Plan.

1. *Grant of Restricted Shares*. STERIS hereby grants to Grantee, as of the date ("Date of Grant") set forth above and in the Acknowledgment and Acceptance Form accompanying this Agreement ("Acknowledgment"), <shares_awarded> (the "Ordinary Shares") of STERIS restricted stock, par value ten pence per share, as previously disclosed to Grantee and as reflected in the records of STERIS as granted as of the Date of Grant ("Restricted Shares"), upon and subject to the terms of this Agreement and the Plan. The Restricted Shares covered by this Agreement shall be issued to the Grantee effective upon the Date of Grant. The Ordinary Shares subject to this grant of Restricted Shares shall be registered in the Grantee's name in STERIS's stock registry as fully paid and nonassessable. Any certificate or other evidence of ownership or the book entry representing the Restricted Shares shall bear an appropriate legend referring to the restrictions hereinafter set forth.

2. *Documents Delivered with Agreement*. STERIS has delivered or made available to the Grantee, along with this Agreement, the following documents: (a) STERIS's Insider Trading Policy (the "Policy"); (b) the Plan and its related Prospectus; (c) the Nondisclosure and Noncompetition Agreement to be entered into between STERIS and Grantee (the "Nondisclosure Agreement"); (d) the Acknowledgment; (e) STERIS or STERIS Corporation's most recent Annual Report to Shareholders and Form 10-K filed with the US Securities and Exchange Commission; (f) STERIS's most recent Annual Report and Accounts; and (g) the Employment Agreement to be entered into between STERIS and the Grantee (the "Employment Agreement"). Acceptance and compliance with these documents is a condition to the effectiveness of this grant of Restricted Shares. By accepting this Agreement or executing the Acknowledgment, the Grantee acknowledges receipt, review and acceptance of these documents and compliance with their terms. Furthermore, as a condition of this grant of Restricted Shares, STERIS in its discretion, may require Grantee to return an executed copy of the Acknowledgement in such format as STERIS may require.

3. *Restrictions on Transfer of Shares*. The Ordinary Shares subject to this grant of Restricted Shares may not be sold, exchanged, assigned, transferred, pledged, encumbered or otherwise disposed of by the Grantee, except to STERIS, unless, and only to the extent, the Restricted Shares have vested and become nonforfeitable as provided in Section 4 hereof or as otherwise provided in the Plan; provided, however, that the Grantee's rights with respect to such Ordinary Shares may be transferred by will or pursuant to the laws of descent and distribution. Any purported transfer or encumbrance in violation of the provisions of this Section 3 shall be void, and the other party to any such purported transaction shall not obtain any rights to or interest in such Ordinary Shares. STERIS in its sole discretion, when and as permitted by the Plan, may waive the restrictions on transferability with respect to all or a portion of the Ordinary Shares subject to this grant of Restricted Shares.

4. *Vesting of Restricted Shares*. Subject to the terms of this Agreement and the Plan, other than Section 23 of the Plan, the provisions of which Section shall not apply to this grant of Restricted Shares, this grant of Restricted Shares is subject to the following limitations:

(a) The Restricted Shares shall vest and become nonforfeitable on January 3, 2022, subject to the succeeding provisions of this Section 4.

(b) Notwithstanding the other provisions of this Section 4, if the date on which the Restricted Shares would otherwise vest is not a trading day on the New York Stock Exchange, such vesting shall be deferred until the first trading day thereafter.

(c) Notwithstanding anything herein to the contrary, the provisions of Section 11 of the Plan, other than Section 11(d)(iii), shall not apply to the Restricted Shares, and if the Grantee terminates service with STERIS and all Subsidiaries prior to the date on which the Grantee's Restricted Shares have become fully vested and nonforfeitable, subject to the provisions of Section 11(d)(iii) of the Plan, such Restricted Shares shall be forfeited; provided, however, if the Grantee's service with STERIS and all of its Subsidiaries is terminated by STERIS or a Subsidiary for any reason other than Cause prior to such time as the Grantee's Restricted Shares otherwise have become fully vested and nonforfeitable, his Restricted Shares shall become vested and nonforfeitable on his termination date.

