## EMPLOYMENT AGREEMENT

This Employment Agreement (including any exhibits hereto, this "<u>Agreement</u>") is entered into by and between **HAROLD WOTTON** ("<u>Executive</u>") and STERIS Instrument Management Services, Inc. ("<u>IMS</u>") on this 29th day of December, 2017 (the "<u>Effective Date</u>").

**WHEREAS**, concurrent with the execution of this Agreement, IMS, Executive, Everost, Inc. ("<u>Seller</u>") and the other parties named therein are entering into an Asset Purchase Agreement, dated as of the date hereof (the "<u>Asset Purchase Agreement</u>"), pursuant to which IMS is purchasing substantially all of the assets of Seller (the "<u>Transaction</u>");

**WHEREAS**, as a material inducement to IMS to enter into the Asset Purchase Agreement and engage in the Transaction, Executive and IMS are entering into this Agreement, pursuant to which (i) Executive will become subject to the Employment Terms (as defined in Section 1) as of the closing of the transactions contemplated by the Asset Purchase Agreement (the "<u>Closing</u>") and (ii) Executive will confirm that the Employment Terms and the restricted shares awarded (the "<u>Award</u>") pursuant to the Restricted Stock Agreement attached hereto as <u>Schedule 3</u> (the "<u>Restricted Stock Agreement</u>") are sufficient and valid consideration for Executive agreeing to the terms and conditions of Section 2.

**NOW**, **THEREFORE**, in consideration of the mutual promises contained in this Agreement and other good and valuable consideration the adequacy, sufficiency and receipt of which is hereby acknowledged, it is agreed as follows:

1. <u>Employment</u>. Effective as of the Closing, Executive will become subject to the terms and conditions of employment set forth on Exhibit A hereto (the "<u>Employment Terms</u>").

2. <u>Non-Competition</u>. Effective as of the Closing, in consideration of the Transaction Payments and the Employment Terms, Executive agrees to be bound by the Non-Compete and Non-Solicit Provision attached hereto as Exhibit B (the "<u>Non-Compete and Non-Solicit Provision</u>").  The foregoing shall be in addition to and not in lieu of any other terms and conditions that may be imposed upon Executive from time to time pursuant to or in conjunction with the Employment Terms, including but not limited to any terms and conditions imposed in conjunction with the receipt of equity grants.

EXHIBIT B

Executive acknowledges and agrees that (a) the Closing of the Transaction, and the payments in connection with the Closing of the Transaction, is expressly conditioned upon the execution and delivery of this Agreement (including the Non-Compete and Non-Solicit Provision) and (b) the Award and the Employment Terms are sufficient and valid consideration for Executive agreeing to the terms and conditions of this Section 2.

3.      <u>Voluntary Agreement</u>. Executive acknowledges that: (a) Executive is knowingly and voluntarily entering into this Agreement; (b) this Agreement has been written in understandable language and all of its provisions are understood by Executive; (c) neither Executive nor IMS are admitting any liability or violation of any law, contract or other agreement; (d) no promise or inducement has been offered to Executive except as stated in this Agreement, and the benefits being provided to Executive pursuant to this Agreement are more than Executive would otherwise be entitled to receive if he did not sign this Agreement; (e) Executive has been advised to consult with an attorney of his choice before signing this Agreement and, by signing below, Executive acknowledges that before signing this Agreement he has had sufficient opportunity to consult with an attorney if he so desires; (f) he has been offered a reasonable and adequate period of time to consider, review and evaluate the terms of this Agreement prior to signing it; (g) the terms of this Agreement are contractual and not a mere recital; and (h) Executive will maintain the terms of this Agreement as confidential and will not disclose these terms to anyone other than his spouse, financial advisor, or attorney, unless he has first received express written consent of IMS. If Executive discloses any of the terms of this Agreement to his spouse, financial advisor, or attorney, Executive shall notify such individual that this Agreement is confidential and may not be further disclosed, and any disclosure of this Agreement or its terms by Executive's spouse, financial advisor, or attorney shall be treated as a breach of this Agreement by Executive. If Executive believes that a subpoena or other legal obligation requires him to disclose terms of this Agreement or any confidential information of IMS, Executive shall promptly notify IMS in a writing addressed to General Counsel, STERIS Corporation, 5960 Heisley Road, Mentor, OH 44060, and shall provide IMS with a reasonable period of time to evaluate or contest the proposed disclosure before any disclosure is made by Executive.

4.      Notice. Immediately after signing this Agreement, Executive shall send a copy of the signed Agreement to IMS by electronic mail or facsimile and shall, within one (1) business day thereafter, send the original signed Agreement by registered or certified U.S. mail to the attention of:

> c/o STERIS Corporation
> Attention: General Counsel
> 5960 Heisley Road
> Mentor, OH 44060
> Facsimile:  (440) 357-2344

5.      Governing Law. This Agreement, including, without limitation, the interpretation, construction, validity and enforcement thereof, shall be governed by, construed, applied and enforced in accordance with the laws of the State of Ohio, without regard to the conflict of laws provisions thereof.

6.      Severability. All provisions of this Agreement are distinct and separable. If any provision or clause shall be held to be unenforceable or overly broad, a court of competent jurisdiction is hereby authorized to modify such provision or clause so as to render this Agreement and all provisions hereof enforceable to the maximum extent permitted by law.

7.      Entire Agreement. This Agreement, together with the employment offer letter to Executive dated as of an even date herewith, contains the entire understanding between the parties and, except as otherwise set forth herein, supersedes any prior understandings and agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings respecting the within subject matter, whether oral or written, between the parties, other than expressly provided herein.

8.      Counterparts. This Agreement may be executed in multiple counterparts, all of which together constitute one and the same Agreement.

9.      Recitals. The Recitals to this Agreement are incorporated into this Agreement by reference.

10.    <u>Assignment</u>. This Agreement will be binding in all respects upon, and shall be enforceable by and inure solely to the benefit of, the parties hereto, the Released Parties and the respective successors and permitted assigns of the parties and the Released Parties.

11.    <u>Withholding for Taxes</u>. IMS may withhold from any amounts payable under this Agreement all federal, state, city or other taxes as shall be required to be withheld pursuant to any applicable law or government regulation or ruling.

12.    <u>Section 409A</u>.  The parties intend for this Agreement to either comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and all provisions of this Agreement will be interpreted and applied accordingly. In no event, however, shall this Section 12 or any other provisions of this Agreement be construed to require IMS to provide any gross-up for the tax consequences of any provisions of, or payments under, this Agreement and IMS shall have no responsibility for tax consequences to Executive resulting from the terms or operation of this Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**STERIS INSTRUMENT MANAGEMENT SERVICES, INC.**

By:_____

_____
**HAROLD WOTTON**

[STE – Everost, Signature Page to Employment Agreement (Harold)]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

STERIS INSTRUMENT MANAGEMENT
SERVICES, INC.

By:_____

_____       Michael J. Tokich
**HAROLD WOTTON**

**EXHIBIT A**

**Employment Terms**

Any capitalized term that is used, but not defined, in this Exhibit A shall have the meaning set forth in the Agreement to which it is an Exhibit.

1.      <u>Employment</u>.  Effective as of the Closing, IMS will employ Executive, and Executive accepts such employment with IMS, upon the terms and conditions set forth in this Exhibit A and in the employment offer letter to Executive dated as of an even date herewith, and such other terms and conditions as may be applicable from time to time to IMS and/or STERIS Corporation ("<u>STERIS</u>") employees.  Notwithstanding anything in this Agreement to the contrary, at all times following the Closing, Executive will be an at-will employee of IMS and either IMS or Executive may terminate Executive's employment with IMS at any time, subject to the provisions of the STERIS Executive Severance Plan as in effect from time to time applicable to Tier III employees such as Executive, the current version of which is attached as Schedule 1. The period during which Executive is employed by IMS following the Closing pursuant to the terms and conditions hereof is referred to as the "<u>Employment Period</u>".

2.      <u>Position and Duties</u>.

(a)      During the Employment Period, Executive will serve as the Director, Lead Product Development Engineer (or such other title as Executive and IMS may mutually agree) of IMS and will have the normal duties, responsibilities and authority of an executive serving in such position, subject to the power of the Board of Directors of IMS or the Chief Executive Officer of STERIS (or his designee) to expand or limit such duties, responsibilities and authority, either generally or in specific instances.

(b)      During the Employment Period, Executive will devote his best efforts and full business time and attention (except for permitted vacation periods and reasonable periods of illness or other incapacity) to the business and affairs of IMS, its subsidiaries and affiliates, including STERIS.

Executive will perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

(c)     Executive will perform his duties and responsibilities principally in the greater Boston, Massachusetts area; provided, however, that Executive acknowledges that he may be required to engage in travel in connection with the performance of his duties hereunder.

3.     <u>Base Salary</u>.  During the Employment Period, Executive initially will receive a base salary at an annual rate of $220,000, payable in accordance with the applicable payroll policies of IMS as in effect from time to time.

4.     <u>Annual Bonus</u>.  Executive will be eligible to participate in IMS's annual bonus plan. Executive's target bonus under such plan for Executive's first year of service will be thirty-five percent (35%) of Executive's annualized salary, which such bonus will be determined and paid in accordance with IMS's bonus plan.  Executive's target bonus and bonus criteria for subsequent years will be determined by IMS and/or STERIS from time to time.

5.     <u>Equity Grants</u>.  Executive will be awarded a grant of Restricted Shares effective the day after Closing, subject to the terms and conditions of the STERIS Corporation 2006 Long-Term Equity Incentive Plan and applicable evidence of award and the other grant related agreements, copies of which are attached as Schedules 2, 3, 4 and 5.  The number of shares granted will be determined as set forth in the Restricted Stock Agreement.

6.     <u>Employee Benefits</u>.  During the Employment Period, Executive will be eligible to participate in such employee benefit plans as are provided to IMS or STERIS employees from time to time.

[End of Exhibit A]

**EXHIBIT B**

**Non-Compete and Non-Solicit Provision**

Any capitalized term that is used, but not defined, in this Exhibit B shall have the meaning set forth in the Agreement to which it is an Exhibit.

1.        During the Term (as defined below), Executive will not (a) engage, directly or indirectly (whether as equityholder, partner, joint venturer, financing source or consultant in any capacity whatsoever), anywhere in the world, in the business of (i) providing and selling any of the following to hospitals, surgery centers, veterinary centers or affiliated businesses: (A) surgical instrument care products (including cardiac products, circumcision clamps, surgical forceps, laparoscopic instruments, laryngoscopes, needle holders, neurological, ophthalmic, orthopedic, podiatry, retractors, scissors, sterilization trays, stainless products, suction tubes, urological surgical instruments, face shields, finger traps, intestinal instruments, decontamination gloves, inspection mats, instrument cleaning brushes, flash cards, magnifiers, marking tape and instrument stringers), medical cleaning brushes and surgical instrument accessories; (B) surgical instrument repair and maintenance services (including instrument sharpening, instrument restoration and maintenance and repair services for flexible and rigid scopes); and (C) consulting, education, training, certification and workflow management services related to such products and services; (ii) providing and selling proprietary educational products and services for the sterile processing market or (iii) designing, manufacturing, marketing and selling products relating to veterinary surgeries, including, without limitation, orthopedic trauma products, internal fixation products, bone anchors, specialty plates and advanced bio absorbable implants (the "Business"), (b) have any direct or indirect financial or other interest in any corporation, firm, business or entity engaged in the Business or (c) solicit, directly or indirectly, any customer of IMS or its subsidiaries or affiliates with respect to or on behalf of any business or entity engaged in the Business; provided, however, this Exhibit B shall not prohibit Executive from owning a passive interest of less than five percent (5%) of a publicly traded company that competes with IMS or its subsidiaries or affiliates.

2.      During the Term, Executive shall not, on his own behalf or on behalf of any other individual or entity, directly or indirectly, solicit for employment or hire any employee employed by IMS and its affiliates (including, upon the Closing, STERIS, its affiliated companies, its subsidiary companies, its predecessor companies and its successor companies) without the prior written consent of IMS; provided that a general advertisement for employment not targeted at such employees shall be deemed to not be a violation of the foregoing restriction on solicitations.

3.      If Executive breaches, or threatens to commit a breach of, any of the provisions of this Exhibit B, IMS and its affiliates (including, upon the Closing, STERIS) shall have the right and remedy to have this Exhibit B specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to IMS and its affiliates (including, upon the Closing, STERIS) and that money damages will not provide an adequate remedy to IMS and its affiliates (including, upon the Closing, STERIS).   Nothing in this Exhibit B shall be construed to limit the right of IMS and its affiliates (including, upon the Closing, STERIS) to collect money damages in the event of a breach of this Exhibit B.   In addition to the remedies IMS and its affiliates (including, upon the Closing, STERIS) may seek and obtain pursuant to this Exhibit B, the Term shall be extended by and all periods during which Executive shall be found by a court of competent jurisdiction to have been in violation of this Exhibit B.

4.      Subject to the provisions of Paragraph 3 of this Exhibit B, the term of this Exhibit B (the "Term") shall be the Employment Period and the one (1) year period following termination of the Employment Period by Executive or IMS for any reason, unless a court of competent jurisdiction shall find that such period is not permissible with respect to a jurisdiction, in which case, this Exhibit B shall terminate, with respect to such jurisdiction only, at the end of the maximum period of time permissible under applicable law.  For the avoidance of doubt, the Term of this Exhibit B will run concurrently with any other non-competition covenants or restrictions between Executive and STERIS, or any of its affiliates.

5.      If any court of competent jurisdiction or other governmental authority determines that this Exhibit B, or any part thereof, is invalid or unenforceable, the remainder of this Exhibit B shall, to the extent enforceable under applicable law, not thereby be affected and shall be given full effect, without regard to the portions which have been declared invalid or unenforceable.

6.      If any court of competent jurisdiction or other governmental authority determines that this Exhibit B, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, it is the intention of the parties that such court of competent jurisdiction or other governmental authority shall have the power to modify any such provision, to the extent necessary to render the provision enforceable, and such provision as so modified shall be enforced.

[End of Exhibit B]

<u>Schedule 1</u>

See attached.

**STERIS Corporation**
**Executive Severance Plan**

## Article 1. Establishment and Term of the Plan

**1.1 Establishment of the Plan** STERIS Corporation hereby establishes this severance plan, to be known as the "STERIS Corporation Senior Executive Severance Plan," effective as of July 1, 2012. The Plan provides severance benefits to specified executives of STERIS and its Affiliates upon terminations of employment.

STERIS considers the establishment and maintenance of a sound management to be essential to protecting and enhancing the best interests of STERIS and its shareholders. In this connection, STERIS recognizes that, as is the case with many corporations, the possibilities of a termination of an Executive's employment may arise and that such possibilities, and the uncertainty and questions which they may raise among management, may result in the departure or distraction of management personnel to the detriment of STERIS and its shareholders.

Accordingly, STERIS has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of the management of the Company (as hereinafter defined) to their assigned duties without distraction in circumstances arising from the possibility of a termination of an Executive's employment.

**1.2 Plan Term** This Plan shall commence on the Effective Date and shall continue in effect until terminated by STERIS. STERIS may terminate this Plan entirely or terminate any individual Executive's participation in the Plan at any time by: (a) giving all Executives at least twelve (12) months prior written notice of Plan termination if terminating the Plan in its entirety or (b) giving the affected Executive at least twelve (12) months prior written notice if terminating the affected Executive's participation in the Plan. Any notice provided pursuant to the preceding sentence shall specify the date (in compliance with the preceding termination sentence) as of which such termination shall be effective. Following delivery of such notice by STERIS, this Plan or the Executive's participation in the Plan, as the case may be, along with all corresponding Plan rights, duties, and covenants, other than those contained in Articles 5 and 6 and in Sections 7.3, 9.2, 9.10, 9.11 and 9.12 shall terminate on the date indicated in such notice, except that any right to Severance Benefits that shall have accrued to Executive prior to the effective date specified in such notice shall not be affected by such termination and such Severance Benefits shall be provided as if such notice had not been given.

## Article 2. Definitions

Wherever used in this Plan, the following capitalized terms shall have the meanings set forth below:

(a)    " **Affiliate** " means any Person directly or indirectly controlling, controlled by or under direct or indirect common control with STERIS. For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or through one of more intermediaries, whether through ownership of voting securities, by contract, or otherwise.

(b)  " **Base Salary** " means, at any time, the then regular gross annual rate of salary payable to Executive as annual salary, including amounts withheld or deferred for any reason, including any amounts not includible in income for federal income tax purposes as a result of elections by the Executive or the Company that would have been includible in income absent such elections. Base Salary does not include incentive compensation, equity compensation or other equity interests, or any other form of compensation.

(c)  " **Board** " means the Board of Directors of STERIS and/or the Committee.

(d)  " **Cause** " means the occurrence of any one or more of the following:

(i)     The Executive's conviction of a felony

(ii)     The Executive's indictment for a felony as a result of any acts or omissions in the operation of the Company's business, except to the extent that such acts or omissions are fully consistent with Company policy and industry practices;

(iii)     The Executive's indictment for a felony that is not as a result of any acts or omissions in the operation of the Company's business but has a material adverse effect upon the Company, its business or reputation or the Executive's ability to perform his/her duties;

(iv)     Fraud, misappropriation or embezzlement by the Executive whether or not involving the Company;

(v)     The Executive's material breach of his/her covenants under this Plan or any of the Other Agreements which has not been cured within the applicable time period if any, set forth therein and, if not so specified, promptly (taking into account the nature of the conduct and the actions that must be taken to effect the cure) after receipt by the Executive of notice thereof from the Company; or

(vi)     The Executive's gross misconduct, gross negligence, conduct involving moral turpitude, or insubordination, that has a material adverse effect upon the Company, its business or reputation or the Executive's ability to perform his/her duties.

(e)  " **Code** " means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

(f)  " **Committee** " means the Compensation Committee of the Board, or another committee of the Board appointed by the Board to administer this Plan.

(g)  " **Company** " means and includes STERIS and all Persons from time to time constituting Affiliates.

3

(h)   " **Disability** " or " **Disabled** " shall have the meaning used for purposes of the Company's long term disability plan as in effect at the time the Disability is claimed to have occurred.

(i)   " **Effective Date** " means July 1, 2012.

(j)   " **Effective Date of Termination** " means the date on which a Qualifying Termination occurs, as provided in Section 3.1, which triggers the payment of Severance Benefits, or such other date upon which the Executive's employment with the Company terminates for reasons other than a Qualifying Termination.

(k)   "**Equity Plan**" means the STERIS Corporation 2006 Long-Term Equity Incentive Plan, as amended from time to time, and/or any similar plan that replaces or supplements such 2006 Long-Term Equity Incentive Plan.