(d) For purposes of this Agreement, the term "Cause" means the termination by STERIS or a Subsidiary of the Grantee's employment with STERIS and all Subsidiaries as a result of (i) the Grantee being charged with the commission of a felony or a fraud, (ii) conduct by the Grantee that brings STERIS or any of its Subsidiaries into substantial public disgrace or disrepute, (iii) gross negligence or gross misconduct by the Grantee with respect to STERIS or any of its Subsidiaries, (iv) the Grantee's abandonment of Grantee's employment with STERIS or any of its Subsidiaries, (v) the Grantee's insubordination or failure to follow in any material respect the directions of his then-current supervisor with STERIS or a Subsidiary, (vi) the Grantee's breach of any written policy of STERIS or its Subsidiaries, (vii) any material breach by the Grantee of this Agreement, the Employment Agreement or any other agreement with STERIS or any of its Subsidiaries; or (viii) any other material breach by the Grantee of the obligations of his employment.

5. *Forfeiture of Shares*. Subject to the terms of this Agreement and the Plan, if the Grantee violates the Policy, this Agreement, or the Nondisclosure Agreement, or if either the Grantee terminates service with STERIS and all of its Subsidiaries for any reason or the Grantee's service with STERIS and all of its Subsidiaries is terminated by STERIS or a Subsidiary for Cause, in either case prior to the time all of the Restricted Shares have become vested and nonforfeitable, the Restricted Shares shall be forfeited, subject to the provisions of Section 11(d)(iii) of the Plan. In the event of a forfeiture under this Section 5, any forfeited Restricted Shares shall be returned by the Grantee to STERIS for no consideration.

6. *Dividend, Voting and Other Rights*. Except as otherwise provided herein, from and after the Date of Grant, the Grantee shall have all of the rights of a shareholder with respect to the Restricted Shares covered by this Agreement, including the right to vote such Restricted Shares and receive any dividends that may be paid thereon; provided, however, that any additional Ordinary Shares or other securities that the Grantee may become entitled to receive pursuant to a stock dividend, issuance of rights or warrants, stock split, combination of shares, recapitalization, merger, consolidation, separation, or reorganization or any other change in the capital structure of STERIS shall be subject to the same or similar restrictions as the Restricted Shares covered by this Agreement as determined by STERIS.

7. *Stock Certificate(s)*. The Ordinary Shares subject to this grant of Restricted Shares shall not be represented by certificates unless otherwise provided by resolution of the Board or required by law, and if such Ordinary Shares should be represented by certificates, the certificates will be held in custody by STERIS until those shares shall vest in accordance with the provisions hereof or as otherwise provided in the Plan. STERIS shall cause the Restricted Shares to be registered in the name of Grantee in STERIS's stock registry, with the foregoing restrictions noted thereon. STERIS may require as a condition to the effectiveness of this grant of Restricted Shares that Grantee deliver to STERIS a stock power endorsed in blank by the Grantee with respect to the Restricted Shares and Grantee agrees to deliver the same.

8. *Compliance with Law*. Notwithstanding any other provision of this Agreement, STERIS shall not be obligated to issue any Ordinary Shares pursuant to this Agreement if the issuance thereof would result in a violation of any applicable law.

9. *Employment*. For purposes of this Agreement, the continuous employment of the Grantee with STERIS or a Subsidiary shall not be deemed to have been interrupted, and the Grantee shall not be deemed to cease being an employee of STERIS or Subsidiary, by reason of (i) the transfer of his or her employment among STERIS and its Subsidiaries or (ii) a leave of absence not to exceed 12 months approved in writing by a duly elected officer of STERIS.