(l)   "**Evidence of Award**" means an Evidence of Award within the meaning of the Equity Plan or any similar agreement or instrument providing for equity or equity related award grants in respect of STERIS.

(m)   " **Executive** " means a Tier 1 Employee, Tier II Employee or Tier III Employee whose participation in the Plan has been approved in writing by the Chief Executive Officer of STERIS and whose participation in the Plan has not terminated pursuant to the provisions hereof.

(n)   " **General Release** " has the meaning set forth in Section 3.4.

(o)   " **Good Reason** " means, with respect to an Executive:

(i)  the Company fails to make any payment when due of the Executive's Base Salary or any incentive compensation to which the Executive is entitled;

(ii) any material decrease in the Executive's rate of Base Salary or a material reduction of the Executive's target incentive compensation opportunity; provided that any such decrease or reduction, will not be considered "Good Reason" if similar change(s) are recommended by STERIS's independent compensation consultant or the Board for general application to other current executives; provided further the failure to extend or renew any Other Severance Arrangement of any Executive or the termination of any Other Severance Arrangement in accordance with its terms or by agreement of the parties  does not constitute "Good Reason" with respect to the Executive;

(iii)  the Company requires the Executive to work out of an office that is more than 50 miles away from the Executive's office location at the time the Executive receives his or her Notice of Participation for more than 30 consecutive days; or

(iv)  Death of the Executive,

4

and in each case, the Executive has provided the Company with written notice within thirty (30) days after the initial event which the Executive believes constitutes "Good Reason," describing such event, and, in the case of events other than those described in clause (iv), the Company has failed to remedy the situation within thirty (30) days after receipt of notice.

(p)  "**Notice of Termination**" means a written notice provided by STERIS or the Executive indicating that the Executive's employment is being terminated. In the event the Executive provides such notice, the Notice of Termination shall indicate the specific termination provision in this Plan relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for the Executive's termination of the Executive's employment under the provision so indicated.

(q)  "**Other Agreements**" means with respect to an Executive restricted share agreements, stock option agreements, or similar agreements entered into by the Executive in conjunction with any Equity Plan or predecessor plan, any non-compete, confidentiality and other similar agreements between STERIS and the Executive, and  STERIS's codes and policies in effect now or in the future.

(r)  "**Other Severance Arrangement**" has the meaning set forth in Section 9.2.

(s)  "**Person**" means any individual and any corporation, partnership, trust, unincorporated organization, association, limited liability company or other entity or group.

(t)  "**Plan**" means this STERIS Corporation Executive Severance Plan, as the same may be amended from time to time.

(u)  "**Qualifying Termination**" has the meaning set forth in Section 3.1.

(v)  "**Separation from Service**" has the meaning set forth in Section 3.1.

(w)  "**Severance Benefits**" means those benefits provided pursuant to Sections 4.2(c), 4.2(d) and 4.2(e).

(x)  '**Severance Period**" means the monthly period immediately succeeding the date of an Executive's Separation from Service that constitutes a Qualifying Termination and consisting of the following number of months subsequent to such Separation from Service: (i) for a Tier I Employee, the first twelve (12) months; for a Tier II Employee, the first nine (9) months; and for a Tier III Employee, the first six (6) months.

(y)  "**STERIS**" means STERIS Corporation, an Ohio corporation, and any successor thereto as provided in Section 8.1.

(z)  "**Tier I Employee**" means a Person employed by the Company at Grade Level M.

(aa)  "**Tier II Employee**" means a Person employed by the Company at Grade Level L.

(bb) "**Tier III Employee**" means a Person employed by the Company at Grade Level K or J.

**Article 3. Severance Eligibility/Conditions.**

**3.1 Qualifying Termination** . STERIS shall pay Severance Benefits and other benefits to an Executive, as such Severance Benefits and other benefits are described in Section 4.2, if at any time prior to the termination of the Plan or termination of the Executive's participation therein pursuant to Section 1.2, the Executive incurs a Separation from Service upon the occurrence of any one or more events, other than the following:

    (a)    By the Company for Cause;

    (b)    By the Company because of the Executive's Disability; or

    (c)    By the Executive without Good Reason.

Any such Separation from Service upon the occurrence of any one or more events other than those enumerated in paragraph (a) or (b) above constitutes a "Qualifying Termination" for purposes of this Plan.

A "Separation from Service" shall be deemed to have occurred on the date on which the level of bona fide services reasonably anticipated to be performed by the Executive is twenty percent (20%) or less (including zero) of the average level of bona fide services performed by such Executive during the immediately preceding thirty-six (36) month period (or the full period of services if the Executive has been providing services for less than thirty-six (36) months). For the avoidance of doubt, a complete termination of Executive's employment and other service relationships with STERIS and all Affiliates constituting the Company shall be a Separation from Service. A Separation from Service by an Executive shall be treated as having occurred with Good Reason only if the Executive terminates his employment and all other service relationships with STERIS and all such Affiliates within thirty (30) days after the end of the Company's cure period described in Section 2(o).

    **3.2 Severance Benefits**. The Executive shall not be entitled to receive Severance Benefits if the Executive's employment with Company ends for reasons other than a Qualifying Termination.

    **3.3  General Release and Other Agreements**.  As a condition to receiving Severance Benefits under this Plan, prior to the 60 $^{th}$ day following the date of the Executive's Qualifying Termination, the Executive shall have executed (i) a general release of claims in favor of STERIS, its current and former Affiliates and shareholders, and the current and former directors, officers, employees, and agents thereof, in the form prescribed by STERIS (a "General Release") and under procedures determined by STERIS in its discretion to be adequate, to effectively waive all claims under applicable law, and any period for revocation of such General Release shall have expired and (ii) at STERIS's option, the Executive shall have executed a written affirmation in such form as STERIS may require of Executive's obligations under

Articles 5 and 6 hereof and under all nondisclosure and non-competition agreements and similar agreements to which Executive is party, including the Other Agreements.

**3.4 Notice of Termination**. Any Separation from Service (including a termination of employment of Executive) by the Company or by the Executive shall be communicated by Notice of Termination to the other party. In the event an Executive provides written notice to STERIS of an alleged Good Reason event and subsequently terminates his/her employment pursuant to Section 2(o) and Section 3.1, then such notice shall constitute a Notice of Termination.

**3.5 Disability.** Notwithstanding any provision of the Plan to the contrary, if an Executive becomes Disabled after the date of the Executive's Qualifying Termination, such Executive shall not be entitled to benefits under any short-term or long-term disability plan of Company.

**Article 4. Severance Benefits and Other Benefits.**

**4.1 General Conditions for Severance Benefits.** Subject to Section 3.3 and the other provisions hereof, the Company shall pay the Executive the benefits, including the Severance Benefits, as described in Section 4.2, if the Executive receives or delivers a Notice of Termination in respect of a Qualifying Termination of the Executive's employment pursuant to Section 3.1.

**4.2 Benefits**. Severance Benefits to be provided to the Executive pursuant to this Section 4.2 shall be the following:

(a)   An amount equal to the Executive's unpaid Base Salary, unreimbursed business expenses, and all other items earned by and owed to the Executive through and including the date of the Qualifying Termination shall be paid in cash to the Executive within thirty days after the date of his or her Effective Date of Termination. Such payment shall constitute full satisfaction for these amounts owed to the Executive.

(b)   Any amount payable to the Executive under the applicable management incentive compensation plan then in effect in respect of the most recently completed fiscal year, to the extent not theretofore paid, shall be paid in cash to the Executive in a single lump sum at the applicable time provided in such plan. Such payment shall constitute full satisfaction for such amount owed to the Executive in respect of such fiscal year.

(c)   An amount equal to the Executive's annual rate of Base Salary in effect immediately prior to the date of his or her Qualifying Termination times (i) one hundred percent (100%), if the Executive is a Tier I Employee; (ii) seventy-five percent (75%), if the Executive is a Tier II Employee; or (iii) fifty percent (50%), if the Executive is a Tier III Employee. Subject to Section 9.2 and the following sentence, such amount shall be paid to the Executive in equal monthly installments or more frequent installments as determined by STERIS over the Executive's Severance Period, payable on the same schedule that would have existed had the Executive remained in the employ of the Company. Notwithstanding the foregoing, the first payment shall

7

be made on the 61st day after the Executive's Separation from Service and shall include all amounts that would have been paid prior to such first payment date but for this sentence.

(d)  An amount equal to the annual bonus the Executive would have earned under the applicable management incentive compensation plan for the fiscal year in which the Qualifying Termination occurs, determined based on the applicable targets, thresholds and actual financial performance achieved (and treating individual performance as having achieved expectations) under such incentive compensation plan for such fiscal year and adjusted on a pro rata basis based on the number of months the Executive was actually employed during such fiscal year (full credit shall be given for partial months of employment), which amount shall be paid in cash to the Executive in a single lump sum at the applicable time provided in such plan. Such payment shall constitute full satisfaction for such amount owed to the Executive under such plan for such fiscal year.

(e)  The Company shall allow Executive, at Executive's expense, to continue to participate in the Company's medical and dental insurance coverages as are in effect from time to time for Company employees until the earlier of (x) Executive's eligibility under another employer's medical or dental plan, or (y) expiration of the Executive's eligibility to participate in such coverages pursuant to COBRA, and shall reimburse the Executive for the monthly cost thereof incurred by Executive during his or her Severance Period.  Subject to Section 9.2, each such reimbursement shall be made within ten (10) days after the end of the month for which such reimbursement is made, provided that the first reimbursement payment shall be made on the 61st day after the Executive's Separation from Service and shall include all reimbursement amounts that would have been paid prior to such first payment date but for this proviso.  Executive agrees that the period of medical and dental coverage under the Company's plans shall count against the obligation to provide continuation coverage under COBRA and ERISA.

(f)  Any exercise or other rights of Executive with respect to Executive's interests in STERIS stock, restricted stock, stock options, stock appreciation, or other equity related interests shall continue to be subject to the terms and conditions of the applicable Equity Plans and/or predecessor plans, as applicable, and the Executive's applicable Evidence(s) of Award, which shall remain in full force and effect, in accordance with their respective terms including without limitation the requirements of "Good Standing", confidentiality and non-competition.  Under no circumstances shall an Executive's receipt of Severance Benefits be construed to continue his employment, or operate to extend the period during which he may be entitled to exercise his rights, for purposes of the Equity Plans and/or predecessor plans and the applicable Evidence(s) of Award.

(g)  Notwithstanding the foregoing, if the payment of any amount of Severance Benefits to the Executive before the date which is six months after the date of Executive's Separation from Service would cause all or any portion of the Severance Benefits to be subject to inclusion in the Executive's gross income for federal income tax purposes under Section 409A(a)(i)(A) of the Code, then the payment of any such amount shall be delayed until the first business day after such date (or, if earlier, the date of the Executive's death).

**Article 5. Protective Covenants.** Executive agrees that the Other Agreements shall apply to Executive and remain in full force and effect subject to their terms, excluding any severance policy, benefits, or other post termination obligation of the Company, except as specified in Section 4.2 of this Plan or except for any Other Severance Arrangement. This Plan shall be in addition to and not in substitution for such Other Agreements, provided that any material breach, default or violation by Executive under this Plan or the Other Agreements or any Other Severance Arrangement, shall constitute a breach of each and every Other Agreement and any Other Severance Arrangement between STERIS and Executive, if so determined by STERIS. This Plan and the Other Agreements are separate and distinct obligations and are intended to supplement, not conflict with, each other. However, in the event of any conflict between the terms of those Other Agreements and this Plan, such conflict shall be governed by the terms of this Plan. Executive acknowledges and agrees that (i) adequate consideration has been provided for this Plan and the Other Agreements and each is binding on Executive, and (ii) both during and after employment with the Company, Executive will freely assist and cooperate with the Company concerning matters in his or her knowledge or arising from or relating to responsibilities with the Company.

**Article 6. Confidentiality.** As used in this Plan, Confidential Information means any information concerning STERIS or any Affiliate of STERIS or otherwise concerning the Company that is not ordinarily provided to Persons who are not employees of the Company except pursuant to a confidentiality agreement, provided that any information that is or becomes publicly known, other than as a result of a breach of this provision by Executive, shall not be or shall cease to be Confidential Information. Executive shall not disclose Confidential Informatio to any Person other than: (a) an officer, director or employee of STERIS or any Affiliate who needs to know such information in his or her capacity as such, (b) an attorney who has been retained by and represents STERIS or an Affiliate with respect to matters relating to the Company and in accordance with attorney/client privilege. Executive shall not use Confidential Information for any purpose unrelated to duties as an officer, director or employee of STERIS or any Affiliate. Nothing in this Plan will prohibit Executive from disclosing Confidential Information as necessary to comply with valid legal process or investigations or to fulfill a legal duty of Executive, provided Executive shall give STERIS prompt notice of such process or investigation or Executive's intent to disclose pursuant to such legal duty so that STERIS may take such steps as it deems appropriate to limit or protect the Confidential Information to be disclosed.

**Article 7. Contractual Rights and Legal Remedies**

**7.1 Payment Obligations Absolute**. Except as otherwise provided in Section 7.3 below, and subject to satisfaction of the conditions herein contained. STERIS's obligation to make the payments and the arrangements provided for herein shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which STERIS or any Affiliate may have against the Executive or anyone else. All amounts payable by STERIS hereunder shall be paid without notice or demand. The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Plan, and the obtaining of any such other employment shall in no event effect

9

any reduction of STERIS's obligations to make the payments and arrangements required to be made under this Plan, except to the extent provided in Section 4.2(e).

**7.2 Contractual Rights to Benefits**. This Plan establishes and vests in the Executive a contractual right to the benefits to which he or she is entitled hereunder, subject to the other provisions hereof. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, STERIS to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

**7.3 Return of Severance Benefits**. If at any time the Executive breaches any provision of (i) the General Release or (ii) Section 5 or 6 hereof (or the Other Agreements), or any obligations of the Executive affirmed under Section 3.3(ii), each as executed by the Executive in accordance with Section 3.4 or pursuant to or as specified in the other provisions of this Plan, then in addition to all other rights and remedies available to it in law or equity, STERIS may cease to provide any further Severance Benefits and other benefits under this Plan, and upon STERIS's written demand, the Executive shall repay to STERIS the Severance Benefits and any other amount previously received under this Plan which Executive would have not been entitled to receive absent the Plan. Any amount to be repaid pursuant to this Section 7.3 shall be (A) determined by STERIS in its sole and absolute discretion, (B) held by the Executive in constructive trust for the benefit of STERIS and (C) paid by the Executive to STERIS within ten (10) days of the Executive's receipt of written notice from STERIS. STERIS shall have the right to offset such amount against any amounts otherwise owed to the Executive by STERIS. In addition, in the event of any such breach by Executive, Executive also shall pay expenses and costs incurred by Company as a result of the breach (including, without limitation, reasonable attorney's fees).

## Article 8. Successors

**8.1 Successors to STERIS**. STERIS shall require any successor (whether direct or indirect, by purchase, merger, reorganization, consolidation, acquisition of property or stock, liquidation, or otherwise) of all or substantially all of the business or assets of STERIS by agreement, to expressly assume and agree to perform this Plan in the same manner and to the same extent that STERIS would be required to perform if no such succession had taken place. Regardless of whether such agreement is executed, this Plan shall be binding upon any successor in accordance with the operation of law and such successor shall be deemed "STERIS" for purposes of this Plan.

**8.2 Assignment by the Executive**. This Plan shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees, and legatees. If the Executive dies while any amount would still be payable to him under Section 4.2(c) and/or 4.2(d) had he continued to live, all such amounts, unless otherwise provided herein, due under 4.2(c) and 4.2(d) shall continue to be paid, on the same schedule and in the same amounts as such payments would have otherwise been made to the Executive had he or she continued to live, to the Executive's devisee, legatee, or other

designee, or if there is no such designee, to the Executive's estate, provided that such devisee, legatee, other designee or estate shall not have the right to designate the payment date.

**Article 9. Miscellaneous**

**9.1 Employment Status.** This Plan is not, and nothing herein shall be deemed to create, an employment contract between the Executive and STERIS or any Affiliate or any other Person constituting part of the Company. The Executive acknowledges that the rights of his or her employer remain wholly intact to change or reduce at any time and from time to time his or her compensation, title, responsibilities, location, and all other aspects of the employment relationship, or to discharge the Executive (subject to Section 3.1).

**9.2 Entire Plan.** This Plan contains the entire understanding of STERIS and the Executive with respect to the subject matter hereof. Notwithstanding anything to the contrary contained herein, if the Executive is entitled to the payments provided for under this Plan in the event of the Executive's termination of employment or other Separation from Service with or from Company and any other employment, retention, severance, or similar agreement with STERIS or any other Affiliate to which the Executive is a party or any severance pay plan or program of STERIS or any other Affiliate in which the Executive is a participant (an "Other Severance Arrangement"), the Executive will be entitled to severance benefits under either this Plan or the Other Severance Arrangement, whichever provides for greater benefits, but will not be entitled to benefits under both this Plan and the Other Severance Arrangement, and in any event nothing set forth herein shall affect the time or form of the payment of the amount of any severance benefits that may become payable to the Executive pursuant to any Other Severance Arrangement in effect with respect to such Executive on the Effective Date in a manner that would cause any amount to be included in the Executive's gross income for federal income tax purposes under Section 409A(a)(i)(A) of the Code. No representation, agreement, understanding, or promise purporting to alter or modify the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by STERIS and Executive or is part of a formal STERIS or Company benefit plan.

**9.3 Notices.** All notices, requests, demands, and other communications hereunder shall be sufficient if in writing and shall be deemed to have been duly given if delivered by hand or if sent by registered or certified mail or recognized overnight carrier service to the Executive at the last address the Executive has filed in writing with STERIS or, in the case of STERIS, at its principal offices.

**9.4 Includable Compensation.** Severance Benefits provided hereunder shall not be considered "includable compensation" for purposes of determining the Executive's benefits under any other plan or program of STERIS or an Affiliate unless otherwise provided by such other plan or program.

**9.5 Tax Withholding.** STERIS shall withhold or cause to be withheld from any amounts payable under this Plan all federal, state, city, or other taxes as legally required to be withheld.

**9.6 Internal Revenue Code Section 409A.** To the extent applicable, it is intended that this Plan comply with the provisions of Code Section 409A. This Plan shall be administered in a manner consistent with this intent. References to Code Section 409A shall include any proposed, temporary or final regulation, or any other guidance, promulgated with respect to such section by the U.S. Department of Treasury or the Internal Revenue Service. Each payment and each provision of Severance Benefits pursuant to Article 4 shall be considered a separate payment and not one of a series of payments for purposes of Code Section 409A. In addition, the Executive shall be solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on the Executive in connection with this Plan (including any taxes and penalties under Code Section 409A), and neither STERIS nor any of its Affiliates shall have any obligation to indemnify or otherwise hold the Executive harmless from any or all of such taxes or penalties.