2

10. *Certain Determinations.* The application, violation, or other interpretation of the terms of this Agreement, the Plan, the Nondisclosure Agreement, the Policy, or any other STERIS policy shall be determined by the Board or the Chief Executive Officer or his delegatee or delegatees, if applicable, in their sole discretion, and such determination shall be final and binding on the Grantee.

11. *Termination of the Plan; No Right to Future Grants; No Right of Employment; Extraordinary Item of Compensation.* By entering into this Agreement, the Grantee acknowledges: (a) that the Plan is discretionary in nature and may be suspended or terminated by STERIS at any time; (b) that the grant of Restricted Shares is a one-time benefit which does not create any contractual or other right to receive future grants of restricted shares, or benefits in lieu of restricted shares; (c) that all determinations with respect to any such future grants, including, but not limited to, the times when the restricted shares shall be granted, the number of shares subject to each grant of restricted shares, and the time or times when the restricted shares shall become nonforfeitable, will be at the sole discretion of STERIS; (d) that the Grantee's participation in the Plan shall not create a right to further employment with the Grantee's employer and shall not interfere with the ability of the Grantee's employer to terminate the Grantee's employment relationship at any time with or without cause; (e) that the Grantee's participation in the Plan is voluntary; (f) that the value of the Restricted Shares is an extraordinary item of compensation which is outside the scope of the Grantee's employment contract, if any; (g) that the Restricted Shares are not part of normal and expected compensation for purposes of any other employee benefit plan or program of STERIS, including for purposes of calculating any severance, resignation, redundancy, end of service, bonus, long-service, pension or retirement benefits or similar payments; (h) that the right to vesting of the Restricted Shares ceases upon termination of employment for any reason except as may otherwise be explicitly provided in the Plan or this Agreement; (i) that the future value, if any, of the Restricted Shares is unknown and cannot be predicted with certainty; and (j) that, where the Grantee's employer is a Subsidiary of STERIS, the Restricted Shares have been granted to the Grantee in the Grantee's status as an employee of such Subsidiary and the terms of this Agreement can be modified by STERIS to facilitate the issuance and administration of the award and can in no event be understood or interpreted to mean that STERIS is the Grantee's employer or that the Grantee has an employment relationship with STERIS.

12. *Employee Data Privacy.* By entering into the Agreement, and as a condition of this award of Restricted Shares, the Grantee consents to the collection, use and transfer of personal data as described in this Section 12. The Grantee understands that STERIS and its Subsidiaries hold certain personal information about the Grantee, including, but not limited to, the Grantee's name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares of stock or directorships held in STERIS, details of all Restricted Shares or other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Grantee's favor, for the purpose of managing and administering the Plan ("Data"). The Grantee further understands that STERIS and/or its Subsidiaries will transfer Data among themselves as necessary for the purposes of implementation, administration and management of the Grantee's participation in the Plan, and that STERIS and/or its Subsidiaries may each further transfer Data to any third parties assisting STERIS in the implementation, administration and management of the Plan ("Data Recipients"). The Grantee understands that these Data Recipients may be located in the Grantee's country of residence, the European Economic Area, and in countries outside the European Economic Area, including the United States. The Grantee authorizes the Data Recipients to receive, possess, use, retain and transfer Data in electronic or other form, for the purposes of implementing, administering and managing the Plan, including any transfer of such Data, as may be necessary or appropriate for the administration of the Plan and/or the subsequent holding of shares of stock on the Grantee's behalf, to a broker or third party with whom the shares acquired on exercise may be deposited. The Grantee understands that he or she may, at any time, review the Data, require any necessary amendments to it or withdraw the consent herein by notifying STERIS in writing. The Grantee further understands that withdrawing consent may affect the Grantee's ability to participate in the Plan, at the sole discretion of the Board or the Chief Executive Officer or its delegatee or delegatees.

13. *Relation to Plan.* This Agreement is subject to the terms and conditions of the Plan. In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern.

14. *Amendments.* Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment shall have a material adverse effect on the rights of the Grantee under this Agreement without the Grantee's consent.