**9.7 Severability.** In the event any provision of this Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Plan are not part of the provisions hereof and shall have no force and effect. Notwithstanding any other provisions of this Plan to the contrary, neither STERIS nor any Affiliate shall have any obligation to make any payment to the Executive hereunder to the extent, but only to the extent, that such payment is prohibited by the terms of any final order of a federal or state court or regulatory agency of competent jurisdiction; provided , however , that such an order shall not affect, impair, or invalidate any provision of this Plan not expressly subject to such order.

**9.8 Modification.** The provisions of this Plan may be modified or waived by STERIS without the Executive's consent at any time by the giving of at least twelve (12) months prior written notice thereof to the Executive, except that any change that reduces the benefits of an Executive who is already receiving Severance Benefits or is then entitled to receive Severance Benefits shall require the Executive's consent; provided, however, that the foregoing restrictions on modifications and waivers shall not prevent STERIS from making Plan modifications or waivers with respect to any Executive so long as the same do not have a material adverse effect on the Executive's obligations, benefits or rights under the Plan. Modifications or waivers agreed to in writing may affect only those Executives who have signed such modification or waiver.

**9.9 Gender and Number.** Except where otherwise indicated by the context, any masculine term used herein shall include the feminine; the plural shall include the singular and the singular shall include the plural.

**9.10 Arbitration.** Any disputes arising out of this Plan including the circumstances relating to Executive's Separation from Service shall be submitted by Executive and STERIS to arbitration in Cleveland, Ohio. The arbitration shall be conducted by the American Arbitration Association or another arbitration body mutually agreed upon by the parties under the mutually agreed rules or absent agreement, the American Arbitration Association Commercial Arbitration Rules. The determination of the arbitrator shall be final and absolute. Notwithstanding this or any other arbitration provision, STERIS shall be entitled to apply to any court of competent jurisdiction for temporary or permanent injunctive relief or other equitable relief to enforce the

12

terms of Sections 5 or 6 hereof or the Other Agreements. The decision of the arbitrator may be entered as a judgment in any court of competent jurisdiction. The non-prevailing party in the arbitration or court proceeding shall pay the reasonable legal fees of the other party in enforcing this Plan.

**9.11  Remedies.** If STERIS breaches it obligations to Executive under this Plan, STERIS shall pay the Executive's expenses and costs incurred to remedy the breach including, without limitation, reasonable attorneys' fees.

**9.12  Section 280G.** The amounts payable to the Executive under Article 4 may be adjusted as set forth in this Section 9.12 if the sum (the "combined amount") of the amounts payable under Article 4 and all other payments or benefits which the Executive has received or has the right to receive from the Company which are defined in Section 280G(b)(2)(A)(i) of the Code, would, but for the application of this Section 9.12, constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code). In such event, the combined amount shall be reduced to the minimum extent necessary (but in no event to less than zero) so that no portion of any such payment or benefit, as so reduced, constitutes a parachute payment; provided, however, that the foregoing reduction shall be made only if and to the extent that such reduction would result in an increase in the aggregate payments and benefits to be provided to the Executive, determined on an after-tax basis (taking into account the excise tax imposed pursuant to Section 4999 of the Code, or any successor provision thereto, any tax imposed by any comparable provision of state law, and any applicable federal, state and local income taxes). To the extent the reduction referred to in the second sentence of this Section 9.12 applies, such reduction shall be made to the combined amount by reduction of the payments described in Sections 4.2(c) and 4.2(d) of this Plan and, to the extent further reductions are required, in such payments due to the Executive as the Company may determine. Any determinations required to be made under this Section 9.12 shall be made by the Company's independent accountants, which shall provide detailed supporting calculations both to the Company and the Executive within 15 business days of the date of termination or such earlier time as is requested by the Company, and shall be made at the, expense of the Company. The fact that the Executive's right to payments or benefits may be reduced by reason of the limitations contained in this Section 9.12 shall not of itself limit or otherwise affect any other rights of the Executive or constitute Good Reason under this Plan.

**9.13  Applicable Law.** To the extent not preempted by the laws of the United States, this Plan, including the General Release and Other Agreements, shall be governed by and construed in accordance with, the laws of the State of Ohio, without giving effect to principles of conflicts of laws.

IN WITNESS WHEREOF, STERIS has executed this Plan as of this 12th day of July, 2012.

STERIS Corporation

By: _____
President and Chief Executive Officer

<u>Schedule 2</u>

See attached.

## STERIS plc

## 2006 LONG-TERM EQUITY INCENTIVE PLAN

### (As Amended and Restated Effective August 2, 2016)

On November 2, 2015, the business combination (the "Combination") of STERIS Corporation ("STERIS") and Synergy Health plc ("Synergy") was completed. Pursuant to the Combination, STERIS and Synergy became wholly owned subsidiaries of STERIS plc, a public limited company organized under the laws of England and Wales ("New STERIS"), and each outstanding STERIS Common Share (as hereinafter defined) was converted into the right to receive one New STERIS Ordinary Share (as hereinafter defined). In connection with the Combination, the STERIS 2006 Long-Term Equity Incentive Plan (the "Prior STERIS Plan") and all awards then outstanding under the Prior STERIS Plan were assumed by New STERIS. Also in connection with the Combination and assumption, (a) each Option Right (as hereinafter defined) to acquire Common Shares that was outstanding immediately prior to the Combination was converted from and after the Combination into an Option Right to acquire the same number of Ordinary Shares and at the same exercise price per share as applied immediately prior to the conversion, (b) each Appreciation Right (as hereinafter defined) with respect to Common Shares that was outstanding immediately prior to the Combination was converted from and after the Combination into an Appreciation Right with respect to the same number of Ordinary Shares and at the same exercise price per share as applied immediately prior to the conversion, (c) each award of Restricted Stock (as hereinafter defined) in Common Shares that was outstanding immediately prior to the Combination was converted from and after the Combination into Restricted Stock in the same number of Ordinary Shares as were held pursuant to such award immediately prior to conversion, and (d) each award of Restricted Stock Units (as hereinafter defined) with respect to Common Shares that was outstanding immediately prior to the Combination was converted from and after the Combination into Restricted Stock Units with respect to the same number of Ordinary Shares as applied to such award immediately prior to conversion, and, except as required in order to comply with applicable law, each of such converted equity awards otherwise will continue to have, and be subject to, the same Plan terms and conditions that were applicable to the corresponding converted award immediately prior to the Combination. Accordingly, the Prior STERIS Plan was amended and restated, effective as of the consummation of the Combination on November 2, 2015, in order to reflect its assumption by New STERIS and the aforesaid conversions, and the Plan is further amended and restated hereby effective August 2, 2016.

1. **Purpose.** The purpose of this STERIS plc 2006 Long-Term Incentive Plan is to attract and retain directors, officers and other employees of STERIS plc, a public limited company organized under the laws of England and Wales, and its Subsidiaries and to provide to such persons incentives and rewards for performance. This Plan, as amended and restated effective August 2, 2016, shall apply to all awards heretofore or hereafter granted hereunder or pursuant hereto, except as otherwise expressly provided herein.

2. **Definitions.** As used in this Plan,

(a)     "Acquisition Price" means such amount, if any, as may be specified by the Board in the Evidence of Award with respect to Restricted Stock as the consideration to be paid by the Participant for such Restricted Stock, subject to adjustment pursuant to the provisions hereof; *provided*, that the par value of a share of Restricted Stock, if required to be paid by a Participant, shall not constitute an Acquisition Price.

(b)     "Appreciation Right" means a right in respect of Shares, including any right in respect of STERIS Common Shares that was converted into a right in respect of Ordinary Shares, granted pursuant to Section 5 or Section 9 of this Plan, and will include both Free-Standing Appreciation Rights and Tandem Appreciation Rights.

(c)     "Appreciation Right Expiration Date" means the date selected by the Board after which, except as provided in Section 11(d) in the case of the death of the Participant to whom the Appreciation Right was granted, the Appreciation Right may not be exercised.

(d)     "Base Price" means the price to be used as the basis for determining the Spread upon the exercise of a Free-Standing Appreciation Right or a Tandem Appreciation Right.

(e)     "Board" means the Board of Directors of the Company and, to the extent of any delegation by the Board of Directors to the Compensation Committee of the Board of Directors or any other Committee of the Board of

Directors (or subcommittee thereof) pursuant to Section 12 of this Plan or pursuant to the charter of any such Committee or otherwise, such Committee (or subcommittee).

(f) "Cause" has the meaning specified in Section 2(o)(iv) hereof.

(g) "Chief Executive Officer" means the Chief Executive Officer of the Company.

(h) "Change in Control" has the meaning set forth in Section 14 of this Plan.

(i) "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

(j) "Combination" has the meaning set forth in the first paragraph of this Plan.

(k) "Common Shares" means the shares of common stock, without par value, of STERIS.

(l) "Company" means New STERIS in respect of periods from and after the Combination and STERIS in respect of periods prior to the Combination.

(m) "Covered Employee" means a Participant who is, or is determined by the Board to be likely to become, a "covered employee" within the meaning of Section 162(m) of the Code (or any successor provision).

(n) "Date of Grant" means the date specified by the Board or, in the case of awards permitted to be granted hereunder by the Chief Executive Officer or his delegatee or delegatees, by the Chief Executive Officer or such delegatee or delegatees, on which a grant of Option Rights, Appreciation Rights, Performance Shares, Performance Units or other awards contemplated by Section 10 of this Plan, or a grant or sale of Restricted Stock, Restricted Stock Units, or other awards contemplated by Section 10 of this Plan will become effective (which date will not be earlier than the date on which the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, takes action with respect thereto).

(o) "Detrimental Activity" means, in the case of any Participant who is a Non-Employee Director or former Non-Employee Director, such activity, if any, as may be specified as a "Detrimental Activity" in any applicable Evidence of Award of such Participant and, in the case of any Participant who is an Employee or former Employee, any of the following activities:

    (i) Without the prior written consent of the Company, performing, either directly or indirectly, any advisory or consulting services for, operating or investing in (other than not more than one percent of the stock in a publicly-held corporation that is traded on a recognized securities exchange or over-the-counter), being employed by or an independent contractor of, or being a director, partner, or officer of, or otherwise becoming associated with in any capacity, any person, firm, corporation, partnership, proprietorship, or other entity that develops, manufactures, assembles, sells, distributes, or performs products, systems, or services in competition with any products, systems, or services developed, manufactured, assembled, sold, distributed, or performed by the Company or a Subsidiary.

    (ii) Without the prior written consent of the Company, directly or indirectly, inducing or attempting to induce any employee, agent or other representative or associate of the Company or a Subsidiary to terminate his, her or its relationship with the Company or a Subsidiary or interfering with the relationship between the Company or a Subsidiary and any of its employees, agents, representatives, suppliers, customers, or distributors.

    (iii) Disclosing to anyone outside the Company or a Subsidiary, or using in other than the Company's or a Subsidiary's business, without prior written authorization from the Company, any confidential data, marketing strategies (including customer lists), invention records, trade secrets, and other confidential information of the Company or a Subsidiary, including, without limitation, information regarding customers, finances, or personnel, or concerning the products, systems, and services researched, developed, manufactured, assembled, sold, distributed, or performed by the Company or otherwise concerning the business or affairs of the Company or a Subsidiary, acquired by the Participant during his or her employment with the Company or its Subsidiaries or while acting as a consultant for the Company or its Subsidiaries.

    (iv) An activity that results in a termination for Cause. Termination for "Cause" means, except as otherwise provided in a Participant's Evidence of Award, a termination:

        (A) due to the Participant's willful and continuous gross neglect of his or her duties for which he or she is employed,

2

(B)    due to an act of dishonesty on the part of the Participant resulting or intended to result, directly or indirectly, in his or her material personal gain or enrichment at the expense of the Company or a Subsidiary,

(C)    due to an act of theft in connection with the Participant's employment with the Company or a Subsidiary,

(D)    due to any unauthorized disclosure of confidential information belonging to the Company or a Subsidiary, including but not limited to any disclosure in violation of Section 2(l)(iii) hereof, or

(E)    due to any material violation of any provisions of any Company policy or of any agreement with Company or any Subsidiary.

(v)    Such other activity as may be specified as constituting, or defined to be, "Detrimental Activity" in the applicable Evidence of Award.

(vi)    Any other conduct or act determined to be injurious, detrimental or prejudicial to any business, strategy, personnel, reputation or other significant interest of the Company or any Subsidiary unless the Participant acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company.

(p)    "Director" means a member of the Board of Directors of the Company.

(q)    "Effective Date" means July 26, 2006, the date this Plan initially became effective.

(r)    "Employee" means any individual employed by the Company or any Subsidiary.

(s)    "Evidence of Award" means an agreement, certificate, resolution or other type or form of writing or other evidence that sets forth the terms and conditions of the award granted and that is approved by the Board or, in the case of awards permitted to be granted hereunder by the Chief Executive Officer or his delegatee or delegatees, if applicable, approved by such person. An Evidence of Award may be in an electronic medium, may be limited to notation on the books and records of the Company and, with the approval of the Board, need not be signed by a representative of the Company or a Participant.

(t)    "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, as such law, rules and regulations may be amended from time to time.

(u)    "Extended Exercise Period" has the meaning specified in Section 11(b)(i)(A).

(v)    "Free-Standing Appreciation Right" means an Appreciation Right granted pursuant to Section 5 or Section 9 of this Plan that is not granted in tandem with an Option Right.

(w)    "Good Standing" has the meaning specified in Section 11(b)(ii).

(x)    "Incentive Stock Options" means Option Rights that are intended to qualify as "incentive stock options" under Section 422 of the Code or any successor provision.

(y)    "Incumbent Directors" means as of any time prior to the Combination, individuals who are then Directors of the Company, and from and after the Combination the individuals who, effective as of the Combination, are Directors of the Company and any individual becoming a Director subsequent to the Combination whose election, nomination for election by the Company's shareholders, or appointment, was approved by a vote of at least two-thirds of the then Incumbent Directors (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for director, without objection to such nomination); *provided, however*, that an individual shall not be an Incumbent Director if such individual's election or appointment to the Board occurs as a result of an actual or threatened election contest (as described in Rule 14a-12(c) of the Exchange Act) with respect to the election or removal of Directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board.

(z)    "Management Objectives" means the measurable performance objective or objectives established pursuant to this Plan for Participants who have received grants of Performance Shares or Performance Units or, when so determined by the Board or, in the case of awards permitted to be granted hereunder by the Chief Executive Officer or his delegatee or delegatees, Option Rights, Appreciation Rights, Restricted Stock, Restricted Stock Units, dividend equivalents and other awards pursuant to this Plan. Management Objectives may be described in terms of Company-wide objectives or objectives that are related to the performance of the individual Participant or of the Subsidiary, segment, business unit, team, division, department, region or function within

the Company or Subsidiary for which the Participant provides service. The Management Objectives may be made relative to the performance of other companies, businesses or industries in respect of which the Participant provides service. The Management Objectives applicable to any award to a Covered Employee that is designated by the Board as intended to satisfy the requirements for "qualified performance-based compensation" under Section 162(m) of the Code will be based on specified levels of or growth in one or more of the following criteria:

| | |
|---|---|
| (i) | Cash flow (including free cash flow) |
| (ii) | Cost of capital |
| (iii) | Cost reduction |
| (iv) | Customer service |
| (v) | Debt reduction or leverage ratio |
| (vi) | Earnings and earnings growth (including earnings per share and earnings before interest and taxes ("EBIT") and earnings before interest, taxes, depreciation and amortization ("EBITDA")) |
| (vii) | Economic value added |
| (viii) | Total shareholder return and improvement of shareholder return |
| (ix) | Inventory management |
| (x) | Margins, including, but not limited to, gross margin, EBIT, EBITDA and net income |
| (xi) | Market share |
| (xii) | Market value added |
| (xiii) | Net income |
| (xiv) | Productivity improvement |
| (xv) | Profit after taxes |
| (xvi) | Project execution |
| (xvii) | Quality |
| (xviii) | Recruitment and development of associates |
| (xix) | Reduction of fixed costs |
| (xx) | Return on assets |
| (xxi) | Return on equity |
| (xxii) | Return on invested capital |
| (xxiii) | Return on total capital |
| (xxiv) | Revenue and revenue growth |
| (xxv) | Sales and sales growth |
| (xxvi) | Successful start-up of new facility |
| (xxvii) | Successful acquisition, divestiture or other special project |
| (xxviii) | Unit volume |
| (xxix) | Working capital, including, but not limited to, inventory turns and days sales outstanding |

If the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, determines that a change in the business, operations, corporate structure or capital structure of the Company, or the manner in which it conducts its business, or other events or circumstances render the Management Objectives unsuitable, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may in its, his, her or their discretion modify such Management Objectives or the related levels of achievement, in whole or in part, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, deems appropriate and equitable, except in the case of an award to a Covered Employee that is designated by the Board as intended to satisfy the requirements for "qualified performance-based compensation" under Section 162(m) of the Code where such action would result in

the loss of the otherwise available exemption of the award under Section 162(m) of the Code. In such case, neither the Management Objectives nor the level or levels of achievement with respect to such award shall be modified.

(aa)  "Market Value per Share" means, as of any particular date, the closing sales price per share of the Shares as reported on the New York Stock Exchange Composite Tape or, if not listed on such exchange, on any other national securities exchange on which the Shares are listed. If there is no regular trading market for such Shares, the Market Value per Share shall be determined by the Board or, in the case of awards permitted to be made by the Chief Executive Officer or his delegatee or delegatees, by the Chief Executive Officer or such delegatee or delegatees.

(bb)  "New STERIS" has the meaning set forth in the first paragraph of this Plan.

(cc)  "Non-Employee Director" means a person who is a "non-employee director" of the Company within the meaning of Rule 16b-3 of the U.S. Securities and Exchange Commission promulgated under the Exchange Act.

(dd)  "Nonqualified Stock Options" means Option Rights intended by the Board not to qualify as "incentive stock options" under Section 422 of the Code.

(ee)  "Optionee" means the optionee named in an Evidence of Award evidencing an outstanding Option Right.

(ff)  "Option Expiration Date" means the date selected by the Board or, in the case of awards permitted to be made by the Chief Executive Officer or his delegatee or delegatees, by the Chief Executive Officer or his delegatee or delegatees, after which, except as provided in Section 11(d) in the case of the death of the Participant to whom the Option Right was granted, the Option Right may not be exercised.

(gg)  "Option Price" means the purchase price payable on exercise of an Option Right, which Option Price shall be specified in the Evidence of Award in respect of the relevant Option Right, subject to adjustment pursuant to the provisions hereof.