57357706 v2

15. *Severability.* If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to any other person or circumstances shall not be affected, and the provisions so held to be invalid or unenforceable shall be reformed to the extent (and only to the extent) necessary to make it enforceable and valid while accomplishing the most similar purpose.

16. *Governing Law.* This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of Ohio, without giving effect to any principle of law that would result in the application of the law of any other jurisdiction. Any unresolved dispute shall be submitted exclusively to the jurisdiction of the courts of Lake County, Ohio.

17. *Payment of Par Value.* By entering into this Agreement, the Grantee undertakes and agrees to pay the par value of £0.10 for each Restricted Share granted pursuant to this Agreement (the "Par Value Consideration") on or before the date ("Payment Date") that is six weeks after the Date of Grant as such date may be extended by STERIS in its sole discretion. Such payment of the Par Value Consideration shall be made, at the option of the Grantee's employer, on or before the Payment Date through withholding of the Par Value Consideration by the Grantee's employer from the Grantee's compensation as soon as reasonably practicable after the Grant Date or by other means of payment by the Grantee as determined by STERIS or such employer. If such payment is not received by the Payment Date, the Restricted Shares shall be forfeited for non-payment pursuant to the Articles of Association of STERIS.

18. *Taxes.* Unless Grantee has made an election under Section 83(b) of the Code with respect to the Restricted Shares, each time any of the Restricted Shares become vested and nonforfeitable STERIS shall withhold or cause to be withheld from such Restricted Shares at the time such vesting occurs a number of Ordinary Shares having a value equal to the amount of federal, state, local, foreign or other taxes required to be withheld pursuant to applicable employment or tax laws, as determined by STERIS. Likewise, with respect to previous Plan grants of restricted shares and in respect of which the Grantee has not made an election under Section 83(b) of the Code, STERIS shall withhold or cause to be withheld from such restricted shares at the time such vesting occurs a number of Common Shares having a value equal to the amount of federal, state, local, foreign or other taxes required to be withheld pursuant to applicable employment or tax laws, as determined by STERIS. For purposes of the foregoing withholding, the Ordinary Shares used for tax withholding will be valued at an amount equal to the Market Value per Share of such Ordinary Shares on the date the benefit is to be included in the Grantee's income. The foregoing provisions shall apply notwithstanding any alternate methods for the payment of withholding of taxes contained in the Plan.

19. *Miscellaneous.* Nothing contained in this Agreement shall be understood as conferring on Grantee any right to continue as an employee of STERIS or any Subsidiary or affiliate. STERIS reserves the right to correct any clerical, typographical, or other error in this Agreement or otherwise with respect to this grant. This Agreement shall inure to the benefit of and be binding upon its parties and their respective heirs, executors, administrators, successors, and assigns, but the Restricted Shares shall not be transferable by Grantee other than as provided in Section 17 of the Plan.

20. *Authority.* Any director or authorised signatory of STERIS is authorised to execute any document and do any act necessary or desirable to effect the forfeiture of any Restricted Shares which are subject to forfeiture and their return to STERIS for no consideration in accordance with the Plan and/or this Agreement.

    STERIS has caused this Agreement to be executed on its behalf by its duly authorized officer, and Grantee has entered into this Agreement and accepted all terms and conditions thereof by electronic acceptance and/or by the signed Acknowledgment, either of which has the same force and binding effect as if this Agreement were physically signed by Grantee, all as of the Date of Grant.

**STERIS plc**                                    **Grantee**

57357706 v2

By:

                                              **Signature by electronic acceptance and/or execution of the Acknowledgment and Acceptance form.**

Secretary

5

**<u>Exhibit D</u>**

**Form of Royalty Agreement**

**Execution Copy**

# ROYALTY AGREEMENT

THIS ROYALTY AGREEMENT (this "***Agreement***"), dated as of December 29, 2017 (the "***Effective Date***"), is by and between STERIS Instrument Management Services, Inc., a Delaware corporation ("***STERIS***"), and Everost, Inc., a Massachusetts corporation ("***Everost***"). STERIS and Everost are sometimes referred to individually as a "***Party***" and collectively as the "***Parties***."