(hh)  "Option Right" means the right to purchase Shares, including any right to purchase STERIS Common Shares that was converted into a right to purchase Ordinary Shares, upon exercise of an option granted pursuant to Section 4 or Section 9 of this Plan.

(ii)  "Ordinary Shares" means the ordinary shares, par value £0.10, of New STERIS or any security into which such ordinary shares may be changed by reason of any transaction or event of the type referred to in Section 13 of this Plan.

(jj)  "Participant" means a person who is selected or designated to receive benefits under this Plan pursuant to the provisions hereof and who is at the time an officer or other key employee of the Company or any one or more of its Subsidiaries, or who has agreed to commence serving in any of such capacities within 90 days of the Date of Grant, and also includes each Non- Employee Director who receives Shares or an award of Option Rights, Appreciation Rights, Restricted Stock, Restricted Stock Units or other awards under this Plan.

(kk)  "Participant's Representative" means (i) in the case of a deceased Participant, the Participant's executor or administrator or, if the deceased Participant's estate is exempt from or not otherwise subject to administration, the person or persons to whom the Participant's rights under any Option Rights have been transferred by will or the laws of descent and distribution, and (ii) in the case of a disabled or incapacitated Participant, the Participant's attorney-in-fact or legal guardian.

(ll)  "Performance Period" means, in respect of a Performance Share or Performance Unit, a period of time established pursuant to Section 8 of this Plan within which the Management Objectives relating to such Performance Share or Performance Unit are to be achieved.

(mm)  "Performance Share" means a bookkeeping entry that records the equivalent of one Share awarded pursuant to Section 8 of this Plan.

(nn)  "Performance Unit" means a bookkeeping entry that records a unit equivalent to $1.00 or such other value as is determined by the Board or the Chief Executive Officer or his delegate or delegatees awarded pursuant to Section 8 of this Plan.

(oo)  "Plan" means this STERIS plc 2006 Long-Term Incentive Plan, as may be amended from time to time, in respect of periods from and after the Combination, and the Prior STERIS Plan, as amended from time to time, in respect of periods prior to the Combination.

(pp)   "Prior STERIS Plan" has the meaning set forth in the first paragraph of this Plan.

(qq)   "Qualifying Retirement" has the meaning specified in Section 11(b)(iii) of this Plan.

(rr)   "Qualifying Retirement Eligible" means that a Participant has attained age 55 and has been in the service of the Company and/or a Subsidiary for at least five consecutive years.

(ss)   "Restricted Stock" means Shares, including any Common Shares that were converted into Ordinary Shares, granted or sold pursuant to Section 6 or Section 9 of this Plan as to which neither the substantial risk of forfeiture nor the prohibition on transfers has expired.

(tt)   "Restricted Stock Unit" means an award of the right to receive Shares, including any right to receive STERIS Common Shares that was converted into a right to receive Ordinary Shares, or cash at the end of a specified period made pursuant to Section 7 or Section 9 of this Plan.

(uu)   "Restriction Period" means the period of time during which Restricted Stock Units are subject to restrictions, as provided in Section 7 or Section 9 of this Plan.

(vv)   "Service Termination Date" means (i) with respect to an Employee, the first date on which, as of the end of the day, the Employee is no longer employed by the Company or any Subsidiary and (ii) with respect to a Director who is a Non-Employee Director, the first date on which, as of the end of the day, the Non-Employee Director ceases to serve as a Director; provided, that, for the avoidance of doubt, the date on which the Combination is completed shall not be a Service Termination Date for any Non-Employee Director who, upon completion of the Combination, ceases to serve as a Director of STERIS and immediately commences to serve as a Director of New STERIS. References in the Plan to a Participant's "service" shall be deemed to be, with respect to an Employee, to the Employee's employment with the Company or a Subsidiary, and with respect to a Director who is a Non-Employee Director, to the Director's service on the Board.

(ww)   "Shares" means Ordinary Shares in respect of periods on and after the Combination and Common Shares in respect of periods prior to the Combination.

(xx)   "Spread" means the excess of the Market Value per Share on the date when an Option Right or Appreciation Right is exercised over the Option Price or Base Price provided for in the related Option Right or Free-Standing Appreciation Right, respectively.

(yy)   "STERIS" has the meaning set forth in the first paragraph of the Plan.

(zz)   "Subsidiary" means a corporation, company or other entity (i) at least 50 percent of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, or (ii) which does not have outstanding shares or securities (as may be the case in a partnership, joint venture or unincorporated association), but at least 50 percent of whose ownership interest representing the right generally to make decisions for such other entity is, now or hereafter, owned or controlled, directly or indirectly, by the Company except that for purposes of determining whether any person may be a Participant for purposes of any grant of Incentive Stock Options, "Subsidiary" means any corporation in which at the time the Company owns or controls, directly or indirectly, at least 50 percent of the total combined voting power represented by all classes of stock issued by such corporation.

(aaa)   "Tandem Appreciation Right" means an Appreciation Right granted pursuant to Section 5 or Section 9 of this Plan that is granted in tandem with an Option Right.

(bbb)   "Voting Stock" means securities entitled to vote generally in the election of directors.

### 3. Shares Available Under the Plan.

(a)   *Maximum Shares Available Under Plan.*

(i)   Subject to adjustment as provided in Section 13 of this Plan, the number of Shares that may be issued or transferred on or after the Effective Date (A) upon the exercise of Option Rights or Appreciation Rights, (B) in payment of Restricted Stock and released from substantial risks of forfeiture thereof, (C) as Restricted Stock Units, (D) in payment of Performance Shares or Performance Units that have been earned, (E) as awards contemplated by Section 10 of this Plan, or (F) in payment of dividend equivalents paid with respect to awards made under the Plan will not exceed in the aggregate Twelve Million Two Hundred Thousand (12,200,000) Shares. In addition to the Shares authorized by the

preceding sentence, to the extent any award under the Plan otherwise terminates without the issuance of some or all of the Shares underlying the award to a participant or if any option under the Plan terminates without having been exercised in full, the Shares underlying such award, to the extent of any such forfeiture or termination, shall be available for future grant under the Plan and credited toward the Plan limit. Such shares may be shares of original issuance or treasury shares or a combination of the foregoing.

(ii) The total number of Shares available under the Plan as of a given date shall not be reduced by any Shares relating to prior awards that have expired or have been forfeited or cancelled. Notwithstanding anything to the contrary contained herein: (A) the number of Shares tendered or otherwise used in payment of the Option Price of an Option Right shall nonetheless reduce the aggregate plan limit described above; (B) the number of Shares withheld by the Company to satisfy the tax withholding obligation shall reduce the aggregate plan limit described above; and (C) the number of Shares covered by an Appreciation Right, to the extent that it is exercised and settled in Shares, and whether or not shares are actually issued to the participant upon exercise of the right, shall be considered issued or transferred pursuant to the Plan. In the event that the Company repurchases Shares with Option Right proceeds, those Shares will not be added to the aggregate plan limit described above.

(b) *Limits.* Notwithstanding anything elsewhere in this Plan to the contrary, but subject as well to the other limitations contained in this Section 3 and subject to adjustment as provided in Section 13 of this Plan:

(i) The aggregate number of Shares actually issued or transferred by the Company upon the exercise of Incentive Stock Options (after taking into account forfeitures and cancellations) shall not exceed Two Million (2,000,000) Shares.

(ii) No Participant will be granted Option Rights or Appreciation Rights, in the aggregate, for more than One Million (1,000,000) Shares during any calendar year.

(iii) No Participant will be granted Restricted Stock or Restricted Stock Units that specify Management Objectives, Performance Shares, Performance Units or other awards under Section 10 of this Plan that specify Management Objectives, in the aggregate, for more than Five Hundred Thousand (500,000) Shares (or, in the case of Performance Units, the cash equivalent thereof based on the Market Value per Share as of the Date of Grant) during any calendar year.

4. **Option Rights.** The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may, from time to time and upon such terms and conditions as it may determine, authorize the granting to Participants of options to purchase Shares. Each such grant will be subject to all of the requirements contained in, and may contain such provisions as are authorized by, the following provisions:

(a) Each grant will specify the number of Shares to which it pertains subject to the limitations set forth in Section 3 of this Plan.

(b) Each grant will specify an Option Price per share, which may not be less than the Market Value per Share on the Date of Grant.

(c) Each grant will specify whether the Option Price will be payable (i) in cash or by check acceptable to the Company or by wire transfer of immediately available funds, (ii) by the actual or constructive transfer to the Company of Shares owned by the Optionee having a value at the time of exercise equal to the total Option Price, (iii) by a combination of such methods of payment, or (iv) by such other methods as may be approved by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable.

(d) To the extent permitted by law, any grant may provide for deferred payment of the Option Price from the proceeds of sale through a bank or broker on a date satisfactory to the Company of some or all of the shares to which such exercise relates.

(e) Successive grants may be made to the same Participant whether or not any Option Rights previously granted to such Participant remain unexercised.

(f) Each grant will specify the period or periods of continuous service by the Optionee with the Company or any Subsidiary that is necessary before the Option Rights or installments thereof will become exercisable. A grant of Option Rights may provide for the earlier exercise of such Option Rights in the event of the retirement, death or Disability of a Participant. Unless otherwise provided in the relevant Evidence of Award, each grant of Option Rights (i) with a Date of Grant prior to March 13, 2014 shall become immediately exercisable upon

7

a Change in Control, and (ii) with a Date of Grant on or after March 13, 2014 shall be subject to Section 24 hereof.

(g)    Any grant of Option Rights may specify Management Objectives that must be achieved as a condition to the exercise of such rights.

(h)    Option Rights granted under this Plan may be (i) options, including, without limitation, Incentive Stock Options, that are intended to qualify under particular provisions of the Code, (ii) options that are not intended so to qualify, or (iii) combinations of the foregoing. Incentive Stock Options may only be granted to Participants who meet the definition of "employees" under Section 3401(c) of the Code.

(i)    The exercise of an Option Right will result in the cancellation on a share-for-share basis of any Tandem Appreciation Right authorized under Section 5 of this Plan that was granted therewith.

(j)    Except as otherwise provided herein or in an Evidence of Award, no Option Right will be exercisable more than 10 years from the Date of Grant.

(k)    Each grant of Option Rights will be evidenced by an Evidence of Award. Each Evidence of Award shall be subject to this Plan and shall contain such terms and provisions, consistent with this Plan, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve.

## 5. Appreciation Rights.

(a)    The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may also authorize the granting (i) to any Optionee, of Tandem Appreciation Rights in respect of Option Rights granted hereunder, and (ii) to any Participant, of Free-Standing Appreciation Rights. A Tandem Appreciation Right will be a right of the Optionee, exercisable by surrender of the related Option Right, to receive from the Company an amount determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, which will be expressed as a percentage of the Spread (not exceeding 100 percent) at the time of exercise. Tandem Appreciation Rights may be granted at any time prior to the exercise or termination of the related Option Rights; *provided, however,* that a Tandem Appreciation Right awarded in relation to an Incentive Stock Option must be granted concurrently with such Incentive Stock Option. A Free-Standing Appreciation Right will be a right of the Participant to receive from the Company an amount determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, which will be expressed as a percentage of the Spread (not exceeding 100 percent) at the time of exercise.

(b)    Each grant of Appreciation Rights will be subject to all of the requirements contained in, and may contain such provisions as are authorized by, the following provisions:

    (i)    Any grant may specify that the amount payable on exercise of an Appreciation Right may be paid by the Company in cash, in Shares or in any combination thereof and may either grant to the Participant or retain in the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, the right to elect among those alternatives.

    (ii)    Any grant may specify that the amount payable on exercise of an Appreciation Right may not exceed a maximum specified by the Board at the Date of Grant.

    (iii)    Any grant may specify waiting periods before exercise and permissible exercise dates or periods.

    (iv)    Any grant may specify that such Appreciation Right may be exercised only in the event of, or earlier in the event of, the retirement, death or Disability of a Participant. Unless otherwise provided in the relevant Evidence of Award, each grant of Appreciation Rights (i) with a Date of Grant prior to March 13, 2014 shall become immediately exercisable upon a Change in Control, and (ii) with a Date of Grant on or after March 13, 2014 shall be subject to Section 24 hereof.

    (v)    Any grant of Appreciation Rights may specify Management Objectives that must be achieved as a condition of the exercise of such Appreciation Rights.

    (vi)    Each grant of Appreciation Rights will be evidenced by an Evidence of Award, which Evidence of Award will describe such Appreciation Rights, identify the related Option Rights (if applicable), and contain such other terms and provisions, consistent with this Plan, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve.

(c)    Any grant of Tandem Appreciation Rights will provide that such Tandem Appreciation Rights may be exercised only at a time when the related Option Right is also exercisable and at a time when the Spread is positive, and by surrender of the related Option Right for cancellation. Successive grants of Tandem Appreciation Rights may be made to the same Participant regardless of whether any Tandem Appreciation Rights previously granted to the Participant remain unexercised.

(d)    Regarding Free-Standing Appreciation Rights only:

    (i)    Each grant will specify in respect of each Free-Standing Appreciation Right a Base Price, which may not be less than the Market Value per Share on the Date of Grant;

    (ii)    Successive grants may be made to the same Participant regardless of whether any Free-Standing Appreciation Rights previously granted to the Participant remain unexercised; and

    (iii)    Except as otherwise provided herein or in an Evidence of Award, no Free-Standing Appreciation Right granted under this Plan may be exercised more than 10 years from the Date of Grant.

6. **Restricted Stock.** The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may also authorize the grant or sale of Restricted Stock to Participants. Each such grant or sale will be subject to all of the requirements contained in, and may contain such provisions as are authorized by, the following provisions and the other provisions of the Plan:

(a)    Each such grant or sale will constitute an immediate transfer of the ownership of Shares to the Participant in consideration of the performance of services, entitling such Participant to voting, dividend and other ownership rights (subject to such restrictions as are set out in the Evidence of Award), but subject to the substantial risk of forfeiture and restrictions on transfer hereinafter referred to.

(b)    Each such grant or sale may be made without additional consideration or in consideration of a payment by such Participant that is less than the Market Value per Share at the Date of Grant.

(c)    Each such grant or sale will provide that the Restricted Stock covered by such grant or sale that vests upon the passage of time will be subject to a "substantial risk of forfeiture" within the meaning of Section 83 of the Code for a period to be determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the Date of Grant and may provide for the earlier lapse of such substantial risk of forfeiture as provided in Section 6(e) below or in the event of the retirement, death or Disability of a Participant or as otherwise provided herein. Unless otherwise provided in the relevant Evidence of Award, all substantial risks of forfeiture or restrictions on transfer applicable to any grant or sale of Restricted Stock (i) with a Date of Grant prior to March 13, 2014 shall lapse and terminate upon a Change in Control, and (ii) with a Date of Grant on or after March 13, 2014 shall be subject to Section 24 hereof.

(d)    Each such grant or sale will provide that during the period for which such substantial risk of forfeiture is to continue, the transferability of the Restricted Stock will be prohibited or restricted in the manner and to the extent prescribed by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the Date of Grant (which restrictions may include, without limitation, rights of repurchase or first refusal in the Company or provisions subjecting the Restricted Stock to a continuing substantial risk of forfeiture in the hands of any transferee).

(e)    Any grant of Restricted Stock may specify Management Objectives that, if achieved, will result in termination or early termination of the restrictions applicable to such Restricted Stock. Each grant may specify in respect of such Management Objectives a minimum acceptable level of achievement and may set forth a formula for determining the number of shares of Restricted Stock on which restrictions will terminate if performance is below, at or above the minimum or threshold level or levels, or is at or above the target level or levels, but falls short of maximum achievement of the specified Management Objectives.

(f)    Any such grant or sale of Restricted Stock may require that any or all dividends or other distributions paid thereon during the period of such restrictions be automatically deferred and reinvested in additional shares of Restricted Stock, which may be subject to the same restrictions as the underlying award.

(g)    Each grant or sale of Restricted Stock will be evidenced by an Evidence of Award and will contain such terms and provisions, consistent with this Plan, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve. Unless otherwise directed by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, all certificates representing shares of Restricted Stock will be held in custody by the Company until all restrictions thereon will have lapsed, together with a stock power or

powers executed by the Participant in whose name such certificates are registered, endorsed in blank and covering such Shares.

7. **Restricted Stock Units.** The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may also authorize the granting or sale of Restricted Stock Units to Participants. Each such grant or sale will be subject to all of the requirements contained in, and may contain such provisions as are authorized by, the following provisions and the other provisions of the Plan:

(a) Each such grant or sale will constitute the agreement by the Company to deliver Shares or cash to the Participant in the future in consideration of the performance of services, but subject to the fulfillment of such conditions (which may include the achievement of Management Objectives) during the Restriction Period as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may specify. Each grant that specifies Management Objectives may further specify in respect of such Management Objectives a minimum acceptable level of achievement and may set forth a formula for determining the number of shares of Restricted Stock Units on which restrictions will terminate if performance is at or above the minimum level, but falls short of full achievement of the specified Management Objectives. In addition, any grant of such Restricted Stock Units will further specify that, before the termination or early termination of restrictions applicable to such Restricted Stock Units, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, must determine that the Management Objectives have been satisfied.

(b) Each such grant or sale may be made without additional consideration or in consideration of a payment by such Participant that is less than the Market Value per Share at the Date of Grant.

(c) If the Restriction Period lapses only by the passage of time, each such grant or sale will be subject to a Restriction Period, as determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the Date of Grant, and may provide for the earlier lapse or other modification of such Restriction Period in the event of the retirement, death or Disability of a Participant or as otherwise provided herein. Unless otherwise provided on the relevant Evidence of Award, the Restriction Period applicable to any grant of Restricted Stock Units (i) with a Date of Grant prior to March 13, 2014 shall lapse and terminate upon a Change in Control, and (ii) with a Date of Grant on or after March 13, 2014 shall be subject to Section 24 hereof.

(d) During the Restriction Period, the Participant will have no right to transfer any rights under his or her award and will have no rights of ownership in the Restricted Stock Units and will have no right to vote them, but the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may at the Date of Grant, authorize the payment of dividend equivalents on such Restricted Stock Units on either a current or deferred or contingent basis, either in cash or in additional Shares.

(e) Each grant or sale will specify the time and manner of payment of the Restricted Stock Units that have been earned. Any grant or sale may specify that the amount payable with respect thereto may be paid by the Company in cash, in Shares or in any combination thereof and may either grant to the Participant or retain in the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, the right to elect among those alternatives.

(f) Each grant or sale of Restricted Stock Units will be evidenced by an Evidence of Award and will contain such terms and provisions, consistent with this Plan, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve.