## Background

A.    STERIS, Everost, Harold Wotton and Darroll Wotton have executed and delivered that certain Asset Purchase Agreement, dated as of the Effective Date (the "***Purchase Agreement***"), pursuant to which Everost has transferred and sold to STERIS, and STERIS has purchased and accepted from Everost, substantially all of the assets and business of Everost, including all right, title and interest in and to the Patents set forth on <u>Exhibit A</u> attached hereto (the "***Covered Patents***").

B.    STERIS desires to pay to Everost, and Everost desires to accept from STERIS, certain royalties on the sale of the Products within the Field of Use (as such terms are defined below), in each case in accordance with the terms and conditions of this Agreement.

C.    The execution and delivery of this Agreement is a condition precedent to the closing of the transactions contemplated by the Purchase Agreement.

D.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

## Agreement

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, STERIS and Everost hereby agree as follows:

## Article 1
## ROYALTY

**1.1    Royalty Payments** .  Subject to the terms hereof, STERIS will pay Everost a royalty based on the Revenue as follows (collectively, the "***Royalty Payments***"):

(a)    STERIS will pay Everost a royalty equal to 2% of Revenue from the Patented Products during the period beginning on the Effective Date and ending on the tenth (10th) anniversary of the Effective Date (the "***Extended Royalty Period***"); and

(b)    STERIS will pay Everost a royalty equal to 2% of Revenue from the Other Products during the period beginning on the Effective Date and ending on the fifth (5th) anniversary of the Effective Date (the "***Partial Royalty Period***");

provided, however, that the aggregate amount of the Royalty Payments will not exceed Ten Million Dollars ($10,000,000).

**1.2    Conversion of Patent Applications.**  In the event that the applicable Governmental Authority grants a valid and enforceable patent with respect to any Patent Application during the Partial Royalty Period, such Patent Application shall be treated as a Granted Patent (and not a Patent Application), and

4832-4861-8328

57359367 v1

therefore as a Patented Product, for all purposes under this Agreement from and after the date of such grant.  For the avoidance of doubt, (a) Everost will not be entitled to any Royalty Payment under **Section 1.1(a)** with respect to any Patent Application that becomes a Granted Patent for the period prior to such conversion, and (b) no Patent Application can become a Granted Patent for purposes of this Agreement after the expiration of the Partial Royalty Period, regardless of whether a valid and enforceable patent is issued with respect to such Patent Application after the expiration of the Partial Royalty Period.

**1.3**     **Defined Terms.**  For purposes of this Agreement, the following terms will be defined as follows:

(a)     "***Field of Use***" means the animal health market.

(b)     "***Granted Patent***" means (i) any Patent set forth on <u>Exhibit A</u> hereto for which the applicable Governmental Authority has granted a valid and enforceable patent as of the Effective Date and (ii) any Patent Application that becomes a Granted Patent following the Effective Date in accordance with **Section 1.2** hereof.

(c)     "***Patent Application***" means any Patent set forth on <u>Exhibit A</u> hereto for which the applicable Governmental Authority has not granted a valid and enforceable patent as of the Effective Date.

(d)     "***Patented Product***" means any product manufactured, sold, distributed or otherwise made available for use by STERIS (or any affiliate of STERIS), solely within the Field of Use, that is covered by one or more valid and enforceable claims of the Granted Patents.  For the avoidance of doubt, "Patented Product" will not include any (i) product that is covered, included, embodied, reflected or described by any claim in any continuation, continuation-in-part, divisional, re-examination of, reissue of, or any patent claiming priority from the Granted Patents and not one or more enforceable claims of the Granted Patents, or (ii) any product that is manufactured, sold, distributed or otherwise made available for use by STERIS (or any affiliate of STERIS) outside the Field of Use.