8. **Performance Shares and Performance Units.** The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may also authorize the granting of Performance Shares and Performance Units that will become payable to a Participant upon achievement of specified Management Objectives during the Performance Period. Each such grant will be subject to all of the requirements contained in, and may contain such provisions as are authorized by, the following provisions:

(a) Each grant will specify the number of Performance Shares or Performance Units to which it pertains, which number may be subject to adjustment to reflect changes in compensation or other factors; *provided, however,* that no such adjustment will be made in the case of an award to a Covered Employee that is designated by the Board as intended to satisfy the requirements for "qualified performance-based compensation" under Section 162(m) of the Code where such action would result in the loss of the otherwise available exemption of the award under Section 162(m) of the Code.

(b) The Performance Period with respect to each Performance Share or Performance Unit will be such period of time as will be determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the time of grant, which may be subject to earlier lapse or other modification in the event of the retirement, death or Disability of a Participant. Unless otherwise provided in the relevant Evidence of Award, the Performance Period applicable to any grant of Performance Shares or Performance Units shall lapse and terminate, and the Management Objectives applicable thereto shall be treated as having been achieved, upon a Change in Control.

(c) Any grant of Performance Shares or Performance Units will specify Management Objectives which, if achieved, will result in payment or early payment of the award, and each grant may specify in respect of such specified Management Objectives a level or levels of achievement and will set forth a formula for determining the number of Performance Shares or Performance Units that will be earned if performance is at or above the minimum level or levels, but falls short of full achievement of the specified Management Objectives. The grant of Performance Shares or Performance Units will specify that, before the Performance Shares or Performance Units will be earned and paid, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, must determine that the Management Objectives have been satisfied.

(d) Each grant will specify the time and manner of payment of Performance Shares or Performance Units that have been earned. Any grant may specify that the amount payable with respect thereto may be paid by the Company in cash, in Shares or in any combination thereof and may either grant to the Participant or retain in the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, the right to elect among those alternatives.

(e) Any grant of Performance Shares may specify that the amount payable with respect thereto may not exceed a maximum specified by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the Date of Grant. Any grant of Performance Units may specify that the amount payable or the number of Shares issued with respect thereto may not exceed maximums specified by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, at the Date of Grant.

(f) The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may at the Date of Grant of Performance Shares, provide for the payment of dividend equivalents to the holder thereof on a deferred or contingent basis, either in cash or in additional Shares; provided, however, no dividend equivalents will be payable in respect of Performance Shares prior to such time, if any, as the Performance Shares are earned or become payable.

(g) Each grant of Performance Shares or Performance Units will be evidenced by an Evidence of Award and will contain such other terms and provisions, consistent with this Plan, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve.

**9. Awards to Non-Employee Directors.** The Board may, from time to time and upon such terms and conditions as it may determine, authorize the granting to Non-Employee Directors of Option Rights, Appreciation Rights or other awards contemplated by Section 10 of this Plan and may also authorize the grant or sale of Shares, Restricted Stock or Restricted Stock Units to Non-Employee Directors. Each grant of an award to a Non-Employee Director will be upon such terms and conditions as approved by the Board and will be evidenced by an Evidence of Award in such form as will be approved by the Board. Each grant will specify in the case of an Option Right an Option Price per share, and in the case of a Free-Standing Appreciation Right, a Base Price per share, which will not be less than the Market Value per Share on the Date of Grant. Except as otherwise provided herein or in the applicable Evidence of Award, each Option Right and Free-Standing Appreciation Right granted under the Plan to a Non-Employee Director will expire not more than 10 years from the Date of Grant and will be subject to earlier termination as hereinafter provided. If a Non-Employee Director subsequently becomes an employee of the Company or a Subsidiary while remaining a member of the Board, any award held under this Plan by such individual at the time of such commencement of employment will not be affected thereby. Non-Employee Directors, pursuant to this Section 9, may be awarded, or may be permitted to elect to receive, pursuant to procedures established by the Board, all or any portion of their annual retainer, meeting fees, chairman and committee chair fees or other fees in grants of awards pursuant to the preceding provisions or in Shares in lieu of cash.

**10. Other Awards.**

(a) The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may, subject to limitations under applicable law, grant to any Participant such other awards that may be denominated or

payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Shares or factors that may influence the value of such shares, including, without limitation, convertible or exchangeable debt securities, other rights convertible or exchangeable into Shares, purchase rights for Shares, awards with value and payment contingent upon performance of the Company or specified Subsidiaries, affiliates or other business units thereof or any other factors designated by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, and awards valued by reference to the book value of Shares or the value of securities of, or the performance of specified Subsidiaries or affiliates or other business units of the Company. The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, shall determine the terms and conditions of such awards. Shares delivered pursuant to an award in the nature of a purchase right granted under this Section 10 shall be purchased for such consideration, paid for at such time, by such methods, and in such forms, including, without limitation, cash, Shares, other awards, notes or other property, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, shall determine.

(b) Cash awards, as an element of or supplement to any other award granted under this Plan, may also be granted pursuant to this Section 10 of this Plan.

(c) The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may grant Shares as a bonus, or may grant other awards in lieu of obligations of the Company or a Subsidiary to pay cash or deliver other property under this Plan or under other plans or compensatory arrangements, subject to such terms as shall be determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable.

11. **Termination of Service.** After a Participant's Service Termination Date, unless otherwise provided in the relevant Evidence of Award, the rules set forth in this Section 11 shall apply. All factual determinations with respect to the termination of a Participant's service that may be relevant under this Section 11 shall be made by the Board in its sole discretion or by such other person as may be authorized to make such determination pursuant to the provisions hereof, or by the person or persons to whom such authority has been delegated pursuant to the provisions hereof, in his, her or their sole discretion.

(a) **Termination Other Than Upon Qualifying Retirement, Death or Disability or for Cause.** Upon any termination of a Participant's service for any reason other than the Participant's Qualifying Retirement, Disability, or death or, in the case of Participants who are Employees, other than for Cause:

    (i) Unless otherwise provided in the relevant Evidence of Award, the Participant shall have the right during the period ending three months after the Service Termination Date, but not later than the Option Expiration Date or Appreciation Right Expiration Date, as applicable, to exercise any Option Rights and Appreciation Rights that were outstanding on the Service Termination Date, if and to the same extent as those Option Rights and Appreciation Rights were exercisable by the Participant on the Service Termination Date;

    (ii) Unless otherwise provided in the relevant Evidence of Award, in the case of any Restricted Stock for which the Participant paid an Acquisition Price, the Participant shall offer for resale at the Acquisition Price to the Company each Share of Restricted Stock held by the Participant at the Service Termination Date with respect to which, as of that date, any restrictions, conditions, or contingencies have not lapsed; and

    (iii) Unless otherwise provided in the relevant Evidence of Award, the Participant shall forfeit each (A) Share of Restricted Stock for which the Participant did not pay an Acquisition Price, (B) Restricted Stock Unit, (C) Performance Share, (D) Performance Unit, and/or (E) other award granted pursuant to Section 10 hereof, in each case with respect to which, as of the Participant's Service Termination Date, any restrictions, conditions, or contingencies have not lapsed.

(b) **Qualifying Retirement.** Upon a Participant's Qualifying Retirement (as defined below):

    (i) Unless otherwise provided in the relevant Evidence of Award and so long as the Participant remains in "Good Standing" (as defined below):

        (A) The Participant will be entitled to exercise vested Option Rights and Appreciation Rights granted under the relevant Evidence of Award from time to time on any date during the period (the "Extended Exercise Period") that begins on the date of retirement and ends on the expiration date of the relevant award;

(B) If, at any time during the Extended Exercise Period, the Participant fails to remain in Good Standing, any Option Rights and Appreciation Rights granted under the relevant Evidence of Award that are then outstanding and held by the Participant shall be forfeited and of no force or effect; and

(C) If the Participant dies during the Extended Exercise Period and while in Good Standing, vested Option Rights and Appreciation Rights granted under the Evidence of Award will thereafter be exercisable, to the extent exercisable by the Participant on the date of his death, at the same times (for so long and only so long after the Participant's death) as if the Participant had continued in the service of the Company through the date of the Participant's death.

(ii) For the purposes of this Plan, a Participant will cease to remain in "Good Standing" during his or her Extended Exercise Period if he or she engages or has engaged in any Detrimental Activity or commits or has committed a material violation of any applicable provision of any Company policy or of any Evidence of Award or other agreement with the Company or a Subsidiary or if, at any time during the Extended Exercise Period, he or she otherwise acts in a manner detrimental to the interests of the Company or any of its Subsidiaries, including but not limited to, in the case of a Participant who is a Non-Employee Director, directly or indirectly materially competing with the Company or any of its Subsidiaries.

(iii) For the purposes of this Plan, "Qualifying Retirement" means that a Participant terminates service with the Company and/or a Subsidiary (A) with the consent of or under guidelines approved by the Board, or the Chief Executive Officer or his delegatee or delegatees, if applicable pursuant to Section 12(d) of this Plan, without having engaged in any Detrimental Activity, (B) before the expiration date of the relevant award, (C) after having attained age 55, and (D) after having been in the service of the Company for at least five consecutive years. Unless otherwise determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, the Participant will be deemed to have "been in the service of the Company for at least five consecutive years" only if the Participant was in the active service of the Company and/or one or more Subsidiaries, on a full-time basis in the case of a Participant who is an Employee, throughout the five year period ending on the Service Termination Date.

(iv) Unless otherwise provided in the applicable Evidence of Award, the provisions of this Section 11(b) shall apply only to Plan awards with a Date of Grant on or after July 28, 2011. Plan awards with a Date of Grant prior to such date shall be governed by the provisions of Section 11(b) of the Plan as in effect prior to such date, as modified by an applicable Evidence of Award.

Notwithstanding anything to the contrary contained herein or in the applicable Evidence of Award, the provisions of Section 11(b)(i)(A) shall not apply to any Option Right or Appreciation Right granted to any Participant if, at the time of the grant thereof, the application of such provisions would violate applicable law because of the age requirement included in the Qualifying Retirement definition.

(c) **Termination Due to Disability.** Upon any termination of a Participant's service due to Disability:

(i) Unless otherwise provided in the relevant Evidence of Award, the Participant, or the Participant's Representative, shall have the right (1) to exercise, from time to time during the period ending one year after the Service Termination Date, but not later than the Option Expiration Date or Appreciation Right Expiration Date, as applicable, any Nonqualified Stock Options and Appreciation Rights that were outstanding on the Service Termination Date, if and to the same extent those Option Rights and Appreciation Rights were exercisable by the Participant on the Service Termination Date, and (2) to exercise, from time to time during the period ending one year after the Service Termination Date, but not later than the Option Expiration Date, any Incentive Stock Options that were outstanding on the Service Termination Date, if and to the same extent as those Option Rights were exercisable by the Participant on the Service Termination Date (even though exercise of the Incentive Stock Option more than three months after the Service Termination Date may cause the Option Right to fail to qualify for Incentive Stock Option treatment under the Code);

(ii) Unless otherwise provided in the relevant Evidence of Award, in the case of any Restricted Stock for which the Participant paid an Acquisition Price, the Participant, or the Participant's Representative, shall offer for resale at the Acquisition Price to the Company each Share of Restricted Stock held by the Participant at the Service Termination Date with respect to which, as of that date, any restrictions, conditions, or contingencies have not lapsed; and

       (iii) Unless otherwise provided in the relevant Evidence of Award, the Participant shall forfeit each (A) Share of Restricted Stock for which the participant did not pay an Acquisition Price, (B) Restricted Stock Unit, (C) Performance Share, (D) Performance Unit, and/or (E) other award granted pursuant to Section 10 hereof, in each case with respect to which, as of the Participant's Service Termination Date, any restrictions, conditions, or contingencies have not lapsed.

(d) **Death of an Employee.** Upon the death of a Participant while in the service of the Company or any Subsidiary or within any of the periods referred to in any of Sections 11(a), 11(b), or 11(c):

       (i) Unless otherwise provided in the relevant Evidence of Award (in which a different period of extension of the Option Expiration Date or Appreciation Right Expiration Date, as applicable, in the event of the death of the Participant may be specified), if the Option Expiration Date or Appreciation Right Expiration Date, as applicable, of any Nonqualified Stock Option or Appreciation Right that had not expired before the Participant's death would otherwise expire before the first anniversary of the Participant's death, that Option Expiration Date or Appreciation Right Expiration Date, as applicable, shall automatically be extended to the first anniversary of the Participant's death;

       (ii) Unless otherwise provided in the relevant Evidence of Award, any Option Rights and Appreciation Rights that are outstanding on the date of the Participant's death shall become immediately exercisable in full and the Participant's Representative shall have the right to exercise any or all of those Option Rights and Appreciation Rights in accordance with Section 4(f) (as to any Option Rights) or Section 5(b) (as to any Appreciation Rights), from time to time during the period ending on the first anniversary of the Participant's death;

       (iii) Unless otherwise provided in the relevant Evidence of Award, all Restricted Stock or Restricted Stock Units held by a Participant who dies on or after January 29, 2013 while employed by the Company or a Subsidiary shall immediately become fully vested and nonforfeitable;

       (iv) Unless otherwise provided in the relevant Evidence of Award, the restrictions, conditions, or contingencies on any (A) Performance Shares, (B) Performance Units, and/or (C) any other award granted pursuant to Section 10 hereof held by the Participant at the date of death shall be modified in such manner as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may specify to give the Participant's Representative the benefit of those awards through that date.

(e) **Termination for Cause.** Upon any termination of service for Cause of a Participant who is an Employee, and unless otherwise provided in the relevant Evidence of Award:

       (i) All of the Participant's rights with respect to unexercised Option Rights and Appreciation Rights shall expire immediately before the Service Termination Date;

       (ii) In the case of any Restricted Stock for which the Participant paid an Acquisition Price, the Participant shall offer for resale at the Acquisition Price to the Company all Restricted Stock held by the Participant at the Service Termination Date with respect to which, as of that date, any restrictions, conditions, or contingencies have not lapsed; and

       (iii) The Participant shall forfeit all (A) Shares of Restricted Stock for which the Participant did not pay an Acquisition Price, (B) Restricted Stock Units, (C) Performance Shares, (D) Performance Units and (E) any other awards granted pursuant to Section 10 hereof, in each case with respect to which, as of the Participant's Service Termination Date, any restrictions, conditions, or contingencies have not lapsed.

For the avoidance of doubt, the provisions of this Section 11(e) do not apply to any Participant who was a Non-Employee Director immediately prior to his or her Service Termination Date.

## 12. Administration of the Plan.

(a) Except as set forth in Section 12(d) of this Plan, this Plan will be administered by the Board of Directors of the Company, which may from time to time delegate all or any part of its authority under this Plan to the Compensation Committee of the Board of Directors of the Company or any other Committee of the Board of Directors of the Company (or a subcommittee thereof), as constituted from time to time.

(b) The interpretation and construction by the Board, or the Chief Executive Officer or his delegatee or delegatees, if applicable, of any provision of this Plan or of any agreement, notification or document evidencing the grant of Option Rights, Appreciation Rights, Restricted Stock, Restricted Stock Units,

Performance Shares, Performance Units or other awards pursuant to Section 10 of this Plan and any determination by the Board, or the Chief Executive Officer or his delegatee or delegatees, if applicable, pursuant to any provision of this Plan or of any such agreement, notification or document, will be final and conclusive.

(c) The Board may delegate to one or more of its members or to one or more officers of the Company, or to one or more agents or advisors, such administrative duties or powers as it may deem advisable, and the Board or any person to whom duties or powers have been delegated as aforesaid, may employ one or more persons to render advice with respect to any responsibility the Board or such person may have under the Plan. The Board may, by resolution, authorize the Chief Executive Officer (or his delegatee or delegatees) to do one or both of the following on the same basis as the Board: (i) designate employees to be recipients of awards under this Plan; (ii) determine the size of any such awards; *provided, however,* that (A) the Board shall not so delegate such responsibilities for awards granted to an individual who is a Director or an "officer" (as defined in Rule 16a-1(f) promulgated under the Exchange Act, or in any successor to such rule) of the Company or any person subject to Section 162(m) of the Code; and (B) the resolution providing for such authorization sets forth the total number of Shares the Chief Executive Officer (or his delegatee or delegatees) may grant; and (iii) the Chief Executive Officer (or his delegatee or delegatees) shall report periodically to the Board regarding the nature and scope of the awards granted pursuant to the authority delegated.

(d) Notwithstanding anything to the contrary, other than Section 12(c) hereof to which this Section 12(d) is subject, all interpretations, conclusions or determinations with respect to any provisions of this Plan or of any related agreement, notification or document, and all factual determinations, including but not limited to determinations made pursuant to Sections 11 and 15 of this Plan and determinations regarding "Cause" and "Detrimental Activity" and "Good Standing" and "Qualifying Retirement" (i) shall be made by the Board, with respect to the Chief Executive Officer, all other "officers" (as defined in Rule 16a-1(f) promulgated under the Exchange Act, or in any successor to such rule), all persons subject to Section 162(m) of the Code and all Directors; *provided, however,* that any Director whose specific rights under the Plan are the subject of any interpretation, conclusion or determination by the Board shall not take part in or contribute to such interpretation, conclusion or determination, and (ii) with respect to all Participants other than the individuals described in clause (i) of this sentence, shall be made by the Board or by the Chief Executive Officer or his delegatee or delegatees; *provided, however,* that in the event of any conflict between a determination made by the Board and a determination made by the Chief Executive Officer or his delegatee or delegatees, the determination of the Board shall control.

13. **Adjustments.** The Board shall make or provide for such adjustments in the numbers of Ordinary Shares covered by outstanding Option Rights, Appreciation Rights, Restricted Stock Units, Performance Shares and Performance Units granted hereunder and, if applicable, in the number of Ordinary Shares covered by other awards granted pursuant to Section 10 hereof, in the Option Price and Base Price provided in outstanding Option Rights and Appreciation Rights, and in the kind of shares covered thereby, as is equitably required to prevent dilution or enlargement of the rights of Participants or Optionees that otherwise would result from (a) any stock dividend, stock split, combination of shares, recapitalization or other change in the capital structure of the Company, or (b) any merger, consolidation, spin-off, split- off, spin-out, split-up, reorganization, partial or complete liquidation or other distribution of assets, issuance of rights or warrants to purchase securities, or (c) any other corporate transaction or event having an effect similar to any of the foregoing. The Board shall also make or provide for such adjustments in the numbers of Shares specified in Section 3 of this Plan as is appropriate to reflect any transaction or event described in the preceding sentence. Any such adjustment to the number specified in Section 3(b)(i) shall be made in such manner as to not cause any option intended to qualify as an Incentive Stock Option to fail so to qualify. Moreover, in the event of any such transaction or event or in the event of a Change in Control, the Board, in its discretion, may provide in substitution for any or all outstanding awards under this Plan such alternative consideration (including cash), if any, as it may determine to be equitable in the circumstances and may require in connection therewith the surrender of all awards so replaced. In addition, for each Option Right or Appreciation Right with an Option Price or Base Price greater than the consideration offered in connection with any such transaction or event or Change in Control, the Board may in its discretion elect to cancel such Option Right or Appreciation Right without any payment to the person holding such Option Right or Appreciation Right.