(e)     "***Products***" means, collectively, the Patented Products and the Other Products.

(f)     "***Other Product***" means any product manufactured, sold, distributed or otherwise made available for use by STERIS (or any affiliate of STERIS), solely within the Field of Use, that is covered by one or more claims of the Patent Applications.  For the avoidance of doubt, "Other Product" will not include any (i) product that is covered, included, embodied, reflected or described by any claim in any continuation, continuation-in-part, divisional, re-examination of, reissue of, or any patent claiming priority from the Patent Applications and not one or more enforceable claims of the Patent Applications, or (ii) any product that is manufactured, sold, distributed or otherwise made available for use by STERIS (or any affiliate of STERIS) outside the Field of Use.

(g)     "***Revenue***" means the gross revenue actually collected by STERIS (or any affiliate of STERIS) on the Products sold or leased by STERIS (or any affiliate of STERIS) during any Royalty Period, <u>less</u> the sum of the following deductions: (i) cash, trade or quantity discounts; (ii) sales, use, tariff, import/export duties or other excise taxes imposed on particular sales; (iii) transportation charges; and (iv) credits to customers due to Product rejections or returns.

(h)     "***Royalty Period***" means, collectively, the Extended Royalty Period and the Partial Royalty Period.

**1.4**     **Royalty Reporting and Payment**.

STERIS will prepare and provide to Everost a statement for the Royalty Payments due under this Agreement by no later than sixty (60) days following the end of each calendar year during the Royalty Period, beginning with 2018 (each, a "**Report**"). Each Report will set forth the following information: (a) the number of units of the Patented Products and the Other Products sold by STERIS during the prior calendar year (and, in the case of the Report for 2018, the period beginning on the Effective Date and ending on December 31, 2017); (b) STERIS's Revenue as the result of each such sale; and (c) STERIS's calculation of the aggregate Royalty Payments payable to Everost based on the amount of such Revenue (taking into account the Ten Million Dollar ($10,000,000) cap described in **Section 1.1**). Everost will have ten (10) business days following receipt of the Report to review and object in writing to the calculation of the Royalty Payment set forth in the Report. In the event that Everost does not deliver an objection to the Report to STERIS within such ten (10) business day period, such Report will be deemed accepted and STERIS will pay the Royalty Payment owed to Everost within thirty (30) days of acceptance of the Report. In the event Everost delivers a timely objection to a Report, the calculation of the Royalty Payment included in such Report will be negotiated by the parties in good faith. If the Parties are unable to resolve any such dispute within thirty (30) days, then the dispute shall be resolved pursuant to the dispute resolution process set forth in Section 2.05(b) of the Purchase Agreement, which shall apply to this **Section 1.4** *mutatis mutandis*, and the Royalty Payments will be paid by STERIS within thirty (30) days following the date on which the amount of such disputed Royalty Payment has been finally determined. All Royalty Payments will be paid in United States dollars via wire transfer of immediately available funds to an account identified by Everost (or such other manner as the Parties may agree).

**1.5**     **Term**.

Royalty Payments will not be payable to Everost for any period following the expiration of the Extended Royalty Period. The obligations of STERIS under this Agreement will expire upon the earlier of (i) STERIS's satisfaction of all reporting and payment obligations with respect to all Royalty Payments that accrued on or before the expiration of the Extended Royalty Period and (ii) STERIS's payment of aggregate Royalty Payments to Everost pursuant to **Section 1.1** equal to Ten Million Dollars ($10,000,000).

**1.6**     **Records and Audits**.

(a)     STERIS will maintain accurate and correct records of all Products sold or leased by STERIS and all Revenue relating thereto. Such records will be retained by STERIS for one (1) year following the conclusion of the reporting period to which such records relate.