14. **Change in Control.** For purposes of this Plan, except as may be otherwise prescribed by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, in an Evidence of Award made under this Plan, a "Change in Control" shall be deemed to have occurred upon the occurrence of any of the following events:

(a) any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) (a "Person") is or becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 25% or more of the combined voting power of the then-outstanding Voting Stock of the Company; *provided, however,* that:

    (i) for purposes of this Section 14(a), the following acquisitions shall not constitute a Change in Control: (A) any acquisition of Voting Stock of the Company directly from the Company that is approved by a majority of the Incumbent Directors, (B) any acquisition of Voting Stock of the Company by the Company or any Subsidiary, (C) any acquisition of Voting Stock of the Company by the trustee or other fiduciary holding securities under any employee benefit plan (or related trust) sponsored or maintained by the Company or any Subsidiary, and (D) any acquisition of Voting Stock of the Company by any Person pursuant to a Business Transaction that complies with clauses (i), (ii) and (iii) of Section 14(c) below;

    (ii) if any Person is or becomes the beneficial owner of 25% or more of combined voting power of the then-outstanding Voting Stock of the Company as a result of a transaction described in clause (A) of Section 14(a)(i) above and such Person thereafter becomes the beneficial owner of any additional shares of Voting Stock of the Company representing 1% or more of the then-outstanding Voting Stock of the Company, other than in an acquisition directly from the Company that is approved by a majority of the Incumbent Directors or other than as a result of a stock dividend, stock split or similar transaction effected by the Company in which all holders of Voting Stock are treated equally, such subsequent acquisition shall be treated as a Change in Control;

    (iii) a Change in Control will not be deemed to have occurred if a Person is or becomes the beneficial owner of 25% or more of the Voting Stock of the Company as a result of a reduction in the number of shares of Voting Stock of the Company outstanding pursuant to a transaction or series of transactions that is approved by a majority of the Incumbent Directors unless and until such Person thereafter becomes the beneficial owner of any additional shares of Voting Stock of the Company representing 1% or more of the then-outstanding Voting Stock of the Company, other than as a result of a stock dividend, stock split or similar transaction effected by the Company in which all holders of Voting Stock are treated equally; and

    (iv) if at least a majority of the Incumbent Directors determine in good faith that a Person has acquired beneficial ownership of 25% or more of the Voting Stock of the Company inadvertently, and such Person divests as promptly as practicable but no later than the date, if any, set by the Incumbent Board a sufficient number of shares so that such Person beneficially owns less than 25% of the Voting Stock of the Company, then no Change in Control shall have occurred as a result of such Person's acquisition; or

(b) a majority of the Board ceases to be comprised of Incumbent Directors; or

(c) the consummation of a reorganization, merger or consolidation, or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of the stock or assets of another corporation, or other transaction (each, a "Business Transaction"), unless, in each case, immediately following such Business Transaction (i) the Voting Stock of the Company outstanding immediately prior to such Business Transaction continues to represent (either by remaining outstanding or by being converted into Voting Stock of the surviving entity or any parent thereof), more than 50% of the combined voting power of the then outstanding shares of Voting Stock of the entity resulting from such Business Transaction (including, without limitation, an entity which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries), (ii) no Person (other than the Company, such entity resulting from such Business Transaction, or any employee benefit plan (or related trust) sponsored or maintained by the Company, any Subsidiary or such entity resulting from such Business Transaction) beneficially owns, directly or indirectly, 25% or more of the combined voting power of the then outstanding shares of Voting Stock of the entity resulting from such Business Transaction, and (iii) at least a majority of the members of the Board of Directors of the entity resulting from such Business Transaction were Incumbent Directors at the time of the execution of the initial agreement or of the action of the Board providing for such Business Transaction; or

(d) approval by the shareholders of the Company of a complete liquidation or dissolution of the Company, except pursuant to a Business Transaction that complies with clauses (i), (ii) and (iii) of Section 14(c).

For the avoidance of doubt, the amendments to the Prior STERIS Plan effected at or around the time of the Combination were not intended to cause the Combination or the transactions contemplated in conjunction therewith to constitute a "Change in Control" for purposes of the Plan and such amendments shall be construed in accordance with such intent.

**15. Detrimental Activity.** Any Evidence of Award may provide that if a Participant, either during service with the Company or a Subsidiary or within a period of two years (or such other period as may be specified in the Evidence of Award) after termination of such service, shall engage in any Detrimental Activity, and the Board, or the Chief Executive Officer or his delegatee or delegatees, if applicable, shall so find, forthwith upon notice of such finding, the Participant shall:

(a) Forfeit any award granted under the Plan then held by the Participant;

(b) In the sole and complete discretion of the Company, return to the Company, in exchange for payment by the Company of any amount actually paid therefor by the Participant, all Shares that the Participant has not disposed of that were offered, acquired or paid out pursuant to or in connection with this Plan within a period of two years (or such longer period as may be specified in an Evidence of Award) prior to the date of the commencement of such Detrimental Activity or during or after the Detrimental Activity; and

(c) In the sole and complete discretion of the Company, with respect to any Shares so acquired or paid out that the Participant has disposed of within a period of two years (or such longer period as may be specified in an Evidence of Award) prior to the date of the commencement of such Detrimental Activity or during or after such Detrimental Activity, pay to the Company in cash the difference between:

   (i) Any amount actually paid therefor by the Participant pursuant to this Plan, and

   (ii) The Market Value per Share of the Shares on the date the Shares were acquired or paid out.

(d) To the extent that such amounts are not paid to the Company, the Company may set off the amounts so payable to it against any amounts that may be owing from time to time by the Company or a Subsidiary to the Participant, whether as wages, retainer fees, deferred compensation or vacation pay or in the form of any other benefit or for any other reason.

The remedies set forth in this Section 15 in the event that a Participant engages in a Detrimental Activity shall be in addition to any and all other remedies that the Company may have against the Participant in that event and shall not be deemed exclusive remedies. The remedies set forth in this Section 15 also do not limit the remedies that the Company may be required or permitted to exercise in respect of Participants pursuant to the provisions of Section 954 of the Wall Street Reform and Consumer Protection Act and the regulations thereunder.

**16. Non U.S. Participants.** In order to facilitate the making of any grant or combination of grants under this Plan, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may provide for such special terms for awards to Participants who are foreign nationals or who are employed by the Company or any Subsidiary outside of the United States of America or who provide services to the Company under an agreement with a foreign nation or agency, as the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. Moreover, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may approve such supplements to or amendments, restatements or alternative versions of this Plan (including, without limitation, sub-plans) as it may consider necessary or appropriate for such purposes, without thereby affecting the terms of this Plan as in effect for any other purpose, and the Secretary or other appropriate officer of the Company may certify any such document as having been approved and adopted in the same manner as this Plan. No such special terms, supplements, amendments or restatements, however, will include any provisions that are inconsistent with the terms of this Plan as then in effect unless this Plan could have been amended to eliminate such inconsistency without further approval by the shareholders of the Company.

**17. Transferability.**

(a) Except as otherwise determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, no Option Right, Appreciation Right, Restricted Stock, Restricted Stock Unit, Performance Share, Performance Unit, award contemplated by Section 9 or 10 of this Plan, or dividend equivalents paid with respect to awards made under the Plan shall be transferable by the Participant except by will or the laws of descent and distribution and, in no event shall any such award granted under the Plan be transferred for value.

17

Except as otherwise determined by the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, Option Rights and Appreciation Rights will be exercisable during the Participant's lifetime only by him or her or, in the event of the Participant's legal incapacity to do so, by his or her guardian or legal representative acting on behalf of the Participant in a fiduciary capacity under state law and/or court supervision.

(b) The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may specify at the Date of Grant that part or all of the Shares that are (i) to be issued or transferred by the Company upon the exercise of Option Rights or Appreciation Rights, upon the termination of the Restriction Period applicable to Restricted Stock Units or upon payment under any grant of Performance Shares or Performance Units or (ii) no longer subject to the substantial risk of forfeiture and restrictions on transfer referred to in Section 6 of this Plan, will be subject to further restrictions on transfer.

18. **Withholding Taxes.** To the extent that the Company is required to withhold federal, state, local or foreign taxes in connection with any payment made or benefit realized by a Participant or other person under this Plan, and the amounts available to the Company for such withholding are insufficient, it will be a condition to the receipt of such payment or the realization of such benefit that the Participant or such other person make arrangements satisfactory to the Company for payment of the balance of such taxes required to be withheld, which arrangements (in the discretion of the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable) may include relinquishment of a portion of such benefit. If a Participant's benefit is to be received in the form of Shares, and such Participant fails to make arrangements for the payment of tax, the Company shall withhold such Shares having a value equal to the amount required to be withheld. Notwithstanding the foregoing, when a Participant is required to pay the Company an amount required to be withheld under applicable income and employment tax laws, the Participant may elect, with the Company's approval, to satisfy the obligation, in whole or in part, by electing to have withheld, from the shares required to be delivered to the Participant, Shares having a value equal to the amount required to be withheld (except in the case of Restricted Stock where an election under Section 83(b) of the Code has been made), or by delivering to the Company other Shares held by such Participant. The shares used for tax withholding will be valued at an amount equal to the Market Value per Share of such Shares on the date the benefit is to be included in the Participant's income. In no event shall the Market Value per Share of the Shares to be withheld and/or delivered pursuant to this Section to satisfy applicable withholding taxes in connection with the benefit exceed the minimum amount of taxes required to be withheld. Participants shall also make such arrangements as the Company may require for the payment of any withholding tax obligation that may arise in connection with the disposition of Shares acquired upon the exercise of Option Rights.

19. **Compliance with Section 409A of the Code.**

(a) To the extent applicable, it is intended that this Plan and any grants made hereunder comply with the provisions of Section 409A of the Code. This Plan and any grants made hereunder shall be administered in a manner consistent with this intent, and any provision that would cause this Plan or any grant made hereunder to fail to satisfy Section 409A of the Code shall have no force and effect unless and until amended to comply with Section 409A of the Code (which amendment may be retroactive to the extent permitted by Section 409A of the Code and may be made by the Company without the consent of Participants). Any reference in this Plan to Section 409A of the Code will also include any proposed, temporary or final regulations, or any other guidance, promulgated with respect to such Section by the U.S. Department of the Treasury or the Internal Revenue Service.

(b) In order to determine for purposes of Section 409A of the Code whether a Participant is in the service of a member of the Company's controlled group of corporations under Section 414(b) of the Code (or by a member of a group of trades or businesses under common control with the Company under Section 414(c) of the Code) and, therefore, whether the Shares that are or have been purchased by or awarded under this Plan to the Participant are shares of "service recipient" stock within the meaning of Section 409A of the Code:

(i) In applying Code Section 1563(a)(1), (2) and (3) for purposes of determining the Company's controlled group under Section 414(b) of the Code, the language "at least 50 percent" is to be used instead of "at least 80 percent" each place it appears in Code Section 1563(a)(1), (2) and (3), and

(ii) In applying Treasury Regulation Section 1.414(c)-2 for purposes of determining trades or businesses under common control with the Company for purposes of Section 414(c) of the Code, the language "at

least 50 percent" is to be used instead of "at least 80 percent" each place it appears in Treasury Regulation Section 1.414(c)-2.

20. **Amendments.**

(a)  The Board may at any time and from time to time amend this Plan in whole or in part; *provided, however,* that if an amendment to this Plan (i) would materially increase the benefits accruing to participants under this Plan, (ii) would materially increase the number of securities which may be issued under this Plan, (iii) would materially modify the requirements for participation in this Plan or (iv) must otherwise be approved by the shareholders of the Company in order to comply with applicable law or the rules of the New York Stock Exchange or, if the Shares are not traded on the New York Stock Exchange, the principal national securities exchange upon which the Shares are traded or quoted, then, such amendment will be subject to shareholder approval and will not be effective unless and until such approval has been obtained.

(b)  Neither the Board nor the Chief Executive Officer or his delegatee or delegatees, as applicable, will, without the further approval of the shareholders of the Company, authorize the amendment of any outstanding Option Right or Appreciation Right to reduce the Option Price or Base Price, as applicable. Furthermore, no Option Right or Appreciation Right will be cancelled and replaced with awards having a lower Option Price or Base Price without further approval of the shareholders of the Company. This Section 20(b) is intended to prohibit the repricing of "underwater" Option Rights and Appreciation Rights and will not be construed to prohibit the adjustments provided for in Section 13 of this Plan.

(c)  If permitted by Section 409A of the Code, in case of termination of service by reason of death, Disability or normal or early retirement, or in the case of unforeseeable emergency or other special circumstances, of a Participant who holds an Option Right or Appreciation Right not immediately exercisable in full, or any shares of Restricted Stock as to which the substantial risk of forfeiture or the prohibition or restriction on transfer has not lapsed, or any Restricted Stock Units as to which the Restriction Period has not been completed, or any Performance Shares or Performance Units which have not been fully earned, or any other awards made pursuant to Section 10 subject to any vesting schedule or transfer restriction, or who holds Shares subject to any transfer restriction imposed pursuant to Section 17(b) of this Plan, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may, in its sole discretion, accelerate the time at which such Option Right, Appreciation Right or other award may be exercised or the time at which such substantial risk of forfeiture or prohibition or restriction on transfer will lapse or the time when such Restriction Period will end or the time at which such Performance Shares or Performance Units will be deemed to have been fully earned or the time when such transfer restriction will terminate or may waive any other limitation or requirement under any such award, except in the case of an award to a Covered Employee that is designated by the Board as intended to satisfy the requirements for "qualified performance-based compensation" under Section 162(m) of the Code where such action would result in the loss of the otherwise available exemption of the award under Section 162(m) of the Code.

(d)  Subject to Section 20(b) hereof, the Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may amend the terms of any award theretofore granted under this Plan prospectively or retroactively, except in the case of an award to a Covered Employee that is designated by the Board as intended to satisfy the requirements for "qualified performance-based compensation" under Section 162(m) of the Code where such action would result in the loss of the otherwise available exemption of the award under Section 162(m) of the Code. In such case, no modification of the Management Objectives or the level or levels of achievement with respect to such award shall be made. Subject to Section 13 above, no such amendment shall impair the rights of any Participant without his or her consent. The Board may, in its discretion, terminate this Plan at any time. Termination of this Plan will not affect the rights of Participants or their successors under any awards outstanding hereunder and not exercised in full on the date of termination.

21. **Governing Law.** The Plan and all grants and awards and actions taken thereunder shall be governed by and construed in accordance with the internal substantive laws of the State of Ohio.

22. **Effect on Prior Plans.** No grants will be made on or after the Effective Date under any of the following plans: (i) STERIS Corporation 2002 Stock Option Plan; (ii) STERIS Corporation 1998 Long-Term Incentive Stock Plan; (iii) STERIS Corporation 1997 Stock Option Plan; (iv) STERIS Corporation 1994 Equity Compensation Plan; and (v) STERIS Corporation 1994 Nonemployee Directors Equity Compensation Plan. Notwithstanding the foregoing,

outstanding options and other awards granted under the plans described in the preceding sentence will continue unaffected following the Effective Date.

**23. Certain Additional Special Rules Concerning Vesting of Awards Granted on or after July 28, 2011.** Unless otherwise provided in the relevant Evidence of Award, each grant of Restricted Stock and Restricted Stock Units made on or after July 28, 2011 to any Participant who is not a Non-Employee Director shall be subject to the following provisions, subject to the provisions of Section 11 hereof:

(a) If at the Date of Grant the Participant is Qualifying Retirement Eligible, the award shall vest and become nonforfeitable in four (4) equal annual installments, on each of the first through fourth anniversaries of the Date of Grant.

(b) If at the Date of Grant the Participant is not Qualifying Retirement Eligible, the award shall vest and become nonforfeitable on the fourth anniversary of the Date of Grant; provided, however, that if before the award has otherwise become vested and nonforfeitable pursuant to the foregoing provision the Participant becomes Qualifying Retirement Eligible, then on the anniversary of the Date of Grant that coincides with or immediately succeeds the date the Participant becomes Qualifying Retirement Eligible and provided the Participant has remained in the service of the Company or a Subsidiary through such anniversary, the award will become vested and nonforfeitable to the same extent as it would have been on such date under paragraph (a) had the Participant been Qualifying Retirement Eligible at the Date of Grant, and if such anniversary is not the fourth anniversary of the Date of Grant, the award will thereafter continue to vest in the same manner and to the same extent as would have been the case under paragraph (a) had the Participant been Qualifying Retirement Eligible at the Date of Grant.

(c) Notwithstanding the foregoing, if any such anniversary on which an award or portion thereof would otherwise vest is not a trading day on the New York Stock Exchange, such vesting shall be deferred until the first trading day thereafter.

(d) Not in limitation of the other forfeiture provisions contained in the Plan or the relevant Evidence of Award, if the Participant terminates service with the Company and all Subsidiaries prior to the date on which the Participant's award has become fully vested and nonforfeitable, and subject to the provisions of Section 11 of the Plan, those portions of the award not vested at the time of such termination shall be forfeited.

(e) Also notwithstanding the foregoing, if on any anniversary of a Date of Grant any portion of an award that would otherwise vest on that anniversary represents a fractional share, that portion shall be aggregated with any portions of the award that represent fractional shares and would otherwise vest on succeeding anniversary dates and all portions so aggregated shall vest on the first of the aforesaid anniversary dates.

(f) Notwithstanding the foregoing or anything to the contrary contained herein or in the applicable Evidence of Award, the foregoing provisions of this Section 23 shall not apply to any Restricted Stock or Restricted Stock Units granted to any Participant if, at the time of the grant thereof, the application of such provisions would violate applicable law because of the age requirement included in the Qualifying Retirement Eligible definition.

(g) For the avoidance of doubt, the provisions of this Section 23 do not apply to any Option Rights, Appreciation Rights, Performance Shares, Performance Units or other awards granted pursuant to Section 10 hereof, do not apply to any other awards with a Date of Grant prior to July 28, 2011 and do not apply to awards to Non-Employee Directors.