(b)     STERIS will make all records relating to Revenue available during normal business hours for inspection and audit, upon the reasonable request and at the sole expense of Everost, for the sole purpose of verifying Revenue amounts for the applicable reporting period. Any such request for inspection and audit may be made no more than once during any calendar year and will be made within one year after the close of the applicable reporting period or periods to be examined. STERIS may require, in its discretion, that Everost, or any representatives engaged by Everost in connection with such review, execute a confidentiality agreement in a form reasonably satisfactory to STERIS prior to being provided access to STERIS's records. If the audit discloses a deficiency in the amounts owed to the Everost under this Agreement, STERIS will pay to Everost such deficiency.

**Article 2**
**MISCELLANEOUS**

**2.1** **No Third-Party Beneficiaries.**

This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**2.2** **Entire Agreement.**

This Agreement, together with the Purchase Agreement and all documents executed in connection with the transactions contemplated by the Purchase Agreement, constitute the entire understanding and agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

**2.3** **Succession and Assignment.**

This Agreement will be binding upon and will inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither Party may assign its rights or obligations hereunder without the prior written consent of the other party.

**2.4** **Counterparts.**

For the convenience of the Parties, this agreement may be executed in counterparts and by facsimile or email exchange of pdf signatures, each of which counterpart will be deemed to be an original, and both of which taken together, will constitute one agreement binding on the Parties.

**2.5** **Notices.**

All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered in person, (b) when dispatched by electronic facsimile transfer (with a confirmation report that the transmission was successful), (c) one business day after having been dispatched by a nationally recognized overnight courier service or (d) five business days after being sent by registered or certified mail, return receipt requested, postage prepaid, to the appropriate party at the address or facsimile number specified below:

| If to Everost: | Copy to: |
|---|---|
| Darroll E. Wotton<br>11 Meadow View Lane<br>Fiskdale, MA 01518<br>Fax: 508-462-0321 | Hinckley, Allen & Snyder, LLP<br>28 State Street<br>Boston, MA 02109-1775<br>Attn: Todd M. Gleason, Esq.<br>Fax: 617-345-9020 |

| If to STERIS: | Copy to: |
|---|---|
| STERIS Instrument Management Services, Inc.<br>3316 2nd Avenue North<br>Birmingham, AL 35222<br>Attn: Vice President, Administration<br>Fax: (440) 357-2344 | STERIS Corporation<br>5960 Heisley Road<br>Mentor, OH 44060<br>Attn: General Counsel<br>Fax: (440) 357-2344 |

**2.6** **Governing Law.**

This Agreement will be governed by and construed in accordance with the internal laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Ohio.

**2.7** **Submission to Jurisdiction; Consent to Service of Process.**

Any Action arising out of or based upon this Agreement or the transactions contemplated hereby will be instituted in the federal courts of the United States of America or the courts of the State of Ohio, in each case located in the city of Ohio and county of Cuyahoga, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such Action.  Service of process, summons, notice or other document by mail to such Party's address set forth in this Agreement will be effective service of process for any Action brought in any such court.  The Parties irrevocably and unconditionally waive any objection to the laying of venue of any Action in such courts and irrevocably waive and agree not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum.

**2.8** **Amendments and Waivers.**

This Agreement may only be amended, modified or supplemented by an agreement in writing signed by STERIS, on the one hand, and Everost, on the other hand.  No waiver by either Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by either Party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**2.9** **Severability.**

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**2.10**    **Expenses**.

Each Party will bear its and their own costs and expenses (including legal fees and expenses) incurred in connection with the negotiation, preparation, execution and delivery of this Agreement and each other agreement, document and instrument contemplated by this Agreement.

**[Signatures on the Following Page.]**

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed the day and year first above written.

**STERIS INSTRUMENT MANAGEMENT**
**SERVICES, INC.**

**EVEROST, INC.**


By:_____
Name:
Title:

By:_____
Name:
Title:

Royalty Agreement

4832-4861-8328

57359367 v1

## EXHIBIT A

**COVERED PATENTS**

See attached.