**24. Certain Additional Provisions Concerning Change in Control and Option Rights, Appreciation Rights, Restricted Stock and Restricted Stock Units with Dates of Grant on or after March 13, 2014.** Unless otherwise provided in the applicable Evidence of Award, the following provisions shall apply to Option Rights, Appreciation Rights, Restricted Stock and Restricted Stock Units with Dates of Grant on or after March 13, 2014:

(a) Upon a Change in Control occurring prior to such time as a Participant's Option Right has become fully exercisable and while the Participant is an employee of the Company or a Subsidiary, to the extent the Option has not then or theretofore been forfeited, the Option Right shall become immediately exercisable in full, except to the extent that a Replacement Option Award is provided to the Participant for such Option Right effective concurrently with or prior to the Change in Control. For purposes of this Plan, a "Replacement Option Award" means an award (i) of stock options, (ii) that has a value at least equal to the value of the Option Right being replaced, (iii) that relates to publicly traded equity securities of the Employer, (iv) the tax

consequences of which are not less favorable to the Participant than the tax consequences of the Option Right being replaced, (v) that becomes exercisable in full upon a termination of the Participant's employment with the Employer (A) by the Participant for Good Reason, or (B) by the Employer other than for Cause or any other Detrimental Activity, with the termination occurring in either case within a period of two years after the Change in Control, and (vi) the other terms and conditions of which are not less favorable to the Participant than the terms and conditions of the Option Right being replaced (including the provisions that would apply in the event of a subsequent Change in Control). Without limiting the generality of the foregoing, the Replacement Option Award may take the form of a continuation of the Option Right being replaced if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 24(a) are satisfied will be made by the Board, as constituted immediately before the Change in Control, in its sole discretion.

(b) Upon a Change in Control occurring prior to such time as a Participant's Appreciation Right has become fully exercisable and while the Participant is an employee of the Company or a Subsidiary, to the extent the Appreciation Right has not then or theretofore been forfeited, the Appreciation Right shall become immediately exercisable in full, except to the extent that a Replacement Appreciation Right Award is provided to the Participant for such Appreciation Right effective concurrently with or prior to the Change in Control. For purposes of this Plan, a "Replacement Appreciation Right Award" means an award (i) of stock appreciation rights, (ii) that has a value at least equal to the value of the Appreciation Right being replaced, (iii) that relates to publicly traded equity securities of the Employer, (iv) the tax consequences of which are not less favorable to the Participant than the tax consequences of the Appreciation Right being replaced, (v) that becomes exercisable in full upon a termination of the Participant's employment with the Employer (A) by the Participant for Good Reason, or (B) by the Employer other than for Cause or any other Detrimental Activity, with the termination occurring in either case within a period of two years after the Change in Control, and (vi) the other terms and conditions of which are not less favorable to the Participant than the terms and conditions of the Appreciation Right being replaced (including the provisions that would apply in the event of a subsequent Change in Control). Without limiting the generality of the foregoing, the Replacement Appreciation Right Award may take the form of a continuation of the Appreciation Right being replaced if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 24(b) are satisfied will be made by the Board, as constituted immediately before the Change in Control, in its sole discretion.

(c) Upon a Change in Control occurring prior to such time as all substantial risks of forfeiture and restrictions on transfer applicable to a Participant's Restricted Stock have lapsed or terminated, and while the Participant is an employee of the Company or a Subsidiary, to the extent the Restricted Stock has not then or theretofore been forfeited, all of such substantial risks of forfeiture and restrictions on transfer applicable to the Restricted Stock shall lapse and terminate, except to the extent that a Replacement Restricted Stock Award is provided to the Participant for such Restricted Stock effective concurrently with or prior to the Change in Control. For purposes of this Plan, a "Replacement Restricted Stock Award" means an award (i) of restricted stock, (ii) that has a value at least equal to the value of the Restricted Stock being replaced, (iii) that relates to publicly traded equity securities of the Employer, (iv) the tax consequences of which are not less favorable to the Participant than the tax consequences of the Restricted Stock being replaced, (v) that provides that all substantial risks of forfeiture and restrictions on transfer applicable thereto shall lapse and terminate in full upon a termination of the Participant's employment with the Employer (A) by the Participant for Good Reason, or (B) by the Employer other than for Cause or any other Detrimental Activity, with the termination occurring in either case within a period of two years after the Change in Control, and (vi) the other terms and conditions of which are not less favorable to the Participant than the terms and conditions of the Restricted Stock being replaced (including the provisions that would apply in the event of a subsequent Change in Control). Without limiting the generality of the foregoing, the Replacement Restricted Stock Award may take the form of a continuation of the Restricted Stock being replaced if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 24(c) are satisfied will be made by the Board, as constituted immediately before the Change in Control, in its sole discretion.

(d) Upon a Change in Control occurring prior to such time as the Restriction Period applicable to any grant of a Restricted Stock Unit to a Participant has lapsed or terminated, and while the Participant is an employee of the Company or a Subsidiary, to the extent the Restriction Period has not then or theretofore lapsed or terminated, the Restriction Period shall lapse and terminate, except to the extent that a Replacement Restricted Stock Unit Award is provided to the Participant for such Restricted Stock Unit effective

concurrently with or prior to the Change in Control. For purposes of this Plan, a "Replacement Restricted Stock Unit Award" means an award (i) of restricted stock units, (ii) that has a value at least equal to the value of the Restricted Stock Unit being replaced, (iii) that relates to publicly traded equity securities of the Employer, (iv) the tax consequences of which are not less favorable to the Participant than the tax consequences of the Restricted Stock Unit being replaced, (v) that provides that the Restriction Period shall lapse and terminate in full upon a termination of the Participant's employment with the Employer (A) by the Participant for Good Reason, or (B) by the Employer other than for Cause or any other Detrimental Activity, with the termination occurring in either case within a period of two years after the Change in Control, and (vi) the other terms and conditions of which are not less favorable to the Participant than the terms and conditions of the Restricted Stock Unit being replaced (including the provisions that would apply in the event of a subsequent Change in Control). Without limiting the generality of the foregoing, the Replacement Restricted Stock Unit Award may take the form of a continuation of the Restricted Stock Unit being replaced if the requirements of the preceding sentence are satisfied. The determination of whether the conditions of this Section 24(d) are satisfied will be made by the Board, as constituted immediately before the Change in Control, in its sole discretion.

(e) For purposes of the Plan, except as may be otherwise prescribed by the Board or Chief Executive Officer or his delegatee or delegatees, as applicable, in an Evidence of Award made under the Plan, the term "Good Reason" means with respect to a Participant:

    (i) the Employer fails to make any payment when due of the Participant's Base Salary or any incentive compensation to which the Participant is entitled;

    (ii) any material decrease in the Participant's rate of Base Salary or a material reduction of the Participant's maximum incentive compensation opportunity;

    (iii) the Employer requires the Participant to work out of an office that is more than 50 miles away from the Participant's office location at the time of the Change in Control for more than 30 consecutive days; or

    (iv) the Disability or death of the Participant;

and in each case the Participant has provided the Employer with written notice within thirty (30) days after the initial event which the Participant believes constitutes "Good Reason," describing such event, and, in the case of events other than those described in clause (iv), the Employer has failed to remedy the situation within thirty (30) days after receipt of notice.

(f) For purposes of the Plan, the term "Base Salary" means, at any time, the then regular gross annual rate of salary payable to a Participant as annual salary, including amounts withheld or deferred for any reason, including any amounts not includible in income for U.S. federal income tax purposes as a result of elections by the Participant or the Employer that would have been includible in income absent such elections.

(g) For purposes of the Plan, the term "Employer" means the Company or its successor in the Change in Control (or another entity that is affiliated with the Company or its successor following the Change in Control). In addition, following a Change in Control, to the extent that a provision of the Plan references the Company, such reference shall be deemed to be a reference to the Employer where appropriate in the context.

(h) For purposes of the Plan, except as may be otherwise prescribed by the Board or Chief Executive Officer or his delegate or delegates, as applicable, in an Evidence of Award made under the Plan, the term "Disability" shall have the meaning used for purposes of the Employer's long-term disability plan as in effect at the time the Disability is claimed to have occurred.

## 25. Miscellaneous Provisions.

(a) The Company will not be required to issue any fractional Shares pursuant to this Plan. The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may provide for the elimination of fractions or for the settlement of fractions in cash.

(b) This Plan will not confer upon any Participant any right with respect to continuance of employment or other service with the Company or any Subsidiary, nor will it interfere in any way with any right the Company or any Subsidiary would otherwise have to terminate such Participant's employment or other service at any time.

(c)     To the extent that any provision of this Plan would prevent any Option Right that was intended to qualify as an Incentive Stock Option from qualifying as such, that provision will be null and void with respect to such Option Right. Such provision, however, will remain in effect for other Option Rights and there will be no further effect on any provision of this Plan.

(d)     No award under this Plan may be exercised by the holder thereof if such exercise, and the receipt of cash or stock thereunder, would be, in the opinion of counsel selected by the Board, contrary to law or the regulations of any duly constituted authority having jurisdiction over this Plan.

(e)     Absence on leave approved by a duly constituted officer of the Company shall not be considered interruption or termination of service of any employee for any purposes of this Plan or awards granted hereunder, except that no awards may be granted to an employee while he or she is absent on leave.

(f)     No Participant shall have any rights as a stockholder with respect to any shares subject to awards granted to him or her under this Plan prior to the date as of which he or she is actually recorded as the holder of such shares upon the stock records of the Company.

(g)     The Board or the Chief Executive Officer or his delegatee or delegatees, as applicable, may condition the grant of any award or combination of awards authorized under this Plan on the surrender or deferral by the Participant of his or her right to receive a cash bonus or other compensation otherwise payable by the Company or a Subsidiary to the Participant.

(h)     If any provision of this Plan is or becomes invalid or unenforceable in any jurisdiction, or would disqualify this Plan or any award under any law deemed applicable by the Board, such provision shall be construed or deemed amended or limited in scope to conform to applicable laws or, in the discretion of the Board, it shall be stricken and the remainder of this Plan shall remain in full force and effect.

<u>Schedule 3</u>

See attached.

**AGREEMENT FOR EMPLOYEES**

**STERIS plc**
**RESTRICTED STOCK AGREEMENT – January 2, 2018**

This Agreement ("Agreement") is between STERIS plc ("STERIS") and< first_name> <middle_name> < last_name> ("Grantee"), with respect to the grant of shares of STERIS restricted stock to Grantee pursuant to the STERIS plc 2006 Long-Term Equity Incentive Plan, as Amended and Restated Effective August 2, 2016, and as further amended from time to time (the "Plan"). All terms used herein with initial capital letters and not otherwise defined herein that are defined in the Plan shall have the meanings assigned to them in the Plan.

1. *Grant of Restricted Shares*. STERIS hereby grants to Grantee, as of the date ("Date of Grant") set forth above and in the Acknowledgment and Acceptance Form accompanying this Agreement ("Acknowledgment"),  (the "Ordinary Shares") of STERIS restricted stock, par value ten pence per share, as previously disclosed to Grantee and as reflected in the records of STERIS as granted as of the Date of Grant ("Restricted Shares"), upon and subject to the terms of this Agreement and the Plan. The Restricted Shares covered by this Agreement shall be issued to the Grantee effective upon the Date of Grant. The Ordinary Shares subject to this grant of Restricted Shares shall be registered in the Grantee's name in STERIS's stock registry as fully paid and nonassessable. Any certificate or other evidence of ownership or the book entry representing the Restricted Shares shall bear an appropriate legend referring to the restrictions hereinafter set forth.

2. *Documents Delivered with Agreement*. STERIS has delivered or made available to the Grantee, along with this Agreement, the following documents: (a) STERIS's Insider Trading Policy (the "Policy"); (b) the Plan and its related Prospectus; (c) the Nondisclosure and Noncompetition Agreement to be entered into between STERIS and Grantee (the "Nondisclosure Agreement"); (d) the Acknowledgment; (e) STERIS or STERIS Corporation's most recent Annual Report to Shareholders and Form 10-K filed with the US Securities and Exchange Commission; (f) STERIS's most recent Annual Report and Accounts; and (g) the Employment Agreement to be entered into between STERIS and the Grantee (the "Employment Agreement"). Acceptance and compliance with these documents is a condition to the effectiveness of this grant of Restricted Shares. By accepting this Agreement or executing the Acknowledgment, the Grantee acknowledges receipt, review and acceptance of these documents and compliance with their terms. Furthermore, as a condition of this grant of Restricted Shares, STERIS in its discretion, may require Grantee to return an executed copy of the Acknowledgement in such format as STERIS may require.

3. *Restrictions on Transfer of Shares*. The Ordinary Shares subject to this grant of Restricted Shares may not be sold, exchanged, assigned, transferred, pledged, encumbered or otherwise disposed of by the Grantee, except to STERIS, unless, and only to the extent, the Restricted Shares have vested and become nonforfeitable as provided in Section 4 hereof or as otherwise provided in the Plan; provided, however, that the Grantee's rights with respect to such Ordinary Shares may be transferred by will or pursuant to the laws of descent and distribution. Any purported transfer or encumbrance in violation of the provisions of this Section 3 shall be void, and the other party to any such purported transaction shall not obtain any rights to or interest in such Ordinary Shares. STERIS in its sole discretion, when and as permitted by the Plan, may waive the restrictions on transferability with respect to all or a portion of the Ordinary Shares subject to this grant of Restricted Shares.

4. *Vesting of Restricted Shares*. Subject to the terms of this Agreement and the Plan, other than Section 23 of the Plan, the provisions of which Section shall not apply to this grant of Restricted Shares, this grant of Restricted Shares is subject to the following limitations:

(a) The Restricted Shares shall vest and become nonforfeitable on January 3, 2022, subject to the succeeding provisions of this Section 4.

(b) Notwithstanding the other provisions of this Section 4, if the date on which the Restricted Shares would otherwise vest is not a trading day on the New York Stock Exchange, such vesting shall be deferred until the first trading day thereafter.

1

(c) Notwithstanding anything herein to the contrary, the provisions of Section 11 of the Plan, other than Section 11(d)(iii), shall not apply to the Restricted Shares, and if the Grantee terminates service with STERIS and all Subsidiaries prior to the date on which the Grantee's Restricted Shares have become fully vested and nonforfeitable, subject to the provisions of Section 11(d)(iii) of the Plan, such Restricted Shares shall be forfeited; provided, however, if the Grantee's service with STERIS and all of its Subsidiaries is terminated by STERIS or a Subsidiary for any reason other than Cause prior to such time as the Grantee's Restricted Shares otherwise have become fully vested and nonforfeitable, his Restricted Shares shall become vested and nonforfeitable on his termination date.

(d) For purposes of this Agreement, the term "Cause" means the termination by STERIS or a Subsidiary of the Grantee's employment with STERIS and all Subsidiaries as a result of (i) the Grantee being charged with the commission of a felony or a fraud, (ii) conduct by the Grantee that brings STERIS or any of its Subsidiaries into substantial public disgrace or disrepute, (iii) gross negligence or gross misconduct by the Grantee with respect to STERIS or any of its Subsidiaries, (iv) the Grantee's abandonment of Grantee's employment with STERIS or any of its Subsidiaries, (v) the Grantee's insubordination or failure to follow in any material respect the directions of his then-current supervisor with STERIS or a Subsidiary, (vi) the Grantee's breach of any written policy of STERIS or its Subsidiaries, (vii) any material breach by the Grantee of this Agreement, the Employment Agreement or any other agreement with STERIS or any of its Subsidiaries; or (viii) any other material breach by the Grantee of the obligations of his employment.

5. *Forfeiture of Shares*. Subject to the terms of this Agreement and the Plan, if the Grantee violates the Policy, this Agreement, or the Nondisclosure Agreement, or if either the Grantee terminates service with STERIS and all of its Subsidiaries for any reason or the Grantee's service with STERIS and all of its Subsidiaries is terminated by STERIS or a Subsidiary for Cause, in either case prior to the time all of the Restricted Shares have become vested and nonforfeitable, the Restricted Shares shall be forfeited, subject to the provisions of Section 11(d)(iii) of the Plan. In the event of a forfeiture under this Section 5, any forfeited Restricted Shares shall be returned by the Grantee to STERIS for no consideration.

6. *Dividend, Voting and Other Rights*. Except as otherwise provided herein, from and after the Date of Grant, the Grantee shall have all of the rights of a shareholder with respect to the Restricted Shares covered by this Agreement, including the right to vote such Restricted Shares and receive any dividends that may be paid thereon; provided, however, that any additional Ordinary Shares or other securities that the Grantee may become entitled to receive pursuant to a stock dividend, issuance of rights or warrants, stock split, combination of shares, recapitalization, merger, consolidation, separation, or reorganization or any other change in the capital structure of STERIS shall be subject to the same or similar restrictions as the Restricted Shares covered by this Agreement as determined by STERIS.

7. *Stock Certificate(s)*. The Ordinary Shares subject to this grant of Restricted Shares shall not be represented by certificates unless otherwise provided by resolution of the Board or required by law, and if such Ordinary Shares should be represented by certificates, the certificates will be held in custody by STERIS until those shares shall vest in accordance with the provisions hereof or as otherwise provided in the Plan. STERIS shall cause the Restricted Shares to be registered in the name of Grantee in STERIS's stock registry, with the foregoing restrictions noted thereon. STERIS may require as a condition to the effectiveness of this grant of Restricted Shares that Grantee deliver to STERIS a stock power endorsed in blank by the Grantee with respect to the Restricted Shares and Grantee agrees to deliver the same.

8. *Compliance with Law*. Notwithstanding any other provision of this Agreement, STERIS shall not be obligated to issue any Ordinary Shares pursuant to this Agreement if the issuance thereof would result in a violation of any applicable law.

9. *Employment*. For purposes of this Agreement, the continuous employment of the Grantee with STERIS or a Subsidiary shall not be deemed to have been interrupted, and the Grantee shall not be deemed to cease being an employee of STERIS or Subsidiary, by reason of (i) the transfer of his or her employment among STERIS and its Subsidiaries or (ii) a leave of absence not to exceed 12 months approved in writing by a duly elected officer of STERIS.

10. *Certain Determinations.* The application, violation, or other interpretation of the terms of this Agreement, the Plan, the Nondisclosure Agreement, the Policy, or any other STERIS policy shall be determined by the Board or the Chief Executive Officer or his delegatee or delegatees, if applicable, in their sole discretion, and such determination shall be final and binding on the Grantee.

11. *Termination of the Plan; No Right to Future Grants; No Right of Employment; Extraordinary Item of Compensation.* By entering into this Agreement, the Grantee acknowledges: (a) that the Plan is discretionary in nature and may be suspended or terminated by STERIS at any time; (b) that the grant of Restricted Shares is a one-time benefit which does not create any contractual or other right to receive future grants of restricted shares, or benefits in lieu of restricted shares; (c) that all determinations with respect to any such future grants, including, but not limited to, the times when the restricted shares shall be granted, the number of shares subject to each grant of restricted shares, and the time or times when the restricted shares shall become nonforfeitable, will be at the sole discretion of STERIS; (d) that the Grantee's participation in the Plan shall not create a right to further employment with the Grantee's employer and shall not interfere with the ability of the Grantee's employer to terminate the Grantee's employment relationship at any time with or without cause; (e) that the Grantee's participation in the Plan is voluntary; (f) that the value of the Restricted Shares is an extraordinary item of compensation which is outside the scope of the Grantee's employment contract, if any; (g) that the Restricted Shares are not part of normal and expected compensation for purposes of any other employee benefit plan or program of STERIS, including for purposes of calculating any severance, resignation, redundancy, end of service, bonus, long-service, pension or retirement benefits or similar payments; (h) that the right to vesting of the Restricted Shares ceases upon termination of employment for any reason except as may otherwise be explicitly provided in the Plan or this Agreement; (i) that the future value, if any, of the Restricted Shares is unknown and cannot be predicted with certainty; and (j) that, where the Grantee's employer is a Subsidiary of STERIS, the Restricted Shares have been granted to the Grantee in the Grantee's status as an employee of such Subsidiary and the terms of this Agreement can be modified by STERIS to facilitate the issuance and administration of the award and can in no event be understood or interpreted to mean that STERIS is the Grantee's employer or that the Grantee has an employment relationship with STERIS.

12. *Employee Data Privacy.* By entering into the Agreement, and as a condition of this award of Restricted Shares, the Grantee consents to the collection, use and transfer of personal data as described in this Section 12. The Grantee understands that STERIS and its Subsidiaries hold certain personal information about the Grantee, including, but not limited to, the Grantee's name, home address and telephone number, date of birth, social insurance number, salary, nationality, job title, any shares of stock or directorships held in STERIS, details of all Restricted Shares or other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Grantee's favor, for the purpose of managing and administering the Plan ("Data"). The Grantee further understands that STERIS and/or its Subsidiaries will transfer Data among themselves as necessary for the purposes of implementation, administration and management of the Grantee's participation in the Plan, and that STERIS and/or its Subsidiaries may each further transfer Data to any third parties assisting STERIS in the implementation, administration and management of the Plan ("Data Recipients"). The Grantee understands that these Data Recipients may be located in the Grantee's country of residence, the European Economic Area, and in countries outside the European Economic Area, including the United States. The Grantee authorizes the Data Recipients to receive, possess, use, retain and transfer Data in electronic or other form, for the purposes of implementing, administering and managing the Plan, including any transfer of such Data, as may be necessary or appropriate for the administration of the Plan and/or the subsequent holding of shares of stock on the Grantee's behalf, to a broker or third party with whom the shares acquired on exercise may be deposited. The Grantee understands that he or she may, at any time, review the Data, require any necessary amendments to it or withdraw the consent herein by notifying STERIS in writing. The Grantee further understands that withdrawing consent may affect the Grantee's ability to participate in the Plan, at the sole discretion of the Board or the Chief Executive Officer or its delegatee or delegatees.

13. *Relation to Plan*. This Agreement is subject to the terms and conditions of the Plan. In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern.

14. *Amendments.* Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; provided, however, that no amendment shall have a material adverse effect on the rights of the Grantee under this Agreement without the Grantee's consent.

15. *Severability.* If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to any other person or circumstances shall not be affected, and the provisions so held to be invalid or unenforceable shall be reformed to the extent (and only to the extent) necessary to make it enforceable and valid while accomplishing the most similar purpose.

16. *Governing Law.* This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of Ohio, without giving effect to any principle of law that would result in the application of the law of any other jurisdiction. Any unresolved dispute shall be submitted exclusively to the jurisdiction of the courts of Lake County, Ohio.

17. *Payment of Par Value.* By entering into this Agreement, the Grantee undertakes and agrees to pay the par value of £0.10 for each Restricted Share granted pursuant to this Agreement (the "Par Value Consideration") on or before the date ("Payment Date") that is six weeks after the Date of Grant as such date may be extended by STERIS in its sole discretion. Such payment of the Par Value Consideration shall be made, at the option of the Grantee's employer, on or before the Payment Date through withholding of the Par Value Consideration by the Grantee's employer from the Grantee's compensation as soon as reasonably practicable after the Grant Date or by other means of payment by the Grantee as determined by STERIS or such employer. If such payment is not received by the Payment Date, the Restricted Shares shall be forfeited for non-payment pursuant to the Articles of Association of STERIS.

18. *Taxes.* Unless Grantee has made an election under Section 83(b) of the Code with respect to the Restricted Shares, each time any of the Restricted Shares become vested and nonforfeitable STERIS shall withhold or cause to be withheld from such Restricted Shares at the time such vesting occurs a number of Ordinary Shares having a value equal to the amount of federal, state, local, foreign or other taxes required to be withheld pursuant to applicable employment or tax laws, as determined by STERIS. Likewise, with respect to previous Plan grants of restricted shares and in respect of which the Grantee has not made an election under Section 83(b) of the Code, STERIS shall withhold or cause to be withheld from such restricted shares at the time such vesting occurs a number of Common Shares having a value equal to the amount of federal, state, local, foreign or other taxes required to be withheld pursuant to applicable employment or tax laws, as determined by STERIS. For purposes of the foregoing withholding, the Ordinary Shares used for tax withholding will be valued at an amount equal to the Market Value per Share of such Ordinary Shares on the date the benefit is to be included in the Grantee's income. The foregoing provisions shall apply notwithstanding any alternate methods for the payment of withholding of taxes contained in the Plan.

19. *Miscellaneous.* Nothing contained in this Agreement shall be understood as conferring on Grantee any right to continue as an employee of STERIS or any Subsidiary or affiliate. STERIS reserves the right to correct any clerical, typographical, or other error in this Agreement or otherwise with respect to this grant. This Agreement shall inure to the benefit of and be binding upon its parties and their respective heirs, executors, administrators, successors, and assigns, but the Restricted Shares shall not be transferable by Grantee other than as provided in Section 17 of the Plan.

20. *Authority.* Any director or authorised signatory of STERIS is authorised to execute any document and do any act necessary or desirable to effect the forfeiture of any Restricted Shares which are subject to forfeiture and their return to STERIS for no consideration in accordance with the Plan and/or this Agreement.

STERIS has caused this Agreement to be executed on its behalf by its duly authorized officer, and Grantee has entered into this Agreement and accepted all terms and conditions thereof by electronic acceptance and/or by the signed Acknowledgment, either of which has the same force and binding effect as if this Agreement were physically signed by Grantee, all as of the Date of Grant.

**STERIS plc**                                        **Grantee**

By: 

**Signature by electronic acceptance and/or execution of the
Acknowledgment and Acceptance form.**

Secretary

5

<u>Schedule 4</u>

See attached.

**STERIS plc**
**NONDISCLOSURE AND NONCOMPETITION AGREEMENT- JANUARY 2, 2018**

This Agreement is made as of as of the date ("Award Date") set forth above and in the Acknowledgment and Acceptance Form ("Acknowledgment") accompanying this Agreement, by and between STERIS plc ("STERIS") and the Employee receiving the related incentive awards ("Incentive Awards"). As Employee has obtained and may hereafter obtain valuable knowledge and information pertaining to the Company's Business (as defined below), STERIS requires protection of its and its Affiliates' trade secrets and confidential information during and after Employee's employment with STERIS or an Affiliate (as defined below). Employee acknowledges those requirements upon the terms of this Agreement, as follows:

1.      *Consideration.*  Employee is entering into this Agreement in consideration of the grant to Employee of certain Incentive Awards, dated as of the Award Date, and in further consideration of the compensation from time to time hereafter paid by STERIS and/or an Affiliate to Employee for services rendered as an employee.

2.      *Agreement for the Benefit of STERIS and its Affiliates.*  This Agreement is entered into by Employee and STERIS.  However, all obligations owed by Employee to STERIS shall also be owed by Employee to each Affiliate and their respective successors and assigns.  This Agreement shall be valid and effective whether Employee is employed directly by STERIS, or one of its Affiliates, or by one or more of the successors or assigns of STERIS or its Affiliates, or by any combination of these entities.  For purposes of this Agreement, the term "Affiliate" means any corporation, business, or entity owned by, controlled by, controlling, or under common control with, STERIS.

3.      *Nondisclosure.*  Employee shall at all times hold in strictest confidence and not disclose or furnish to any person, firm, corporation, partnership, proprietorship, or other entity, or use for Employee's own benefit or on Employee's own behalf, confidential data, marketing strategies (including customer lists), invention records, trade secrets, and other confidential information of STERIS or its Affiliates, including, without limitation, information regarding customers, finances, or personnel, or concerning the products, systems, and services researched, developed, manufactured, assembled, sold, distributed, or performed by STERIS or otherwise concerning the business or affairs of STERIS and its Affiliates.  This Section 3 shall not:  (a) apply to any data, trade secret, or information that is or becomes generally available to or known by the public pursuant to the express consent of STERIS, (b) restrict Employee during the period of Employee's employment with STERIS from disclosing any data, trade secret, or information in furtherance and for the sole benefit of the business and affairs of STERIS, or (c) restrict Employee from disclosing any data, trade secret, or information that Employee is required to disclose under applicable law or regulation or by an order of a governmental agency or court, provided that, before making any disclosure referred to in this clause (c), Employee has first consulted with STERIS's General Counsel and given STERIS an opportunity to interpose an objection to the purported requirement that Employee is required to disclose the data, trade secret, or other information in question.

4.      *Noncompetition.*  (a)   Employee shall not, during the period of Employee's employment with STERIS or an Affiliate:

      (i)       enter into or engage in any business which competes with the Company's Business (as defined below);

      (ii)      solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

      (iii)     divert, entice or otherwise take away any customers, business, patronage or orders of STERIS or its Affiliates or attempt to do so; or

      (iv)     promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(b)     Employee shall not, for a period of two years following the termination of Employee's employment with STERIS or an Affiliate:

(i)     enter into or engage in any business which competes with the Company's Business within the Restricted Territory (as defined in below);

(ii)    solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

(iii)   divert, entice or otherwise take away any customers, business, patronage or orders of STERIS or its Affiliates within the Restricted Territory, or attempt to do so; or

(iv)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(c)     *Indirect Competition*.  For the purposes of Sections 4(a) and 4(b), inclusive, but without limitation thereof, Employee will be in violation thereof if Employee engages in any or all of the activities set forth therein directly as an individual on Employee's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm, association, partnership, corporation or other entity, or as a stockholder of any corporation in which Employee or Employee's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than five percent (5%) of the outstanding stock.

(d)     *Extension*.  If it shall be judicially determined that Employee has violated any of Employee's obligations under Section 4(b), then the period applicable to each obligation that Employee shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(e)     *STERIS*.  For the purposes of Sections 3, 4, 5 6, and 7 of this Agreement, STERIS shall also include any and all direct and indirect subsidiary, parent, affiliated, or related companies of STERIS for which Employee worked or had responsibility at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

(f)     *Definitions*.  For the purposes of this Agreement, the following terms have the following meanings:

(i)     "*Company's Business*" means the business of STERIS and its Affiliates of designing, manufacturing, distributing, selling, installing and maintaining or providing infection prevention and other procedural products and services, or those readily substitutable therefor, that are focused primarily on or related to healthcare, pharmaceutical and medical research markets.

(ii)    "*Restricted Territory*" shall be defined as and limited to (A) the geographic area(s) within a seventy-five (75) mile radius of any and all location(s) of STERIS and its Affiliates in, to, or for which Employee worked, to which Employee was assigned or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination; and (B) all of the specific customer accounts, wherever located, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

5       *Noninterference*.  Employee shall not at any time, without the prior written consent of STERIS, directly or indirectly, induce or attempt to induce any employee, agent, or other representative or associate of STERIS to terminate his, her, or its relationship with STERIS or interfere with the relationship between STERIS and any of its employees, agents, representatives, suppliers, customers, or distributors.

2

6.      *Acknowledgment*.  Employee acknowledges that compliance with the agreements in Sections 3, 4, and 5 is necessary to protect STERIS, that the restrictions imposed by these sections are reasonable, that the restrictions will not cause Employee undue hardship, that there is adequate consideration for these restrictions, and that breach of any of these restrictions will result in irreparable and continuing damage to STERIS for which there will be no adequate remedy at law.  Employee further agrees that in the event of a breach or threatened breach of any of these restrictions, STERIS and its successors and assigns shall be entitled to injunctive relief, attorney fees, and such other relief as is proper in the circumstances.

7.      *Other Remedies Upon any Violation.*  Employee acknowledges that Employee's breach of any of the agreements set forth in Sections 3, 4, and 5 above would constitute "Detrimental Activity" under STERIS's 2006 Long-Term Equity Incentive Plan, assumed as amended and restated (the "Plan"), and that in the event of any such breach, STERIS would have those remedies set forth in the Plan, in addition to all other legal and equitable remedies.  Without limiting the foregoing, if Employee breaches the provisions of Section 5 above by inducing or attempting to induce, directly or indirectly, any employee, agent, or other representative or associate of STERIS or any Affiliate to terminate his or her relationship with STERIS or an Affiliate, Employee agrees it would be difficult to determine STERIS's actual harm and, in addition to any other remedies that may be available to STERIS and/or its Affiliates, further agrees to pay STERIS as liquidating damages, and not as a penalty, an amount equal to 50% of the total annual compensation paid to such employee, agent or other representative or associate by STERIS and/or its Affiliates during the preceding twelve (12) months.  For these purposes, "compensation" includes salary and bonuses and other incentive compensation.

8.      *Notices*.  Written notices by either party to the other under this Agreement shall be effective upon receipt and shall be deemed to have been duly received (a) when delivered in person (to Employee in the case of notices to Employee and to the Secretary of STERIS in the case of notices to STERIS), (b) when delivered by fax or email when a return fax or email is received by the sender, confirming receipt by the intended recipient, or (c) on the date actually received when sent by overnight courier or by United States certified mail, return receipt requested, postage prepaid, and addressed, in the case of notices to STERIS plc, c/o STERIS, 5960 Heisley Road, Mentor, Ohio 44060, USA, Attention:  Secretary and, in the case of notices to Employee, properly addressed to Employee at Employee's most recent home address as shown on the STERIS records relating to the Employee, or such other address as either party may have furnished to the other in writing.  Notices of change of address shall be effective only upon delivery and receipt in accordance with this Section 8.

9.      *Severability*.  The parties agree that the terms of this Agreement are reasonable and express their intent.  However, if any provision or term of this Agreement is determined by any appropriate judicial, quasijudicial, or administrative body to be void or not enforceable to any extent for any reason, the parties agree that such provision shall be reformed and construed to be as consistent as possible with the original provision, while enforceable to the maximum extent allowable by law.  In such case, all other provisions or terms of the Agreement shall remain in full force and effect.  The existence of any claim or causes of action on the part of Employee against STERIS or its Affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by STERIS of the promises contained in this Agreement.

10.     *Governing Law*.  This Agreement has been executed in and shall be construed in accordance with and governed by the laws of the State of Ohio.  Any unresolved dispute relating to this Agreement shall be submitted exclusively to the jurisdiction of the courts of Lake County, Ohio.

STERIS has caused this Agreement to be executed on its behalf by its duly authorized officer, and Employee has entered into this Agreement and accepted all terms and conditions thereof by electronic acceptance and/or by the signed Acknowledgment, either of which has the same force and binding effect as if this Agreement were physically signed by Employee, all as of the Award Date.


**STERIS plc**                                      **Employee**

                                                    **Signature by electronic acceptance and/or execution
                                                    of the Acknowledgment and Acceptance form.**



By:  J. Adam Zangerle
        Vice President, General Counsel and

Corporate Secretary

<u>Schedule 5</u>

See attached.

**STERIS CORPORATION**
**ACKNOWLEDGMENT AND ACCEPTANCE FORM –**_____**GRANT**

*As to STERIS Corporation's Policy Prohibiting the Improper Use of Material Non-Public Information:*

I hereby acknowledge that I have received and read, and fully understand, STERIS Corporation's Policy Prohibiting the Improper Use of Material Non-Public Information ("Policy"). I further acknowledge and agree that I am in compliance with all provisions of this Policy and agree to remain in compliance with such Policy at all times.

I understand that if I fail to comply with this Policy and the "Agreements" (as defined below), I will be subject to appropriate action including, without limitation, dismissal or termination of any relationship with the Company and forfeiture of all incentive awards, and return of any gain or amount received from such awards.

*As to the STERIS Corporation 2006 Long-Term Equity Incentive Plan:*

I hereby acknowledge that I have received a copy of the 2006 Long-Term Equity Incentive Plan (the "Plan") and its related Prospectus. I further acknowledge and agree that I have read and understand all provisions of the Plan. I agree that all Incentive Awards (as defined below) are subject to the terms and conditions of the Plan.

*As to the STERIS Corporation Annual Report on Form 10-K:*

I hereby acknowledge that I have been provided access to and reviewed the most recent STERIS Corporation Annual Report to Shareholders and Form 10-K.

*As to certain STERIS Corporation Incentive Awards Received:*

I hereby acknowledge that I have been advised of and reviewed certain Incentive Awards that I have been granted by STERIS as of the date above, as reflected in the records of the Company ("Incentive Awards").

I further acknowledge that I received, read, and unconditionally agree to all of the terms, limitations and conditions of the Company's applicable agreement with respect to each Incentive Award as reflected in the records of the Company, and I accept the applicable Award upon and subject to all terms, limitations and conditions of the applicable Agreement and the Plan (such agreement may include a Nonqualified Stock Option Agreement, an Appreciation Rights Agreement, a Restricted Stock Agreement and/or Restricted Stock Unit Agreement, as applicable).

*As to the STERIS Corporation Nondisclosure and Noncompetition Agreement:*

I hereby acknowledge that I have received, read, and unconditionally agree to all of the terms, limitations and conditions of the STERIS Corporation Nondisclosure and Noncompetition Agreement as reflected in the records of the Company.

**With respect to each Incentive Award, I further acknowledge and agree that, by my signature below or by my electronic acceptance, all notices have been received, all requirements have been met, all documents have been reviewed, and all agreements referenced herein ("Agreements") are accepted as if formally signed by me and are fully binding upon me. Neither I nor anyone claiming through me will assert any claim or defense that I was not aware of or did not agree to any such requirements, Agreements or obligations or any similar assertion, and in the event such assertion is made, STERIS shall have the right to revoke, terminate, or recover the applicable Incentive Award or Awards in addition to all other rights and remedies. I have been provided the opportunity to print or store the electronic versions of all documents.**

Signature: _____
Print Name: _____
Date: _____

**Please sign and return to the Human Resources Department by** _____ **via one of the following methods:**

Via mail to: _____
STERIS Corporation
5960 Heisley Road
Mentor, Ohio 44060

Via Fax: _____

Via email: _____